MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbrb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbrb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbrb.com
**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

*Proposed Reorganization Counsel for Chapter 11 Debtor and Debtor-in-Possession*

Bruce T. Beesley (NV Bar No. 1164) bbeesley@lrlaw.com
LEWIS AND ROCA LLP
Bank of America Plaza
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone: (775) 823-2900

*Proposed Co-Counsel for Chapter 11 Debtor and Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ASTRATA GROUP INCORPORATED,<br><br>Debtor and Debtor-in-Possession. | Case No. 09-52652-GWZ<br>Chapter 11 |
| ASTRATA GROUP INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>VISION OPPORTUNITY CHINA, LP;<br>VISION OPPORTUNITY MASTER FUND,<br>LTD; VISION CAPITAL ADVANTAGE<br>FUND, LP; AND VISION CAPITAL<br>ADVISORS, LLC<br><br>Defendants. | Adversary No. 09-adv-_____-GWZ<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF:<br>(1) ENJOINING DEFENDANTS FROM CONVERTING PREFERRED STOCK FOR THE PURPOSE OF REPLACING PLAINTIFF'S BOARD OF DIRECTORS; AND<br>(2) HOLDING THAT ANY ATTEMPT TO REMOVE PLAINTIFF'S EXISTING BOARD OF DIRECTORS IS A WILLFUL VIOLATION OF THE AUTOMATIC STAY |

1

In support of its Complaint, Astrata Group Incorporated, debtor and debtor in possession, and plaintiff herein ("Plaintiff"), hereby alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 151, 157 and 1334.

2. This adversary proceeding is brought pursuant to Rule 7001, et seq. of the Federal Rules of Bankruptcy Procedure.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a).

4. This is a "core" proceeding as defined by 28 U.S.C. Sections 157(b)(2)(A), and (O) with respect to the First Cause of Action (for injunctive relief), and the Second Cause of Action (for violation of the automatic stay, under 11 U.S.C. § 362). In addition, resolution of the other claims asserted herein will have an effect upon the value of Plaintiff's bankruptcy estate and its overall administration, and distributions to its creditors.

## PARTIES

5. Plaintiff is the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case initiated on August 6, 2009 (the "Petition Date") by filing a voluntary petition under of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"). Plaintiff is, and at all times herein mentioned was, a Nevada corporation organized and existing under the laws of the State of Nevada with its principle United States office located at Los Angeles, California.

6. Plaintiff is informed and believes that Vision Opportunity China, LP is, and at all times herein mentioned was, a corporation organized and existing under the laws of the Guernsey.

7. Plaintiff is informed and believes that Vision Opportunity Master Fund, Ltd. is, and at all times herein mentioned was, a Cayman Islands exempted company.

8. Plaintiff is informed and believes that Vision Capital Advantage Fund, LP is, and at all times herein mentioned was, a Delaware limited partnership.

9. Plaintiff is informed and believes that Vision Capital Advisors, LLC, is, and at all times herein mentioned was, a Delaware limited liability company organized and existing under the laws of the State of Delaware with its principle office located at New York, New York.

10. Plaintiff is informed and believes that Vision Capital Advisors, LLC is the investment manager of Vision Opportunity China, LP, Vision Opportunity Master Fund, Ltd., and Vision Capital Advantage Fund, LP.

11. Vision Opportunity China, LP, Vision Opportunity Master Fund, Ltd., Vision Capital Advantage Fund, LP, and Vision Capital Advisors, LLC, shall be collectively referred to herein as Vision, which through common ownership, and acting in concert, have together committed the acts alleged herein.

## GENERAL ALLEGATIONS

### A. Plaintiff's Background and Operating History.

12. Plaintiff is the holding company of the stock of various subsidiaries, including Astrata (Asia Pacific) Pte Ltd ("Asia Pacific"), the primary operating entity.[1] Asia Pacific is in the business of providing location-based information (GPS) technology products and services. Its products and services combine global positioning, wireless communications, and geographical information technology, which enable businesses and institutions to monitor, trace, or control the movement and status of machinery, vehicles, personnel and other assets. Incorporated in Nevada and quoted on the Pink Sheets, Plaintiff operates in the United States, Europe and Asia. Plaintiff was founded in 1986 and its U.S. headquarters are in Los Angeles, California. Asia Pacific's operations are primarily based in Singapore.

---

1. In addition to Asia Pacific, direct or indirect subsidiaries of Plaintiff include Astrata Europe, Ltd., Passtime Telematics, Inc., Astrata (Singapore) Pte Ltd., Astrata (Malaysia) Sdn Bhd, Astrata (B) Sdn Bhd, Astrata (New Zealand) Ltd. and Astrata Middle East LLC.

**B.     Plaintiff's Management and Board of Directors.**

13.    Plaintiff's officers include Anthony J. Harrison, the chief executive officer and Martin Euler, the acting chief financial officer and secretary, A. John A. Bryan, Jr., chief restructuring officer, and Richard Nelson, assistant secretary. The Board of Directors of Plaintiff consists of Paul Barril, Anthony Harrison, Martin Euler, Anthony J.A. Bryan, and John Clough (collectively, the "Board of Directors" or "Board Members").

14.    It is essential to Plaintiff's survival that the current management of Plaintiff remains in place.

**C.     Current Management's Efforts to Address Plaintiff's Financial Condition.**

15.    Plaintiff's (and Asia Pacific's) business has survived in large part due to Management and Board Members investing funds and deferring salaries, and suppliers, customers and other interested parties providing credit, loans and financing.

16.    Nevertheless, Plaintiff and its subsidiaries have experienced undercapitalization concerns since their inception.

17.    During the past twelve months, the Management and Board of Directors of Plaintiff, together with their financial advisors, have searched for financing and were unable to find suitable sources due to, among other reasons, existing credit and equity market conditions.

18.    In 2009, when a former officer of Plaintiff advised Plaintiff that his undertaking to provide $3 million of financing was, for reasons beyond his control, going to be delayed for several months, it became clear that Plaintiff was suffering from a critical lack of cash with short-term liabilities of approximately $9.8 million and no liquid assets.

19.    In addition, Plaintiff's management calculated that the subsidiaries, particularly Asia Pacific, required approximately $8.5 million of permanent capital to fund the business.

20. By May 2009, the cash requirements for Plaintiff and its subsidiaries worsened as the impact of the global financial crisis gripped the credit and equity markets, the lack of orders for existing GPS products that could be shipped quickly, payments from customers became more difficult to collect and payment terms became more onerous, large orders were received for new GPS systems that were not completed, and delivery required additional research and development funding, in addition to the transition to Singapore as Plaintiff's global headquarters, fixed overhead costs, and the high cost of reporting as a U.S. publicly traded company.

21. In or around February 2009, current Management approached a number of existing stockholders including Jaker Investments Limited, a founding stockholder of Plaintiff which, in May, 2009, assisted current management in securing interim financing of $8.5 million. Jaker negotiated a 90-day secured loan with Fame.

22. Fame agreed to fund costs and payments that were submitted by management in advance, and then approved by Fame on a weekly basis. Two secured loan agreements were approved and completed: (a) a line of credit of up to $150,000 for Plaintiff, which is currently overadvanced by the approximate amount of $105,000 (the "AGI Loan"), and (b) a facility of up to $8.5 million to Asia Pacific (subsequently increased to $15 million) (the "Asia Pacific Loan").

23. The Asia Pacific Loan was approved on May 14, 2009 (collectively, the AGI Loan and the Asia Pacific Loan shall be referred to as the "Fame Loans"). The Fame Loans were designed to provide current management more time to refinance Plaintiff and its subsidiaries, and/or, fund Plaintiff's capital shortage, and/or restructure Plaintiff.

24. After the completion of the Fame Loans, no other bona fide suitable alternative financing offers were received to fund Plaintiff's capital shortage, and it became clear that management would have to restructure Plaintiff since the Asia Pacific Loan was a short term note and had to be repaid by August 14, 2009.

### D. The Out-of-Court Plan.

25. Prior to filing for chapter 11 protection, Plaintiff initially proposed an out-of-court restructuring plan (the "Out-of-Court Plan") to creditors and equity holders of Plaintiff.

26. Almost all creditors overwhelmingly voted in favor of the Out-of-Court Plan and its alternative. However, an unsecured creditor and stockholder, Jed Frost, as well as Vision, also a stockholder and purported unsecured creditor of Plaintiff, voted against the Out-of-Court Plan. As a result, Plaintiff was unable to effectuate the Out-of-Court Plan which it believed to be in the best interests of Plaintiff's creditors.

27. The alternative to the Out-of-Court Plan has always been bankruptcy. However, Plaintiff wished to avoid bankruptcy under chapter 11 due to its cost, and wished to avoid chapter 7 because Plaintiff wanted to reorganize. Because the Out-of-Court Plan was not approved, Plaintiff, to save its business as well as Asia Pacific's, was compelled to file for bankruptcy.

### E. Need For A Speedy Reorganization.

28. Plaintiff, as the 100% owner of Asia Pacific, has a substantial interest in ensuring that Asia Pacific's business is not disrupted by Plaintiff's bankruptcy.

29. Even though Asia Pacific is not itself a chapter 11 debtor, Plaintiff's status as the parent corporation of Asia Pacific in bankruptcy will lead to the delay of Asia Pacific's lucrative, multi-million dollar contracts with foreign governments and other parties, which delay would negatively and substantially affect Plaintiff's own reorganization efforts.

30. Since Plaintiff filed for bankruptcy protection, Plaintiff has been contacted by concerned customers, a landlord, and suppliers with threats of termination of non-debtor contracts.

31. Suppliers have also placed Plaintiff's subsidiaries on C.O.D. trading terms which is placing severe strain on working capital.

32. Asia Pacific has very large orders of over $100,000,000 which is a vital part of the future value of the estate if it is not cancelled. This contract is expected to generate for creditors over $1,000,000 pursuant to the terms of the proposed Plan over the next three (3) years.

33. Anthony Harrison, as the Chief Executive Officer of Plaintiff, was solely responsible for winning these large orders.

34. Additionally, a major customer required Asia Pacific to place all of the company's intellectual property into escrow, such as back end software, lines of code, product designs, and everything necessary for the customer to complete this order itself, in case Plaintiff falters.

35. One customer required that Mr. Harrison move to Singapore from London for three years and personally oversee the contract and further required Mr. Harrison to agree that he would not leave the company during the length of the contract.

36. If Plaintiff cannot quickly emerge from Chapter 11, there is a strong possibility that the customer will delay the order resulting in significantly higher costs which could make the business unprofitable.

37. Asia Pacific and other of Plaintiff's subsidiaries are bidding on large contracts that will be very lucrative to Plaintiff and its creditors by increasing the amount of the payout to creditors over the next three years. These contracts are in severe jeopardy because Plaintiff is in Chapter 11 and many of Plaintiff's customers have a policy not to award contracts to companies that may be part of a bankruptcy.

38. Plaintiff has guaranteed some of the performance of its subsidiaries on certain contracts. To the extent that Plaintiff's subsidiaries lose business as a result of Plaintiff's bankruptcy, which appears to be the case here, and to the extent that the subsidiaries cannot effectively pay their debts, Plaintiff would be exposed to further liabilities to the detriment of the existing non-contingent creditors of Plaintiff's estate as a result of Plaintiff's guarantees of its subsidiaries' performance. Also, the sooner these

guarantees are replaced by guarantees from the reorganized debtor, the less business will be lost.

39. The sooner Plaintiff is able to effectuate its exit strategy, the less likely that Plaintiff and its subsidiaries, particularly Asia Pacific, will be negatively affected by Plaintiff's necessary bankruptcy filing.

40. Replacing Management now will prevent Plaintiff from a speedy organization. The current balance that is in place, Fame's willingness to finance Plaintiff's and Asia Pacific's operation, as well as Asia Pacific's customers' patience with this bankruptcy, will be lost if Management is replaced. The instability created by such a shift will likely result in Plaintiff's failure to reorganize.

**F.     Plaintiff's Efforts To Effectuate A Speedy Reorganization.**

41. Plaintiff filed for bankruptcy protection on August 6, 2009, after the Out-of-Court Plan was not approved.

42. On August 14, 2009, Plaintiff filed its Ex Parte Motion for (1) Conditional Approval of its Disclosure Statement Combined With Plan Of Reorganization Pursuant to Local Bankruptcy Rule 3016 And (2) Advancing Deadline For Creditors To File Claims (the "Ex Parte Motion").

43. Plaintiff requested such relief for the purpose of expediting its reorganization efforts.

44. Vision is well aware of the problems Plaintiff and Asia Pacific face as a result of having to file for bankruptcy. Vision has stated that "we have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the company seek reorganization under Chapter 11 or protection under Chapter 7 of the Bankruptcy Code."

45. Vision opposed Plaintiff's Ex Parte Motion, alleging that appropriate notification had not been provided to parties in interest. Vision also made various accusations

with respect to Plaintiff's management, accusing existing management of misfeasance and fraud.

46. Vision also asserted that Plaintiff's Plan and Disclosure Statement did not contain adequate information with respect to Plaintiff's valuation and its subsidiaries' values.

47. On August 21, 2009, the Court denied Plaintiff's Ex Parte Motion and set a hearing on approval of Plaintiff's Disclosure Statement for October 9, 2009.

48. Thereafter, Plaintiff filed an amended Plan and Disclosure Statement. Plaintiff also filed employment applications for its counsel, and a motion for an order approving proposed debtor-in-possession financing.

49. Vision has not filed any response to Plaintiff's amended Plan and Disclosure Statement, although the deadline to respond has passed, indicating that Vision's real intent was only to procedurally delay the reorganization process.

50. Vision's initial opposition to Plaintiff's Ex Parte Application and Plan was only gamesmanship not intended to address Plaintiff's reorganization efforts. At that time, Vision alleged that the Plan stood to only benefit Management, and not other interest holders.

51. The amended Plan provides general unsecured creditors treatment similar to the original Plan and the amended Plan seeks to extinguish equity interests.

52. Vision has no interest in partaking in the reorganization process, and instead, only opposed the Ex Parte Application in order to "buy time" until it would attempt to subvert control of Plaintiff.

**G.     Plaintiff's Plan of Reorganization.**

53. Plaintiff's Plan is a reorganization Plan. Upon confirmation of the Plan, Fame has agreed to waive its right to payment on account of the AGI Loan ($255,000), the

guaranty of the Asia Pacific Loan (approx. $4,000,000) and the DIP Loan (up to $300,000). Additionally, Fame has agreed to capitalize the reorganized Plaintiff with funding in the amount of $3,785,000, which is computed as Fame's commitment of $8,500,000, less (i) the AGI Loan ($255,000), (ii) the guaranty of Asia Pacific Loan ($4,000,000)[2], (iii) the DIP Loan (up to $300,000), and (iv) payment of administrative expenses in the chapter 11 case in excess of the DIP Loan ($460,000-$300,000=$160,000). In exchange for the foregoing, Fame will retain 96.5% of the outstanding equity interests in the reorganized Plaintiff. Fame has also agreed to provide additional funding, as necessary, to fund the operations of the reorganized Plaintiff and its subsidiary entities, in an amount estimated to be up to $20,000,000.

54.     General unsecured creditors of Plaintiff will share, pro rata, in 3.5% of the stock in the reorganized debtor. General unsecured creditors will also receive a two-year promissory note from the reorganized debtor (the "Cash Flow Note"). The Cash Flow Note will provide payments to unsecured creditors equal to 5% of the aggregate cumulative cash flow of the reorganized debtor (and its subsidiaries) calculated from the date of the first drawdown of the Fame Loan (May 21, 2009) for a period of two years. If general unsecured creditors do not receive a distribution in the amount of at least 75% of their allowed claims by the end of the second year, then the payments under the Cash Flow Note will extend for one (1) additional year. Preferred and common stockholders will not receive any distribution under the Plan, and their interests shall be deemed extinguished and of no force or effect as of the Effective Date.

---

2. Asia Pacific's credit facility is up to $8.5 million, $4 million of which has been used through the Petition Date. For every additional dollar that Asia Pacific draws on the Asia Pacific Loan over the current balance, the deduction from the contribution amount will increase by one dollar and, therefore, the contribution to be funded by Fame will decrease by the same amount.

### H. Vision's Alleged Ability To Convert Its Preferred Stock And Vision's Prior Attempt To Replace The Board Of Directors And Management.

55. Vision is collectively the holder of Series A-2 Convertible Preferred Stock and Series C Convertible Preferred Stock.

56. Vision is also a creditor of Plaintiff's estate, and is listed in Plaintiff's Schedule of Assets and Liabilities as a general unsecured creditor holding a $280,000 claim.

57. By way of Vision's purported conversion rights, Vision purports to be the beneficial owner of 58,278,818 shares of Plaintiff's common stock which represents, according to Vision, in excess of sixty percent (60%) of Plaintiff's outstanding shares of common stock as of July 29, 2009.

58. Vision's anticipated attempt to replace management is based upon Vision's alleged ability to convert its preferred stock into common stock.

59. Under Section 78.335(1) of the Nevada General Corporation Law, any attempt to remove a member of a board of a Nevada-incorporated company can only be effectuated with the vote of stockholders holding not less than two-thirds of the outstanding shares of stock. To the extent a company's bylaws, but not articles of incorporation, provide otherwise, such provisions are superseded and rendered of no force and effect by the Nevada General Corporation Law.

60. Even if Vision is allowed in converting its preferred stock to common stock, Vision still has no ability or authority to remove any director of Plaintiff because Vision will not hold the requisite percentage of Plaintiff's voting stock.

61. Vision's percentage calculation of its beneficial, not record, ownership in its Schedule 13D is incorrect, in that from and after January 2009, Plaintiff has had in excess of

11

31,788,815 shares of common stock outstanding, which number would result in Vision having less than the two-thirds voting requirement.

### I. The Displacement Of Existing Management Will Only Harm General Unsecured Creditors And Hinder The Debtor's Ability To Reorganize.

62. Pre-petition, subsequent to Plaintiff's solicitation of votes for the Out-of-Court Plan, Plaintiff received correspondence from Vision and Jed Frost which correspondence provided that Vision and Frost would vote against the Out-of-Court Plan.

63. Vision and Frost then proposed to Plaintiff that a 45 day "standstill period" be put into place to allow "sufficient time to reconstitute the Board of Directors, restructure Plaintiff's operations and arrange for alternative financing."

64. Plaintiff was unable to agree to such a standstill period for the following reasons: First, Plaintiff's current Management had been searching for financing for well over a year, had employed an investment banker, Dominick & Dominick LLC, to that effect, had previously asked Vision for financing but Vision refused, and had been unable to obtain financing from any source until Fame agreed to loan money to Plaintiff and Asia Pacific.

65. While Vision stated that it "believed" that alternative financing was available, there was no actual evidence of the availability of alternative financing and Vision's belief was, at best, highly speculative and unreasonable given the state of the financial markets, as well as Plaintiff's own due diligence within the preceding year.[3]

66. Fame would not continue to fund Plaintiff without the Out-of-Court Plan in place. By agreeing to a standstill period, Plaintiff would have essentially been forced out of business because Plaintiff, and Asia Pacific, would have been unable to operate, would have

---

[3] Even today, Vision has been unable to offer any alternative financing arrangements which could potentially help Plaintiff reorganize.

12

put at-risk Plaintiff's ability to obtain and utilize the Fame Loans, and, as a result, would put at-risk a number of potentially lucrative contracts with various entities that wanted to do business with Plaintiff.

67. Without the Fame Loans and without the Out-of-Court Plan, Plaintiff would have essentially been forced out of business.

68. Thereafter, Vision proposed the removal of existing management and the Board of Directors of Plaintiff, except for John Clough.

69. This was especially concerning to Plaintiff since its most valuable contract can, or might, be terminated if Anthony J. Harrison is no longer an officer and a member of Plaintiff's Board.

70. Vision will attempt to convert its preferred stock on October 10, 2009, and thereafter elect a new board of directors who will attempt to replace existing Management. Once it became clear that Vision had no interest in participating in Plaintiff's reorganization (as Vision has not responded to Plaintiff's amended Disclosure Statement or other requests for relief), and instead will apparently seek to simply take control of Plaintiff and possibly have the existing Plan and requests for relief withdrawn.

71. Vision will do so without any semblance of a reorganization plan in place, no financing to fund reorganization, and at the risk of creating enormous instability of Plaintiff's subsidiaries' businesses at the expense of the bankruptcy estate.

72. Fame will not provide financing to Plaintiff or Asia Pacific if existing Management is allowed to be replaced during the reorganization.

73. If Management were to be replaced, the transition would be problematic for the estate because Vision does not have a "back-up" plan of reorganization. No other suitable financing alternative is available -- not to Plaintiff nor to Vision.

74. The only way of preserving Plaintiff's assets so that Plaintiff can reorganize is by enjoining Vision from replacing existing Management.

## FIRST CLAIM FOR RELIEF

### INJUNCTIVE RELIEF

### (Temporary Protective Order and Preliminary Injunction)

75. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 74 above, inclusive, as though fully set forth herein.

76. Plaintiffs have no adequate remedy at law, and will be immediately and irreparably harmed by the conduct of Vision as described herein.

77. Immediate injunctive relief is necessary and expressly authorized by Fed. R. Civ. P. 65 and Fed. R. Bankr. P. 7065.

78. Any attempt by Vision to convert its preferred stock to common stock, effectuate a written consent of shareholders, and replace Plaintiff's Board of Directors constitutes a clear abuse of the bankruptcy process.

79. If Vision is not enjoined from converting its preferred stock, Plaintiff's Management will be replaced.

80. If Vision is not enjoined from converting its preferred stock, Plaintiff's reorganization will fail.

81. As a result, Plaintiff will be immediately and irreparably harmed.

## SECOND CLAIM FOR RELIEF

## DECLARATORY RELIEF

### (Violation of the Automatic Stay – Against Vision)

82. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 84 above, inclusive, as though fully set forth herein.

83. Section 362(a) of the Bankruptcy Code provides, in pertinent part, that the filing of a petition operates as a stay of:

> "(3) any act to obtain possession of property of the estate or of property from the estate **or to exercise control over property of the estate**."

11 U.S.C. § 362(a)(3). (Emphasis added.)

84. Section 362(k) of the Bankruptcy Code provides:

> "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

11 U.S.C. § 362(k).

85. Plaintiff is informed and believes and thereon alleges that any attempt by Vision to covert its preferred stock and replace Plaintiff's Board of Directors constitutes a willful violation of the automatic stay provisions of the Bankruptcy Code for the reasons alleged herein above.

86. Vision has knowledge of Plaintiff's bankruptcy case.

87. On August 7, 2009, Vision was informed that any act to convert its preferred stock would violate the automatic stay.

88. If Vision were to convert its stock replace Plaintiff's Board of Directors, Vision would action would be willful, wanton, malicious, and oppressive, and undertaken

with the intent to defraud, and justify the awarding of exemplary and punitive damages in a sum according to proof at trial.

89.     Plaintiff desires a judicial determination of the rights and duties of the parties, and a judicial declaration is necessary and appropriate at this time under all the circumstances alleged herein, so that the parties may know their rights and obligations with respect to Vision's ability to convert its preferred stock.

### PRAYER

WHEREFORE, Plaintiff respectfully requests relief as follows:

On The First Cause Of Action (Injunctive Relief):

1.     An order and decree effective as to Vision, its affiliates, assigns and successors, enjoining the conversion of preferred stock to common stock and/or effectuation of a written consent of shareholders to replace any member of Plaintiff's Board of Directors.

2.     Attorney's fees and costs and other costs and expenses incurred by Plaintiff to the extent permissible or available under applicable law.

3.     Such other and further relief as the Court deems just and equitable.

On the Second Cause of Action (Declaratory Relief):

1.     For an order and decree and a judicial declaration of the rights, obligations and interests of all of the parties including, without limitation, Plaintiff and Vision, in connection with and arising out of Vision's purported ability to convert its preferred shares of stock into common stock and replace Plaintiff's Board of Directors and/or Management, including, but not limited to, a finding that any such action by Vision, to either convert its preferred stock, effectuate a written consent of shareholders to replace the Board of Directors, or any other action taken in furtherance of replacing existing Management, would constitute a willful and malicious violation of the automatic stay provisions of the Bankruptcy Code, which would entitle Plaintiff to punitive and exemplary damages.

2. Attorney's fees and costs and other costs and expenses incurred by Plaintiff to the extent permissible or available under applicable law.

3. Such other and further relief as the Court deems just and equitable.

DATED this 6th day of October, 2009.          By: /s/ Martin J. Brill
                                                  BRUCE T. BEESLEY, ESQ.
                                                  Nevada Bar No. 1164
                                                  LEWIS AND ROCA LLP
                                                  50 W. Liberty Street, Ste. 410
                                                  Reno, NV 89501

**Proposed Co-Counsel for Chapter 11 Plaintiff and Plaintiff in Possession**

MARTIN BRILL, ESQ.
California Bar No. 53220
DAVID B. GOLUBCHIK, ESQ.
California Bar No. 185520
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067

**Proposed Reorganization Counsel for Chapter 11 Plaintiff and Plaintiff in Possession**