MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbrb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbrb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbrb.com
**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

*Proposed Reorganization Counsel for Chapter 11 Debtor and Debtor-in-Possession*

Bruce T. Beesley (NV Bar No. 1164) bbeesley@lrlaw.com
LEWIS AND ROCA LLP
Bank of America Plaza
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone: (775) 823-2900

*Proposed Co-Counsel for Chapter 11 Debtor and Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| In re:<br><br>ASTRATA GROUP INCORPORATED,<br><br>Debtor and Debtor-in-Possession.<br><br>ASTRATA GROUP INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>VISION OPPORTUNITY CHINA, LP; VISION OPPORTUNITY MASTER FUND, LTD; VISION CAPITAL ADVANTAGE FUND, LP; AND VISION CAPITAL ADVISORS, LLC<br><br>Defendants. | Case No. 09-52652-GWZ<br>Chapter 11<br><br>Adv. No. 09-adv- 05074  -GWZ<br><br>**DECLARATION OF MARTIN EULER IN SUPPORT OF PLAINTIFF'S MOTION FOR: (1) TEMPORARY RESTRAINING ORDER ENJOINING PREFERRED SHAREHOLDER FROM CONVERTING STOCK AND REPLACING BOARD MEMBERS; (2) ORDER HOLDING THAT ANY SUCH ACTION WOULD BE IN VIOLATION OF THE AUTOMATIC STAY; AND (3) HEARING ON ISSUANCE OF INJUNCTION TO PREVENT STOCK CONVERSION AND BOARD REPLACEMENT DURING THE COURSE OF THIS CHAPTER 11 CASE** |

I, Martin Euler, hereby declare:

1.     I am the acting Chief Financial Officer of Astrata Group Incorporated, debtor and debtor in possession herein (the "Debtor"), and make this Declaration in support of the Debtor's Motion for a Temporary Restraining Order and related relief, as titled above (the "TRO Motion").

2.     I have personal knowledge of the facts set forth herein and could and would competently testify as to these facts. As acting Chief Financial Officer, I am responsible for overseeing all aspects of the Debtor's financial affairs, including, but not limited to activity related to the issuance, ownership and trading of the Debtor's stock. I am also one of the custodians of the Debtor's books and records. The records and documents referred to in this Declaration constitute writings taken, made, or received and maintained in the regular or ordinary course of the Debtor's business at or near the time of the act, condition or event to which they relate by myself or other persons employed by the Debtor who had a business duty to accurately and completely take, make and maintain records and documents.

3.     Attached hereto as Exhibit "A" is a true and correct copy of a letter received by the Debtor from concerned employees of Asia Pacific, dated August 27, 2009.

4.     Attached hereto as Exhibit "B" is a true and correct copy of a letter received by the Debtor from Vision, dated July 29, 2009.

5.     Attached hereto as Exhibit "C" are true and correct copies of the Certificates of Designation of Vision's preferred stock.

6.     Attached hereto as Exhibit "D" is a true and correct copy of a Schedule 13D which Vision filed with the Securities and Exchange Commission.

2

7.     I have evaluated the Debtor's books and records with respect to the number of shares of the Debtor's outstanding common stock. From and after the end of February 2009, AGI has had in excess of 32,838,819 shares of common stock outstanding. As of August 11, 2009, the number of shares of AGI common stock had risen to approximately 32,898,819. Attached hereto as Exhibit "E" is a document prepared by me based upon the Debtor's books and records, which document provides a detailed accounting of the change in outstanding stock of the Debtor from February 28, 2009 through August 11, 2009.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed this 6th day of October, 2009, at the Republic of Singapore.

M. G. Euler

MARTIN EULER

3

**EXHIBIT A**

August 27, 2009

Board of Directors
Astrata Group Incorporated
14027 Memorial Drive, Suite 355
Houston, TX
77079-6828
United States

Gentlemen,

On behalf of a group of key employees I would like to inform you there is a growing level of concern
regarding the situation of the company. In the last week, there has been contact by a former employee (Hoyt
Layson) who claims to be acting on behalf of Vision. He has claimed that Vision is attempting to replace the
management team and restructure the company. This along with several personal emails to several of the
employees from this individual (Hoyt Layson) has created considerable speculation and concern. These
employees who have signed this letter are key to the current & future development & sales of Astrata.

From the perspective of the development team, through a very difficult time, the team has bonded and has
pushed on with major development projects. The management's ability to find funding to allow this
development to continue is well known within the team. They are keenly aware that the funding came from
an alternative source rather than existing investors, as they were involved in creating presentations and
demonstrations of Astrata's products.

Further business disruption and or changes in the Executive Management team will create concern and
instability within the development organization. These individuals would begin to re-evaluate their future
options both internally and externally. As a group that is running at a high utilization any slowdown or loss of
personnel (many of which took months to recruit) would impact deliveries and revenue.

From the business side, the local Singapore operations and the other operating subsidiaries have kept the
business together during a difficult financial period in Astrata. This team of business individuals struggled
through these times because of the trust they had in the management. The struggles and sacrifices made by
the team would be largely devalued if there were changes at the global Executive Management level.

Although both groups were hindered by the lack of funding, they managed to keep their teams together. The
development organisation slowed on items that required funding and the business organisation did not
receive the products on schedule due to delays in development.

With the renewed funding the development team has brought several projects to completion and initiated
new ones while the sales team has significantly expanded the sales funnel is driving the projects forward.
The close working between these teams and the global Executive Management during this period has built a
renewed sense of purpose and direction. This would not survive significant managerial change.

In summary I would like to stress that the organization has gone through a very difficult period with little or
no support from the existing investors.  They are re-energised and committed to move the business forward
with the current management.

Signed:

Shawn Sanderson
Global Sales & Business Development Director

Employees:

| Robin Littau | Managing Director Asia Pacific & Middle East | |
| Henry Negron | CTO | |
| HK Chng | Deputy CTO and 3S Project Director | |
| Subhankar Mitra | Regional Sales Manager Asia Pacific & Middle East | |

| Lau Hui Jen | Regional Operations Manager | |
| Marius Van De Berg | Group Technical Support Manager | |
| Willem Myburgh | Firmware Staff Engineer | |
| Jon Wu | Sr. Software Engineer | |
| Sam Koh | Commercial Release Project Lead | |
| Bienvenido Arendayen | Group IT Manager | |

Pat Ellis          Regional Sales Director Europe & Africa

Mike Hemming       Business Development Manager

Rory Stephen       Project Manager & Cotecna Account Lead

Richard Nelson     Marketing & Communications Director

Tong Pow Mun    Regional Director Malaysia & Brunei    _____

**EXHIBIT B**

July 29, 2009

Board of Directors
Astrata Group Incorporated
14027 Memorial Drive, Suite 355
Houston, TX 77079-6826

Gentlemen,

The undersigned, Vision Opportunity China Fund Limited, Vision Capital Advantage Fund, L.P. and Vision Opportunity Master Fund, Ltd. (collectively, "Vision") and Jed Frost are major investors in Astrata Group Incorporated (the "Company" or "Astrata") and are majority stockholders of the Company. Vision has been an investor in the Company since 2006 and is the beneficial holder of Series A2 Convertible Preferred Stock, Series B Convertible Preferred Stock, Series C Convertible Preferred Stock and common stock. In total, Vision has invested over $12,500,000 in the Company. On an "as converted" basis and taken together with Vision current common stock ownership, Vision is the beneficial owner of 58,278,818 shares of the Company's common stock which represents over sixty percent (60%) of the Company's outstanding shares of common stock. Jed Frost has made loans to the Company with an aggregate principal and interest in the amount of $3,655,373.88 which converts into shares of the Company's common stock, in addition to which he directly holds a significant number of shares of the Company's common stock.

Each of the undersigned is extremely troubled by the actions taken by the Company and its management with the approval of the Company's Board of Directors during the last three months. These actions reflect mismanagement and the failure of the Board of Directors to exercise its fiduciary duties in good faith on behalf of the Company's stockholders. In fact management's actions have led the Company to its dire state. As majority stockholders and on behalf of all other similarly situated stockholders of the Company, we intend to reverse the Company's recent actions and take the following actions to revive the Company:

1. Vision and Frost will vote against the proposed Restructuring Plan. Since Vision holds in excess of 91% of the preferred stock and Frost holds in excess of 35% of the unsecured debt, Vision's and Frost's vote against the Plan will effectively block Scenario 1 as described in the Disclosure Document. In addition, Frost will not vote in favor of Scenario 2 – Chapter 11 Filing, effectively blocking Scenario 2 as described in the Disclosure Document.

2.  The pledge of 100% of the shares of Astrata (Asia Pacific) Pte Ltd. to secure the Fame facility required shareholder approval since it amounted to a sale of substantially all of Astrata's assets. In addition, the credit facility, coupled with the Restructuring Plan, reflect a series of interested party transactions that failed to have the approval of the Company's stockholders. Moreover, we believe that the Fame facility was part of a series of transactions that constituted a fraudulent conveyance under both the federal Bankruptcy Code and applicable state laws. We also believe that the transactions violated applicable Singapore law.

3.  Finally, the Company violated the Securities Exchange Act of 1934 by failing to disclose publicly the credit facility within four (4) business days of entering the facility.

4.  We believe that there is alternative financing available from third parties who have indicated they will only finance the Company if the Board of Directors is reconstituted. To that end, we propose that the Board be reconstituted immediately as follows: two (2) members appointed by Vision/Jed Frost, one (1) member appointed by Fame Trading, one (1) existing board member, and three (3) independent members acceptable to Vision and Frost with John Clough remaining as one of the independent directors.

5.  We request that the company agree to a standstill period of 45 days which will be sufficient time to reconstitute the Board of Directors, restructure the Company's operations and arrange for alternative financing. During this standstill period and until the Company's Board has been reconstituted, we request that the Company shall refrain from any actions that might potentially harm Vision and Jed Frost, including but not limited to, deviating from its ordinary course of business, incurring of additional debt, repaying debt, modifying or entering into employment agreements, and drawing down additional amounts under the Fame Trading credit line.

We have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the company seek reorganization under Chapter 11 or protection under Chapter 7 of the Bankruptcy Code. We would, therefore, like to resolve this matter amicably. Accordingly, we request that you respond to the requests set forth in this letter by Thursday, July 30, by 6:00 p.m. EST. If you do not respond within that time period or if you refuse to work together to resolve the issues facing the Company, we intend to enforce our rights and remedies and to contest the senior status of Fame's debt. We request that the company

send a copy of this letter to the principals of Fame Trading without undue delay. Each of the undersigned reserves its rights and remedies under the transaction documents relating to its investment in the Company.

Very truly yours,

Vision Opportunity China Fund Limited
Vision Capital Advantage Fund, L.P.
Vision Opportunity Master Fund, Ltd.

By: _____
Adam Benowitz
Director

By _____
Jed Frost

Kramer Levin Naftalis & Frankel LLP
Greene Radovsky Maloney Share & Hennigh LLP

**EXHIBIT C**

EX-4.5 6 astrata_8k-ex0405.htm CERTIFICATE OF DESIGNATION FOR SERIES A-2
**EXHIBIT 4.5**

## CERTIFICATE OF DESIGNATION OF THE RELATIVE RIGHTS AND PREFERENCES
### OF THE
### SERIES A-2 CONVERTIBLE PREFERRED STOCK
### OF
### ASTRATA GROUP INCORPORATED

The undersigned, the Chief Executive Officer of Astrata Group Incorporated, a Nevada corporation (the "Company"), in accordance with the provisions of the Nevada Revised Statutes, does hereby certify that, pursuant to the authority conferred upon the Board of Directors by the Articles of Incorporation of the Company, the following resolution creating a series of preferred stock, designated as Series A-2 Convertible Preferred Stock, was duly adopted on May 29, 2008, as follows:

RESOLVED, that pursuant to the authority expressly granted to and vested in the Board of Directors of the Company by provisions of the Articles of Incorporation of the Company (the "Articles of Incorporation"), there hereby is created out of the shares of the Company's preferred stock, par value $0.0001 per share, of the Company authorized in Article IV of the Articles of Incorporation (the "Preferred Stock"), a series of Preferred Stock of the Company, to be named "Series A-2 Convertible Preferred Stock," consisting of One Million Six Hundred Eighty Six Thousand Four (1,686,004) shares, which series shall have the following designations, powers, preferences and relative and other special rights and the following qualifications, limitations and restrictions:

1.     <u>Designation and Rank</u>. The designation of such series of the Preferred Stock shall be the Series A-2 Convertible Preferred Stock, par value $0.0001 per share (the "Series A-2 Preferred Stock"). The maximum number of shares of Series A-2 Preferred Stock shall be One Million Six Hundred Eighty Six Thousand Four (1,686,004) shares. The Series A-2 Preferred Stock shall rank senior to the Company's common stock, par value $0.0001 per share (the "Common Stock"), and to all other classes and series of equity securities of the Company which by their terms do not rank senior to the Series A-2 Preferred Stock ("Junior Stock"). The Series A-2 Preferred Stock shall be subordinate to and rank junior to all indebtedness of the Company now or hereafter outstanding.

2.     <u>Dividends</u>.

    (a)     <u>Payment of Dividends</u>. Commencing on the date of the initial issuance (the "Issuance Date") of the Series A-2 Preferred Stock, the holders of record of shares of Series A-2 Preferred Stock shall be entitled to receive, out of any assets at the time legally available therefor and as declared by the Board of Directors, cash dividends at the rate of eight percent (8%) of the stated Liquidation Preference Amount (as defined in Section 4 hereof) per share per annum (the "Dividend Payment"), and no more, payable on the date of payment of the Liquidation Preference Amount to the holders of Series A-2 Preferred Stock, pursuant to Section 4 hereof, in the event of a dissolution, liquidation or winding up of the Company. In the case of shares of Series A-2 Preferred Stock outstanding for less than a full year, dividends shall be pro rated based on the portion of each year during which such shares are outstanding. Dividends on the Series A-2 Preferred Stock shall be cumulative, shall accrue and be payable in the event of a dissolution, liquidation or winding up of the Company pursuant to Section 4 hereof. Dividends on the Series A-2 Preferred Stock are prior and in preference to any declaration or payment of any distribution (as defined below) on any outstanding shares of Junior Stock. Such dividends shall accrue on each share of Series A-2 Preferred Stock from day to day whether or not earned or declared so that if such dividends with respect to any previous dividend period at the rate provided for herein have not been paid on, or declared and set apart for, all shares of Series A-2 Preferred Stock at the time outstanding, the deficiency shall be fully paid on, or declared and set apart for, such shares on a pro rata basis with all other equity securities of the Company ranking pari passu with the Series A-2 Preferred Stock as to the payment of dividends before any distribution shall be paid on, or declared and set apart for Junior Stock.

(b)        So long as any shares of Series A-2 Preferred Stock are outstanding, the Company shall not declare, pay or set apart for payment any dividend or make any distribution on any Junior Stock (other than dividends or distributions payable in additional shares of Junior Stock), unless at the time of such dividend or distribution the Company shall have paid all accrued and unpaid dividends on the outstanding shares of Series A-2 Preferred Stock.

(c)        In the event of (i) a mandatory redemption pursuant to Section 9 hereof or (ii) a redemption upon the occurrence of a Major Transaction (as defined in Section 8(c) hereof) or a Triggering Event (as defined in Section 8(d) hereof), all accrued and unpaid dividends on the Series A-2 Preferred Stock shall be payable on the date of such redemption.  In the event of a conversion pursuant to Section 5(a) hereof, all accrued and unpaid dividends on the Series A-2 Preferred Stock being converted shall be payable on the Conversion Date (as defined in Section 5(b)(i) hereof).

(d)        For purposes hereof, unless the context otherwise requires, "distribution" shall mean the transfer of cash or property without consideration, whether by way of dividend or otherwise, payable other than in shares of Common Stock or other equity securities of the Company, or the purchase or redemption of shares of the Company (other than redemptions set forth in Section 8 below or repurchases of Common Stock held by employees or consultants of the Company upon termination of their employment or services pursuant to agreements providing for such repurchase or upon the cashless exercise of options held by employees or consultants) for cash or property.

3.        Voting Rights.

(a)        Class Voting Rights.  So long as any shares of the Series A-2 Preferred Stock remain outstanding, the Company shall not, without the affirmative vote or consent of the holders of at least seventy-five percent (75%) of the shares of the Series A-2 Preferred Stock outstanding at the time, given in person or by proxy, either in writing or at a meeting, in which the holders of the Series A-2 Preferred Stock vote separately as a class: (i) authorize, create, issue or increase the authorized or issued amount of any class or series of stock, including but not limited to the issuance of any more shares of Preferred Stock, ranking pari passu or senior to the Series A-2 Preferred Stock, with respect to the distribution of assets on liquidation, dissolution or winding up; (ii) amend, alter or repeal the provisions of the Series A-2 Preferred Stock, whether by merger, consolidation or otherwise, so as to adversely affect any right, preference, privilege or voting power of the Series A-2 Preferred Stock; provided, however, that any creation and issuance of another series of Junior Stock shall not be deemed to adversely affect such rights, preferences, privileges or voting powers; (iii) repurchase, redeem or pay dividends on, shares of Common Stock or any other shares of the Company's Junior Stock (other than de minimus repurchases from employees of the Company in certain circumstances, and any contractual redemption obligations existing as of the date hereof as disclosed in the Company's public filings with the Securities and Exchange Commission); (iv) amend the Articles of Incorporation or By-Laws of the Company so as to affect materially and adversely any right, preference, privilege or voting power of the Series A-2 Preferred Stock; provided, however, that any creation and issuance of another series of Junior Stock shall not be deemed to adversely affect such rights, preferences, privileges or voting powers; (v) effect any distribution with respect to Junior Stock other than as permitted hereby; (vi) reclassify the Company's outstanding securities; (vii) voluntarily file for bankruptcy, liquidate the Company's assets or make an assignment for the benefit of the Company's creditors; or (viii) materially change the nature of the Company's business.

2

(b)    General Voting Rights. Except with respect to transactions upon which the Series A-2 Preferred Stock shall be entitled to vote separately as a class pursuant to Section 3(a) above and except as otherwise required by Nevada law, the Series A-2 Preferred Stock shall have no voting rights. The Common Stock into which the Series A-2 Preferred Stock is convertible shall, upon issuance, have all of the same voting rights as other issued and outstanding Common Stock of the Company, and none of the rights of the Preferred Stock.

4.    Liquidation Preference.

(a)    In the event of the liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, the holders of shares of Series A-2 Preferred Stock then outstanding shall be entitled to receive, out of the assets of the Company available for distribution to its stockholders, an amount equal to \$5.00 per share (the "Liquidation Preference Amount") of the Series A-2 Preferred Stock plus any accrued and unpaid dividends before any payment shall be made or any assets distributed to the holders of the Common Stock or any other Junior Stock. If the assets of the Company are not sufficient to pay in full the Liquidation Preference Amount plus any accrued and unpaid dividends payable to the holders of outstanding shares of the Series A-2 Preferred Stock and any series of Preferred Stock or any other class of stock ranking pari passu, as to rights on liquidation, dissolution or winding up, with the Series A-2 Preferred Stock, then all of said assets will be distributed among the holders of the Series A-2 Preferred Stock and the other classes of stock ranking pari passu with the Series A-2 Preferred Stock, if any, ratably in accordance with the respective amounts that would be payable on such shares if all amounts payable thereon were paid in full. The liquidation payment with respect to each outstanding fractional share of Series A-2 Preferred Stock shall be equal to a ratably proportionate amount of the liquidation payment with respect to each outstanding share of Series A-2 Preferred Stock. All payments for which this Section 4(a) provides shall be in cash, property (valued at its fair market value as determined by an independent appraiser reasonably acceptable to the holders of a majority of the Series A-2 Preferred Stock) or a combination thereof; provided, however, that no cash shall be paid to holders of Junior Stock unless each holder of the outstanding shares of Series A-2 Preferred Stock has been paid in cash the full Liquidation Preference Amount plus any accrued and unpaid dividends to which such holder is entitled as provided herein. After payment of the full Liquidation Preference Amount plus any accrued and unpaid dividends to which each holder is entitled, such holders of shares of Series A-2 Preferred Stock will not be entitled to any further participation as such in any distribution of the assets of the Company.

3

(b)        A consolidation or merger of the Company with or into any other corporation or corporations, or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of related transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed, shall not be deemed to be a liquidation, dissolution, or winding up within the meaning of this Section 4. In the event of the merger or consolidation of the Company with or into another corporation, the Series A-2 Preferred Stock shall maintain its relative powers, designations and preferences provided for herein and no merger shall result which is inconsistent therewith unless otherwise approved by at least seventy-five percent (75%) of the then outstanding shares of Series A-2 Preferred Stock.

(c)        Written notice of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, stating a payment date and the place where the distributable amounts shall be payable, shall be given by mail, postage prepaid, no less than forty-five (45) days prior to the payment date stated therein, to the holders of record of the Series A-2 Preferred Stock at their respective addresses as the same shall appear on the books of the Company.

5.        Conversion. The holder of Series A-2 Preferred Stock shall have the following conversion rights (the "Conversion Rights"):

(a)        Right to Convert. At any time on or after the Issuance Date, the holder of any such shares of Series A-2 Preferred Stock may, at such holder's option, subject to the limitations set forth in Section 7 herein, elect to convert (a "Conversion") all or any portion of the shares of Series A-2 Preferred Stock held by such person into a number of fully paid and nonassessable shares of Common Stock equal to the quotient of (i) the Liquidation Preference Amount of the shares of Series A-2 Preferred Stock being converted by (ii) the Conversion Price (as defined in Section 5(d) below) then in effect as of the date of the delivery by such holder of its notice of election to convert. In the event of a notice of redemption of any shares of Series A-2 Preferred Stock pursuant to Section 8 hereof, the Conversion Rights of the shares designated for redemption shall terminate at the close of business on the last full day preceding the date fixed for redemption, unless the redemption price is not paid on such redemption date, in which case the Conversion Rights for such shares shall continue until such price is paid in full. In the event of a liquidation, dissolution or winding up of the Company, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Series A-2 Preferred Stock. In the event of such a redemption or liquidation, dissolution or winding up, the Company shall provide to each holder of shares of Series A-2 Preferred Stock notice of such redemption or liquidation, dissolution or winding up, which notice shall (i) be sent at least fifteen (15) days prior to the termination of the Conversion Rights (or, if the Company obtains lesser notice thereof, then as promptly as possible after the date that it has obtained notice thereof) and (ii) state the amount per share of Series A-2 Preferred Stock that will be paid or distributed on such redemption or liquidation, dissolution or winding up, as the case may be.

4

(b)     Mechanics of Conversion. The Conversion of Series A-2 Preferred Stock shall be conducted in the following manner:

(i)     Holder's Delivery Requirements. To convert Series A-2 Preferred Stock into full shares of Common Stock on any date (the "Conversion Date"), the holder thereof shall (A) transmit by facsimile (or otherwise deliver), for receipt on or prior to 5:00 p.m., New York time on such date, a copy of a fully executed notice of conversion in the form attached hereto as Exhibit 1 (the "Conversion Notice"), to the Company at (310) 226-8553, Attention: Chief Executive Officer, and (B) surrender to a common carrier for delivery to the Company as soon as practicable following such Conversion Date the original certificates representing the shares of Series A-2 Preferred Stock being converted (or an indemnification undertaking with respect to such shares in the case of their loss, theft or destruction) (the "Preferred Stock Certificates") and the originally executed Conversion Notice.

(ii)     Company's Response. Upon receipt by the Company of a facsimile copy of a Conversion Notice, the Company shall immediately send, via facsimile, a confirmation of receipt of such Conversion Notice to such holder. Upon receipt by the Company of a copy of the fully executed Conversion Notice, the Company or its designated transfer agent (the "Transfer Agent"), as applicable, shall, within three (3) business days following the date of receipt by the Company of the fully executed Conversion Notice, issue and deliver to the Depository Trust Company ("DTC") account on the Holder's behalf via the Deposit Withdrawal Agent Commission System ("DWAC") as specified in the Conversion Notice, or via physical certificate if so specified in the Conversion Notice, registered in the name of the holder or its designee, for the number of shares of Common Stock to which the holder shall be entitled. Notwithstanding the foregoing to the contrary, the Company or its Transfer Agent shall only be obligated to issue and deliver the shares to the DTC on a holder's behalf via DWAC if a registration statement providing for the resale of the shares of Common Stock issuable upon conversion of the Series A-2 Preferred Stock is effective or such shares are otherwise eligible for legend removal, and if the Transfer Agent is a participant in the DWAC system. If the shares of Common Stock to be received pursuant to the Conversion Notice are not registered or otherwise eligible for legend removal, the Transfer Agent shall issue a physical certificate in the name of the holder representing such shares with a restrictive legend and a notation that such shares are deemed owned by the holder as of the Issuance Date for purposes of determining the holder's holding period under Rule 144 ("Rule 144") of the Securities Act of 1933, as amended. If the number of shares of Preferred Stock represented by the Preferred Stock Certificate(s) submitted for conversion is greater than the number of shares of Series A-2 Preferred Stock being converted, then the Company shall, as soon as practicable and in no event later than three (3) business days after receipt of the Preferred Stock Certificate(s) and at the Company's expense, issue and deliver to the holder a new Preferred Stock Certificate representing the number of shares of Series A-2 Preferred Stock not converted.

5

          (iii)     Dispute Resolution. In the case of a dispute as to the arithmetic calculation of the number of shares of Common Stock to be issued upon conversion, the Company shall cause its Transfer Agent to promptly issue to the holder the number of shares of Common Stock that is not disputed and shall submit the arithmetic calculations to the holder via facsimile as soon as possible, but in no event later than two (2) business days after receipt of such holder's Conversion Notice. If such holder and thc Company are unable to agree upon the arithmetic calculation of the number of shares of Common Stock to be issued upon such conversion within one (1) business day of such disputed arithmetic calculation being submitted to the holder, then the Company shall within one (1) business day submit via facsimile the disputed arithmetic calculation of the number of shares of Common Stock to be issued upon such conversion to the Company's independent, outside accountant. The Company shall cause the accountant to perform the calculations and notify the Company and the holder of the results no later than seventy-two (72) hours from the timc it receives the disputed calculations. Such accountant's calculation shall be binding upon all parties absent manifest error. The reasonable expenses of such accountant in making such determination shall be paid by the Company, in the event the holder's calculation was correct, or by the holder, in the event the Company's calculation was correct, or equally by the Company and the holder in the event that neither the Company's or the holder's calculation was correct. The period of time in which the Company is required to effect conversions or redemptions under this Certificate of Designation shall be tolled with respect to the subject conversion or redemption pending resolution of any dispute by the Company made in good faith and in accordance with this Section 5(b)(iii).

          (iv)     Record Holder. The person or persons entitled to receive the shares of Common Stock issuable upon a conversion of the Series A-2 Preferred Stock shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the Conversion Date.

          (v)     Company's Failure to Timely Convert. If within three (3) business days of the Company's receipt of an executed copy of the Conversion Notice (so long as the applicable Preferred Stock Certificates and original Conversion Notice are received by the Company on or before such third business day) (the "Delivery Datc") the Transfer Agent shall fail to issue and deliver to a holder the number of shares of Common Stock to which such holder is entitled upon such holder's conversion of the Series A-2 Preferred Stock or to issue a new Preferred Stock Certificate representing the number of shares of Series A-2 Preferred Stock to which such holder is entitled pursuant to Section 5(b)(ii) (a "Conversion Failure"), in addition to all other available remedies which such holder may pursue hereunder and under the Amendment to Certain Warrants for the Purchase of Shares of Common Stock of the Company by and among the Company, Vision Opportunity Master Fund, Ltd. ("VOMF") and Vision Opportunity China Fund Limited ("VOC") dated as of May 29, 2008, the Warrant Exchange Agreement by and among Company and the holders signatory thereto dated as of May 29, 2008, the Preferred Stock Exchange Agreement by and among Company and the holders signatory thereto dated as of May 29, 2008, and the Lock-Up Agreement by and among the Company and the initial holders of the Series A-2 Preferred Stock (collectively, the "Transaction Documents") among the Company and the initial holders of the Series A-2 Preferred Stock, the Company shall pay additional damages to such holder on

6

each business day after such third (3rd) business day that such conversion is not timely effected in an amount equal to 0.5% of the product of (A) the sum of the number of shares of Common Stock not issued to the holder on a timely basis pursuant to Section 5(b)(ii) and to which such holder is entitled and, in the event the Company has failed to deliver a Preferred Stock Certificate to the holder on a timely basis pursuant to Section 5(b)(ii), the number of shares of Common Stock issuable upon conversion of the shares of Series A-2 Preferred Stock represented by such Preferred Stock Certificate, as of the last possible date which the Company could have issued such Preferred Stock Certificate to such holder without violating Section 5(b)(ii) and (B) the Closing Bid Price (as defined below) of the Common Stock on the last possible date which the Company could have issued such Common Stock and such Preferred Stock Certificate, as the case may be, to such holder without violating Section 5(b)(ii). If the Company fails to pay the additional damages set forth in this Section 5(b)(v) within five (5) business days of the date incurred, then such payment shall bear interest at the rate of 2.0% per month (pro rated for partial months) until such payments are made. The term "Closing Bid Price" shall mean, for any security as of any date, the last closing bid price of such security on the OTC Bulletin Board or other quotation venue or principal exchange on which such security is traded as reported by Bloomberg, or, if no closing bid price is reported for such security by Bloomberg, the last closing trade price of such security as reported by Bloomberg, or, if no last closing trade price is reported for such security by Bloomberg, the average of the bid prices of any market makers for such security as reported by the Pink Sheets LLC. If the Closing Bid Price cannot be calculated for such security on such date on any of the foregoing bases, the Closing Bid Price of such security on such date shall be the fair market value as mutually determined by the Company and the holders of a majority of the outstanding shares of Series A-2 Preferred Stock.

(vi)    Buy-In Rights. In addition to any other rights available to the holders of Series A-2 Preferred Stock, if the Company fails to cause its Transfer Agent to transmit to the holder a certificate or certificates representing the shares of Common Stock issuable upon conversion of the Series A-2 Preferred Stock on or before the Delivery Date, and if after such date the holder is required by its broker to purchase (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the holder of the shares of Common Stock issuable upon conversion of Series A-2 Preferred Stock which the holder anticipated receiving upon such conversion (a "Buy-In"), then the Company shall (1) pay in cash to the holder the amount by which (x) the holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (A) the number of shares of Common Stock issuable upon conversion of Series A-2 Preferred Stock that the Company was required to deliver to the holder in connection with the conversion at issue times (B) the price at which the sell order giving rise to such purchase obligation was executed, and (2) at the option of the holder, either reinstate the shares of Series A-2 Preferred Stock and equivalent number of shares of Common Stock for which such conversion was not honored or deliver to the holder the number of shares of Common Stock that would have been issued had the Company timely complied with its conversion and delivery obligations hereunder. For example, if the holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (1) of the immediately preceding sentence the Company shall be required to pay to the holder $1,000. The holder shall provide the Company written notice indicating the amounts payable to the holder in respect of the Buy-In, together with applicable confirmations and other evidence reasonably requested by the Company. Nothing herein shall limit a holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock upon conversion of the Series A-2 Preferred Stock as required pursuant to the terms hereof.

7

(c)     Intentionally omitted.

(d)     Conversion Price. The term "Conversion Price" shall mean $0.25, subject to adjustment under Section 5(e) hereof. Notwithstanding any adjustment hereunder, at no time shall the Conversion Price be greater than $0.25 per share except if it is adjusted pursuant to Section 5(e)(i).

(e)     Adjustments of Conversion Price.

(i)     Adjustments for Stock Splits and Combinations. If the Company shall at any time or from time to time after the Issuance Date, effect a stock split of the outstanding Common Stock, the Conversion Price shall be proportionately decreased. If the Company shall at any time or from time to time after the Issuance Date, combine the outstanding shares of Common Stock, the Conversion Price shall be proportionately increased. Any adjustments under this Section 5(e)(i) shall be effective at the close of business on the date the stock split or combination becomes effective.

(ii)     Adjustments for Certain Dividends and Distributions. If the Company shall at any time or from time to time after the Issuance Date, make or issue or set a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in shares of Common Stock, then, and in each event, the Conversion Price shall be decreased as of the time of such issuance or, in the event such record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Price then in effect by a fraction:

(1)     the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date; and

(2)     the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

(iii)     Adjustment for Other Dividends and Distributions. If the Company shall at any time or from time to time after the Issuance Date, make or issue or set a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in securities of the Company other than shares of Common Stock, then, and in each event, an appropriate revision to the applicable Conversion Price shall be made and provision shall be made (by adjustments of the Conversion Price or otherwise) so that the holders of Series A-2 Preferred Stock shall receive upon conversions thereof, in addition to the number of shares of Common Stock receivable thereon, the number of securities of the Company which they would have received had their Series A-2 Preferred Stock been converted into Common Stock on the date of such event and had

8

thereafter, during the period from the date of such event to and including the Conversion Date, retained such securities (together with any distributions payable thereon during such period), giving application to all adjustments called for during such period under this Section 5(e)(iii) with respect to the rights of the holders of the Series A-2 Preferred Stock; provided, however, that if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Conversion Price shall be adjusted pursuant to this paragraph as of the time of actual payment of such dividends or distributions; and provided further, however, that no such adjustment shall be made if the holders of Series A-2 Preferred Stock simultaneously receive (i) a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Series A-2 Preferred Stock had been converted into Common Stock on the date of such event or (ii) a dividend or other distribution of shares of Series A-2 Preferred Stock which are convertible, as of the date of such event, into such number of shares of Common Stock as is equal to the number of additional shares of Common Stock being issued with respect to each share of Common Stock in such dividend or distribution.

(iv)     Adjustments for Reclassification, Exchange or Substitution. If the Common Stock issuable upon conversion of the Series A-2 Preferred Stock at any time or from time to time after the Issuance Date shall be changed to the same or different number of shares of any class or classes of stock, whether by reclassification, exchange, substitution or otherwise (other than by way of a stock split or combination of shares or stock dividends provided for in Sections 5(e)(i), (ii) and (iii), or a reorganization, merger, consolidation, or sale of assets provided for in Section 5(e)(v)), then, and in each event, an appropriate revision to the Conversion Price shall be made and provisions shall be made (by adjustments of the Conversion Price or otherwise) so that the holder of each share of Series A-2 Preferred Stock shall have the right thereafter to convert such share of Series A-2 Preferred Stock into the kind and amount of shares of stock and other securities receivable upon reclassification, exchange, substitution or other change, by holders of the number of shares of Common Stock into which such share of Series A-2 Preferred Stock might have been converted immediately prior to such reclassification, exchange, substitution or other change, all subject to further adjustment as provided herein.

(v)     Adjustments for Reorganization, Merger, Consolidation or Sales of Assets. If at any time or from time to time after the Issuance Date there shall be a capital reorganization of the Company (other than by way of a stock split or combination of shares or stock dividends or distributions provided for in Section 5(e)(i), (ii) and (iii), or a reclassification, exchange or substitution of shares provided for in Section 5(e)(iv)), or a merger or consolidation of the Company with or into another corporation where the holders of outstanding voting securities prior to such merger or consolidation do not own over 50% of the outstanding voting securities of the merged or consolidated entity, immediately after such merger or consolidation, or the sale of all or substantially all of the Company's properties or assets to any other person (an "Organic Change"), then as a part of such Organic Change an appropriate revision to the Conversion Price shall be made if necessary and provision shall be made if necessary (by adjustments of the Conversion Price or otherwise) so that the holder of each share of Series A-2 Preferred Stock shall have the right thereafter to convert such share of Series A-2 Preferred Stock into the kind and amount of shares of stock and other securities or property of the Company or any successor corporation resulting from Organic Change. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 5(e)(v) with respect to the rights of the holders of the Series A-2 Preferred Stock after the Organic Change to the end that the provisions of this Section 5(e)(v) (including any adjustment in the Conversion Price then in effect and the number of shares of stock or other securities deliverable upon conversion of the Series A-2 Preferred Stock) shall be applied after that event in as nearly an equivalent manner as may be practicable.

9

(vi)        Adjustments for Issuance of Additional Shares of Common Stock.

(A)        In the event the Company, shall, at any time, from time to time, issue or sell any additional shares of Common Stock (otherwise than as provided in the foregoing subsections (i) through (v) of this Section 5(e) or pursuant to Common Stock Equivalents (hereafter defined) granted or issued prior to the Issuance Date) (the "Additional Shares of Common Stock"), at a price per share less than the Conversion Price, or without consideration, the Conversion Price then in effect upon each such issuance shall be adjusted to that price (rounded to the nearest cent) determined by multiplying the Conversion Price by a fraction:

(1)        the numerator of which shall be equal to the sum of (A) the number of shares of Common Stock outstanding immediately prior to the issuance of such Additional Shares of Common Stock plus (B) the number of shares of Common Stock (rounded to the nearest whole share) which the aggregate consideration for the total number of such Additional Shares of Common Stock so issued would purchase at a price per share equal to the then Conversion Price, and

(2)        the denominator of which shall be equal to the number of shares of Common Stock outstanding immediately after the issuance of such Additional Shares of Common Stock

No adjustment of the number of shares of Common Stock shall be made under paragraph (A) of Section 5(e)(vi) upon the issuance of any Additional Shares of Common Stock which are issued pursuant to the exercise of any warrants or other subscription or purchase rights or pursuant to the exercise of any conversion or exchange rights in any Common Stock Equivalents (as defined below), if any such adjustment shall previously have been made upon the issuance of such warrants or other rights or upon the issuance of such Common Stock Equivalents (or upon the issuance of any warrant or other rights therefore) pursuant to Section 5(e)(vii).

(vii)        Issuance of Common Stock Equivalents. The provisions of this Section 5(e)(vii) shall apply if (a) the Company, at any time after the Issuance Date, shall issue any securities convertible into or exchangeable for, directly or indirectly, Common Stock ("Convertible Securities"), other than the Series A-2 Preferred Stock, or (b) any rights or warrants or options to purchase any such Common Stock or Convertible Securities (collectively, the "Common Stock Equivalents") shall be issued or sold. If the price per share for which Additional Shares of Common Stock may be issuable pursuant to any such Common Stock Equivalent shall be less than the applicable Conversion Price then in effect, or if, after any such issuance of Common Stock Equivalents, the price per share for which Additional Shares of Common Stock may be issuable thereafter is amended or adjusted, and such price as so amended shall be less than the applicable Conversion Price in effect at the time of such amendment or adjustment, then the applicable Conversion Price upon each such issuance or amendment shall be adjusted as provided in the first sentence of subsection (vi) of this Section 5(e). No adjustment shall be made to the Conversion Price upon the issuance of Common Stock pursuant to the exercise, conversion or exchange of any Convertible Security or Common Stock Equivalent where an adjustment to the Conversion Price was made as a result of the issuance or purchase of any Convertible Security or Common Stock Equivalent.

10

(viii)    Consideration for Stock. In case any shares of Common Stock or Convertible Securities other than the Series A-2 Preferred Stock, or any rights or warrants or options to purchase any such Common Stock or Convertible Securities, shall be issued or sold:

(1)    in connection with any merger or consolidation in which the Company is the surviving corporation (other than any consolidation or merger in which the previously outstanding shares of Common Stock of the Company shall be changed to or exchanged for the stock or other securities of another corporation), the amount of consideration therefore shall be, deemed to be the fair value, as determined reasonably and in good faith by the Board of Directors of the Company, of such portion of the assets and business of the nonsurviving corporation as such Board may determine to be attributable to such shares of Common Stock, Convertible Securities, rights or warrants or options, as the case may be; or

(2)    in the event of any consolidation or merger of the Company in which the Company is not the surviving corporation or in which the previously outstanding shares of Common Stock of the Company shall be changed into or exchanged for the stock or other securities of another corporation, or in the event of any sale of all or substantially all of the assets of the Company for stock or other securities of any corporation, the Company shall be deemed to have issued a number of shares of its Common Stock for stock or securities or other property of the other corporation computed on the basis of the actual exchange ratio on which the transaction was predicated, and for a consideration equal to the fair market value on the date of such transaction of all such stock or securities or other property of the other corporation. If any such calculation results in adjustment of the applicable Conversion Price, or the number of shares of Common Stock issuable upon conversion of the Series A-2 Preferred Stock, the determination of the applicable Conversion Price or the number of shares of Common Stock issuable upon conversion of the Series A-2 Preferred Stock immediately prior to such merger, consolidation or sale, shall be made after giving effect to such adjustment of the number of shares of Common Stock issuable upon conversion of the Series A-2 Preferred Stock. In the event any consideration received by the Company for any securities consists of property other than cash, the fair market value thereof at the time of issuance or as otherwise applicable shall be as determined in good faith by the Board of Directors of the Company. In the event Common Stock is issued with other shares or securities or other assets of the Company for consideration which covers both, the consideration computed as provided in this Section (5)(e)(viii) shall be allocated among such securities and assets as determined in good faith by the Board of Directors of the Company.

11

(ix) Record Date. In case the Company shall take record of the holders of its Common Stock or any other Preferred Stock for the purpose of entitling them to subscribe for or purchase Common Stock or Convertible Securities, then the date of the issue or sale of the shares of Common Stock shall be deemed to be such record date.

(x) Certain Issues Excepted. Anything herein to the contrary notwithstanding, the Company shall not be required to make any adjustment to the Conversion Price upon (i) securities issued (other than for cash) in connection with a merger, acquisition, or consolidation, (ii) securities issued pursuant to the conversion or exercise of convertible or exercisable securities issued or outstanding on or prior to the date of the Transaction Documents or issued pursuant to the Transaction Documents (so long as the conversion or exercise price in such securities are not amended to lower such price and/or adversely affect the holders), (iii) securities issued in connection with bona fide strategic license agreements or other partnering arrangements so long as such issuances are not for the purpose of raising capital, (iv) Common Stock issued or the issuance or grants of options to purchase Common Stock pursuant to the Issuer's stock option plans and employee stock purchase plans outstanding as they exist on the date of the Transaction Documents, and (v) any warrants issued to the placement agent and its designees for the transactions contemplated by the Transaction Documents.

(f) No Impairment. The Company shall not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Section 5 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series A-2 Preferred Stock against impairment. In the event a holder shall elect to convert any shares of Series A-2 Preferred Stock as provided herein, the Company cannot refuse conversion based on any claim that such holder or any one associated or affiliated with such holder has been engaged in any violation of law, unless (i) an order from the Securities and Exchange Commission prohibiting such conversion or (ii) an injunction from a court, on notice, restraining and/or adjoining conversion of all or of said shares of Series A-2 Preferred Stock shall have been issued and the Company posts a surety bond for the benefit of such holder in an amount equal to 120% of the Liquidation Preference Amount of the Series A-2 Preferred Stock such holder has elected to convert, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such holder in the event it obtains judgment.

(g) Certificates as to Adjustments. Upon occurrence of each adjustment or readjustment of the Conversion Price or number of shares of Common Stock issuable upon conversion of the Series A-2 Preferred Stock pursuant to this Section 5, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of such Series A-2 Preferred Stock a certificate setting forth such adjustment and readjustment, showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon written request of the holder of such affected Series A-2 Preferred Stock, at any time, furnish or cause to be furnished to such holder a like certificate setting forth such adjustments and readjustments, the Conversion Price in effect at the time, and the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon the conversion of a share of such Series A-2 Preferred Stock. Notwithstanding the foregoing, the Company shall not be obligated to deliver a certificate unless such certificate would reflect an increase or decrease of at least one percent of such adjusted amount.

12

(h)    Issue Taxes. The Company shall pay any and all issue and other taxes, excluding federal, state or local income taxes, that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of shares of Series A-2 Preferred Stock pursuant hereto; provided, however, that the Company shall not be obligated to pay any transfer taxes resulting from any transfer requested by any holder in connection with any such conversion.

(i)    Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile or three (3) business days following being mailed by certified or registered mail, postage prepaid, return-receipt requested, addressed to the holder of record at its address appearing on the books of the Company. The Company will give written notice to each holder of Series A-2 Preferred Stock at least twenty (20) days prior to the date on which the Company closes its books or takes a record (I) with respect to any dividend or distribution upon the Common Stock, (II) with respect to any pro rata subscription offer to holders of Common Stock or (III) for determining rights to vote with respect to any Organic Change, dissolution, liquidation or winding-up and in no event shall such notice be provided to such holder prior to such information being made known to the public. The Company will also give written notice to each holder of Series A-2 Preferred Stock at least twenty (20) days prior to the date on which any Organic Change, dissolution, liquidation or winding-up will take place and in no event shall such notice be provided to such holder prior to such information being made known to the public.

(j)    Fractional Shares. No fractional shares of Common Stock shall be issued upon conversion of the Series A-2 Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Company shall round the number of shares to be issued upon conversion up to the nearest whole number of shares.

(k)    Reservation of Common Stock. The Company shall, so long as any shares of Series A-2 Preferred Stock are outstanding, reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Series A-2 Preferred Stock, such number of shares of Common Stock that are not issued or reserved for issuance as of the Issuance Date; provided, however, upon the Company filing the Charter Amendment (as defined in the Transaction Documents), the Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, free of preemptive rights and other similar contractual rights of stockholders, a number of shares of Common Stock equal to one hundred fifty percent (150%) of the number of shares of Common Stock as shall from time to time be sufficient to effect the conversion of all of the shares of Series A-2 Preferred Stock then outstanding. The initial number of shares of Common Stock reserved for conversions of the Series A-2 Preferred Stock and any increase in the number of shares so reserved shall be allocated pro rata among the holders of the Series A-2 Preferred Stock based on the number of shares of Series A-2 Preferred Stock held by each holder of record at the time of issuance of the Series A-2 Preferred Stock or increase in the number of reserved shares, as the case may be. In the event a holder shall sell or otherwise transfer any of such holder's shares of Series A-2 Preferred Stock, each transferee shall be allocated a pro rata portion of the number of reserved shares of Common Stock reserved for such transferor.

13

(l)    Retirement of Series A-2 Preferred Stock. Conversion of Series A-2 Preferred Stock shall be deemed to have been effected on the Conversion Date. Upon conversion of only a portion of the number of shares of Series A-2 Preferred Stock represented by a certificate surrendered for conversion, the Company shall issue and deliver to such holder at the expense of the Company, a new certificate covering the number of shares of Series A-2 Preferred Stock representing the unconverted portion of the certificate so surrendered as required by Section 5(b)(ii).

(m)    Regulatory Compliance. If any shares of Common Stock to be reserved for the purpose of conversion of Series A-2 Preferred Stock require registration or listing with or approval of any governmental authority, stock exehange or other regulatory body under any federal or state law or regulation or otherwise before such shares may be validly issued or delivered upon conversion, the Company shall, at its sole cost and expense, in good faith and as expeditiously as possible, endeavor to secure such registration, listing or approval, as the case may be.

6.    No Preemptive Rights. Exeept as provided in Section 5 hereof, no holder of the Series A-2 Preferred Stock shall be entitled to rights to subscribe for, purchase or receive any part of any new or additional shares of any class, whether now or hereinafter authorized, or of bonds or debentures, or other evidences of indebtedness convertible into or exchangeable for shares of any class, but all such new or additional shares of any class, or any bond, debentures or other evidences of indebtedness convertible into or exchangeable for shares, may be issued and disposed of by the Board of Directors on such terms and for such consideration (to the extent permitted by law), and to such person or persons as the Board of Directors in their absolute discretion may deem advisable.

7.    Conversion Restriction. Notwithstanding anything to the contrary set forth in Section 5 of this Certificate of Designation, at no time may a holder of shares of Series A-2 Preferred Stock convert shares of the Series A-2 Preferred Stock if the number of shares of Common Stock to be issued pursuant to such conversion would cause the number of shares of Common Stock owned by such holder and its affiliates at such time to exceed, when aggregated with all other shares of Common Stock owned by such holder and its affiliates at such time, the number of shares of Common Stock which would result in such holder and its affiliates beneficially owning (as determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules thereunder) in excess of 9.9% of the then issued and outstanding shares of Common Stock outstanding at such time; provided, however, that upon a holder of Series A-2 Preferred Stock providing the Company with sixty-one (61) days notice (pursuant to Section 5(i) hereof) (the "Waiver Notice") that such holder would like to waive Section 7 of this Certificate of Designation with regard to any or all shares of Common Stock issuable upon conversion of Series A-2 Preferred Stock, this Section 7 shall be of no force or effect with regard to those shares of Series A-2 Preferred Stock referenced in the Waiver Notice.

14

8. Redemption.

(a) Redemption Option Upon Major Transaction. In addition to all other rights of the holders of Series A-2 Preferred Stock contained herein, simultaneous with the occurrence of a Major Transaction (as defined below), each holder of Series A-2 Preferred Stock shall have the right, at such holder's option, to require the Company to redeem all or a portion of such holder's shares of Series A-2 Preferred Stock at a price per share of Series A-2 Preferred Stock equal to one hundred percent (100%) of the Liquidation Preference Amount, plus any accrued but unpaid dividends and liquidated damages (the "Major Transaction Redemption Price"); provided that the Company shall have the sole option to pay the Major Transaction Redemption Price in cash or shares of Common Stock. If the Company elects to pay the Major Transaction Redemption Price in shares of Common Stock, the price per share shall be based upon the Conversion Price then in effect on the day preceding the date of delivery of the Notice of Redemption at Option of Buyer Upon Major Transaction (as hereafter defined) and the holder of such shares of Common Stock shall have demand registration rights with respect to such shares.

(b) Redemption Option Upon Triggering Event. In addition to all other rights of the holders of Series A-2 Preferred Stock contained herein, after a Triggering Event (as defined below), each holder of Series A-2 Preferred Stock shall have the right, at such holder's option, to require the Company to redeem all or a portion of such holder's shares of Series A-2 Preferred Stock at a price per share of Series A-2 Preferred Stock equal to one hundred twenty percent (120%) of the Liquidation Preference Amount, plus any accrued but unpaid dividends and liquidated damages the "Triggering Event Redemption Price" and, collectively with the "Major Transaction Redemption Price," the "Redemption Price"); provided that with respect to the Triggering Events described in clauses (i), (ii), (iii) and (vii) of Section 8(d), the Company shall have the sole option to pay the Triggering Event Redemption Price in cash or shares of Common Stock; and provided, further, that with respect to the Triggering Event described in clauses (iv), (v), (vi) and (viii) of Section 8(d), the Company shall pay the Triggering Event Redemption Price in cash. If the Company elects to pay the Triggering Event Redemption Price in shares of Common Stock in accordance with this Section 8(b), the price per share shall be based upon the Conversion Price then in effect on the day preceding the date of delivery of the Notice of Redemption at Option of Buyer Upon Triggering Event and the holder of such shares of Common Stock shall have demand registration rights with respect to such shares.

(c) "Major Transaction". A "Major Transaction" shall be deemed to have occurred at such time as any of the following events:

(i) the consolidation, merger or other business combination of the Company with or into another Person (other than (A) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company or (B) a consolidation, merger or other business combination in which holders of the Company's voting power immediately prior to the transaction continue after the transaction to hold, directly or indirectly, the voting power of the surviving entity or entities necessary to elect a majority of the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities).

15

(ii)       the sale or transfer of more than 50% of the Company's assets other than inventory in the ordinary course of business in one or a related series of transactions; or

(iii)       closing of a purchase, tender or exchange offer made to the holders of more than fifty percent (50%) of the outstanding shares of Common Stock in which more than fifty percent (50%) of the outstanding shares of Common Stock were tendered and accepted.

(d)       "Triggering Event". A "Triggering Event" shall be deemed to have occurred at such time as any of the following events:

(i)       so long as any shares of Series A-2 Preferred Stock are outstanding, (i) the Company fails to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Section 13(a) or 15(d) of the Exchange Act, or (ii) if the Company is not required to file reports pursuant to Section 13(a) or 15(d) of the Exchange Act, it fails to prepare and furnish to the holders and make publicly available in accordance with Rule 144(c) promulgated under the Securities Act annual and quarterly financial statements, together with a discussion and analysis of such financial statements in form and substance substantially similar to those that would otherwise be required to be included in reports required by Section 13(a) or 15(d) of the Exchange Act, as well as any other information required thereby, in the time period that such filings would have been required to have been made under the Exchange Act.

(ii)       the suspension from listing or trading, without subsequent listing on any one of, or the failure of the Common Stock to be listed or traded on at least one of, the OTC Bulletin Board, the Nasdaq National Market, the Nasdaq Global Market, the New York Stock Exchange, Inc. or the American Stock Exchange, Inc., for a period of five (5) consecutive trading days;

(iii)       the Company's notice to any holder of Series A-2 Preferred Stock, including by way of public announcement, at any time, of its inability to comply (including for any of the reasons described in Section 9) or its intention not to comply with proper requests for conversion of any Series A-2 Preferred Stock into shares of Common Stock; or

(iv)       the Company's failure to comply with a Conversion Notice tendered in accordance with the provisions of this Certificate of Designation within ten (10) business days after the receipt by the Company of the Conversion Notice and the Preferred Stock Certificates; or

(v)       the Company deregisters its shares of Common Stock and as a result such shares of Common Stock are no longer publicly traded; or

16

(vi)         the Company consummates a "going private" transaction and as a result the Common Stock is no longer registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended; or

(vii)        the Company breaches any representation, warranty, covenant or other term or condition of the Transaction Documents, this Certificate of Designation or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated thereby or hereby, except to the extent that such breach would not have a material adverse effect on the Company and except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of a least ten (10) business days; or

(e)         Mechanics of Redemption at Option of Buyer Upon Major Transaction. No sooner than thirty (30) days nor later than ten (10) days prior to the consummation of a Major Transaction, but not prior to the public announcement of such Major Transaction, the Company shall deliver written notice thereof via facsimile and overnight courier ("Notice of Major Transaction") to each holder of Series A-2 Preferred Stock. At any time after receipt of a Notice of a Major Transaction (or, in the event a Notice of Major Transaction is not delivered at least ten (10) days prior to a Major Transaction, at any time within ten (10) days prior to a Major Transaction), any holder of Series A-2 Preferred Stock then outstanding may require the Company to redeem, effective immediately prior to the consummation of such Major Transaction, all of the holder's Series A-2 Preferred Stock then outstanding by delivering written notice thereof via facsimile and overnight courier ("Notice of Redemption at Option of Buyer Upon Major Transaction") to the Company, which Notice of Redemption at Option of Buyer Upon Major Transaction shall indicate (i) the number of shares of Series A-2 Preferred Stock that such holder is electing to redeem and (ii) the applicable Major Transaction Redemption Price, as calculated pursuant to Section 8(a) above.

(f)         Mechanics of Redemption at Option of Buyer Upon Triggering Event. Within one (1) business day after the Company obtains knowledge of the occurrence of a Triggering Event, the Company shall deliver written notice thereof via facsimile and overnight courier ("Notice of Triggering Event") to each holder of Series A-2 Preferred Stock. At any time after the earlier of a holder's receipt of a Notice of Triggering Event and such holder becoming aware of a Triggering Event, any holder of Series A-2 Preferred Stock then outstanding may require the Company to redeem all of the Series A-2 Preferred Stock by delivering written notice thereof via facsimile and overnight courier ("Notice of Redemption at Option of Buyer Upon Triggering Event") to the Company, which Notice of Redemption at Option of Buyer Upon Triggering Event shall indicate (i) the number of shares of Series A-2 Preferred Stock that such holder is electing to redeem and (ii) the applicable Triggering Event Redemption Price, as calculated pursuant to Section 8(b) above.

(g)         Payment of Redemption Price. Upon the Company's receipt of a Notice(s) of Redemption at Option of Buyer Upon Triggering Event or a Notice(s) of Redemption at Option of Buyer Upon Major Transaction from any holder of Series A-2 Preferred Stock, the Company shall immediately notify such holder of Series A-2 Preferred Stock by facsimile of the Company's receipt of such Notice(s) of Redemption at Option of Buyer Upon Triggering Event or Notice(s) of Redemption at Option of Buyer Upon Major Transaction and each holder which has sent such a notice shall promptly submit to the Company such holder's Preferred Stock Certificates which such holder has elected to have

17

redeemed. Other than with respect to the Triggering Event described in clause (iv) of Section 8(d), the Company shall have the sole option to pay the Redemption Price in cash or shares of Common Stock in accordance with Sections 8(a) and (b) and Section 9 of this Certificate of Designation. The Company shall deliver the applicable Major Transaction Redemption Price immediately prior to the consummation of the Major Transaction; provided that a holder's Preferred Stock Certificates shall have been so delivered to the Company; provided further that if the Company is unable to redeem all of the Series A-2 Preferred Stock to be redeemed, the Company shall redeem an amount from each holder of Series A-2 Preferred Stock being redeemed equal to such holder's pro-rata amount (based on the number of shares of Series A-2 Preferred Stock held by such holder relative to the number of shares of Series A-2 Preferred Stock outstanding) of all Series A-2 Preferred Stock being redeemed. If the Company shall fail to redeem all of the Series A-2 Preferred Stock submitted for redemption (other than pursuant to a dispute as to the arithmetic calculation of the Redemption Price), in addition to any remedy such holder of Series A-2 Preferred Stock may have under this Certificate of Designation and the Transaction Documents, the applicable Redemption Price payable in respect of such unredeemed Series A-2 Preferred Stock shall bear interest at the rate of 1.0% per month (prorated for partial months) until paid in full. Until the Company pays such unpaid applicable Redemption Price in full to a holder of shares of Series A-2 Preferred Stock submitted for redemption, such holder shall have the option (the "Void Optional Redemption Option") to, in lieu of redemption, require the Company to promptly return to such holder(s) all of the shares of Series A-2 Preferred Stock that were submitted for redemption by such holder(s) under this Section 8 and for which the applicable Redemption Price has not been paid, by sending written notice thereof to the Company via facsimile (the "Void Optional Redemption Notice"). Upon the Company's receipt of such Void Optional Redemption Notice(s) and prior to payment of the full applicable Redemption Price to such holder, (i) the Notice(s) of Redemption at Option of Buyer Upon Major Transaction or Notice(s) of Redemption at Option of Buyer Upon Triggering Event (as applicable) shall be null and void with respect to those shares of Series A-2 Preferred Stock submitted for redemption and for which the applicable Redemption Price has not been paid and (ii) the Company shall immediately return any Series A-2 Preferred Stock submitted to the Company by each holder for redemption under this Section 8(d) and for which the applicable Redemption Price has not been paid; provided that no adjustment shall be made if such adjustment would result in an increase of the Conversion Price then in effect. A holder's delivery of a Void Optional Redemption Notice and exercise of its rights following such notice shall not effect the Company's obligations to make any payments which have accrued prior to the date of such notice other than interest payments. Payments provided for in this Section 8 shall have priority to payments to other stockholders in connection with a Major Transaction.

(h)     Demand Registration Rights. If the Redemption Price upon the occurrence of a Major Transaction or a Triggering Event is paid in shares of Common Stock and such shares have not been previously registered on a registration statement under the Securities Act, a holder of Series A-2 Preferred Stock may make a written request for registration under the Securities Act pursuant to this Section 8(h) of all of its shares of Common Stock issued upon such Major Transaction or Triggering Event. The Company shall use its reasonable best efforts to cause to be filed and declared effective as soon as reasonably practicable (but in no event later than the ninetieth (90th) day after such holder's request is made) a registration statement under the Securities Act, providing for the sale of all of the shares of Common Stock issued upon such Major Transaction or Triggering Event by such holder. The Company agrees to use its reasonable best efforts to keep any such registration statement continuously effective for resale of the Common Stock for so long as such holder shall request, but in no event shall the Company be required to maintain the effectiveness of such registration statement later than the date that the shares of Common Stock issued upon such Major Transaction or Triggering Event may be offered for resale to the public without volume restriction under Rule 144.

18

9.    Inability to Fully Convert.

(a)    Holder's Option if Company Cannot Fully Convert. If, upon the Company's receipt of a Conversion Notice, the Company cannot issue shares of Common Stock registered for resale under the Registration Statement for any reason, including, without limitation, because the Company (w) does not have a sufficient number of shares of Common Stock authorized and available, (x) is otherwise prohibited by applicable law or by the rules or regulations of any stock exchange, interdealer quotation system or other self-regulatory organization with jurisdiction over the Company or its securities from issuing all of the Common Stock which is to be issued to a holder of Series A-2 Preferred Stock pursuant to a Conversion Notice or (y) subsequent to the effective date of the Registration Statement, fails to have a sufficient number of shares of Common Stock registered for resale under the Registration Statement, then the Company shall issue as many shares of Common Stock as it is able to issue in accordance with such holder's Conversion Notice and pursuant to Section 5(b)(ii) above and, with respect to the unconverted Series A-2 Preferred Stock, the holder, solely at such holder's option, can elect, within five (5) business days after receipt of notice from the Company thereof to:

(i)    require the Company to redeem from such holder those Series A-2 Preferred Stock for which the Company is unable to issue Common Stock in accordance with such holder's Conversion Notice ("Mandatory Redemption") at a price per share equal to the Major Transaction Redemption Price as of such Conversion Date (the "Mandatory Redemption Price"); provided that the Company shall have the sole option to pay the Mandatory Redemption Price in cash or, subject to Section 7 hereof, shares of Common Stock;

(ii)    if the Company's inability to fully convert Series A-2 Preferred Stock is pursuant to Section 9(a)(y) above, require the Company to issue restricted shares of Common Stock in accordance with such holder's Conversion Notice and pursuant to Section 5(b)(ii) above;

(iii)    void its Conversion Notice and retain or have returned, as the case may be, the shares of Series A-2 Preferred Stock that were to be converted pursuant to such holder's Conversion Notice (provided that a holder's voiding its Conversion Notice shall not effect the Company's obligations to make any payments which have accrued prior to the date of such notice); or

19

(iv)     exercise its Buy-In rights pursuant to and in accordance with the terms and provisions of Section 5(b)(vi) hereof.

(b)     Mechanics of Fulfilling Holder's Election. The Company shall immediately send via facsimile or overnight courier to a holder of Series A-2 Preferred Stock, upon receipt of an original or facsimile copy of a Conversion Notice from such holder which cannot be fully satisfied as described in Section 9(a) above, a notice of the Company's inability to fully satisfy such holder's Conversion Notice (the "Inability to Fully Convert Notice"). Such Inability to Fully Convert Notice shall indicate (i) the reason why the Company is unable to fully satisfy such holder's Conversion Notice, (ii) the number of Series A-2 Preferred Stock which cannot be converted and (iii) the applicable Mandatory Redemption Price. Such holder shall notify the Company of its election pursuant to Section 9(a) above by delivering written notice via facsimile to the Company ("Notice in Response to Inability to Convert").

(c)     Payment of Redemption Price. If such holder shall elect to have its shares redeemed pursuant to Section 9(a)(i) above, the Company shall pay the Mandatory Redemption Price to such holder within thirty (30) days of the Company's receipt of the holder's Notice in Response to Inability to Convert, provided that prior to the Company's receipt of the holder's Notice in Response to Inability to Convert the Company has not delivered a notice to such holder stating, to the satisfaction of the holder, that the event or condition resulting in the Mandatory Redemption has been cured and all Conversion Shares issuable to such holder can and will be delivered to the holder in accordance with the terms of Section 2 (g). If the Company shall fail to pay the applicable Mandatory Redemption Price to such holder on a timely basis as described in this Section 9(c) (other than pursuant to a dispute as to the determination of the arithmetic calculation of the Redemption Price), in addition to any remedy such holder of Series A-2 Preferred Stock may have under this Certificate of Designation and the Transaction Documents, such unpaid amount shall bear interest at the rate of 2.0% per month (prorated for partial months) until paid in full. Until the full Mandatory Redemption Price is paid in full to such holder, such holder may (i) void the Mandatory Redemption with respect to those Series A-2 Preferred Stock for which the full Mandatory Redemption Price has not been paid, (ii) receive back such Series A-2 Preferred Stock, and (iii) require that the Conversion Price of such returned Series A-2 Preferred Stock be adjusted to the lesser of (A) the Conversion Price and (B) the lowest Closing Bid Price during the period beginning on the Conversion Date and ending on the date the holder voided the Mandatory Redemption.

(d)     Pro-rata Conversion and Redemption. In the event the Company receives a Conversion Notice from more than one holder of Series A-2 Preferred Stock on the same day and the Company can convert and redeem some, but not all, of the Series A-2 Preferred Stock pursuant to this Section 9, the Company shall convert and redeem from each holder of Series A-2 Preferred Stock electing to have Series A-2 Preferred Stock converted and redeemed at such time an amount equal to such holder's pro-rata amount (based on the number shares of Series A-2 Preferred Stock held by such holder relative to the number shares of Series A-2 Preferred Stock outstanding) of all shares of Series A-2 Preferred Stock being converted and redeemed at such time.

20

10.  Vote to Change the Terms of or Issue Preferred Stock. The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting, of the holders of not less than seventy-five percent (75%) of the then outstanding shares of Series A-2 Preferred Stock (in addition to any other corporate approvals then required to effect such action), shall be required (a) for any change to this Certificate of Designation or the Company's Articles of Incorporation which would amend, alter, change or repeal any of the powers, designations, preferences and rights of the Series A-2 Preferred Stock or (b) for the issuance of shares of Series A-2 Preferred Stock other than pursuant to the Transaction Documents.

11.  Lost or Stolen Certificates. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of any Preferred Stock Certificates representing the shares of Series A-2 Preferred Stock, and, in the case of loss, theft or destruction, of any indemnification undertaking by the holder to the Company that is reasonably acceptable to the Company and, in the case of mutilation, upon surrender and cancellation of the Preferred Stock Certificate(s), the Company shall execute and deliver new preferred stock certificate(s) of like tenor and date; provided, however, that the Company shall not be obligated to re-issue Preferred Stock Certificates if the holder contemporaneously requests the Company to convert such shares of Series A-2 Preferred Stock into Common Stock.

12.  Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Certificate of Designation shall be cumulative and in addition to all other remedies available under this Certificate of Designation, at law or in equity (including a decree of specific performance and/or other injunctive relief), no remedy contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit a holder's right to pursue actual damages for any failure by the Company to comply with the terms of this Certificate of Designation. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the holder thereof and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the holders of the Series A-2 Preferred Stock and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holders of the Series A-2 Preferred Stock shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

13.  Specific Shall Not Limit General; Construction. No specific provision contained in this Certificate of Designation shall limit or modify any more general provision contained herein. This Certificate of Designation shall be deemed to be jointly drafted by the Company and all initial purchasers of the Series A-2 Preferred Stock and shall not be construed against any person as the drafter hereof.

14.  Failure or Indulgence Not Waiver. No failure or delay on the part of a holder of Series A-2 Preferred Stock in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

21

IN WITNESS WHEREOF, the undersigned has executed and subscribed this Certificate and does affirm the foregoing as true this 29th[th] day of May, 2008.

**ASTRATA GROUP INCORPORATED**

By:/s/ Martin George Euler

Name: Martin George Euler
Title: Chief Executive Officer

22

EXHIBIT I

## ASTRATA GROUP INCORPORATED
## CONVERSION NOTICE

Reference is made to the Certificate of Designation of the Relative Rights and Preferences of the Series A-2 Preferred Stock of Astrata Group Incorporated (the "Certificate of Designation"). In accordance with and pursuant to the Certificate of Designation, the undersigned hereby elects to convert the number of shares of Series A-2 Preferred Stock, par value $0.0001 per share (the "Preferred Shares"), of Astrata Group Incorporated, a Nevada corporation (the "Company"), indicated below into shares of Common Stock, par value $0.0001 per share (the "Common Stock"), of the Company, by tendering the stock certificate(s) representing the share(s) of Preferred Shares specified below as of the date specified below.

Date of Conversion:

Number of Preferred Shares to be converted:

Stock certificate no(s). of Preferred Shares to be converted:

The Common Stock are being contemporaneously sold pursuant to the Registration Statement:                                                                                                    YES ____ NO ____

Please confirm the following information:

Conversion Price:

Number of shares of Common Stock to be issued:

Number of shares of Common Stock beneficially owned or deemed beneficially owned by the Holder on the Date of Conversion:

Please issue the Common Stock into which the Preferred Shares are being converted and, if applicable, any check drawn on an account of the Company in the following name and to the following address:

Issue to:

Facsimile Number:

Authorization:

By:

Title:

Dated:

23

EX-4.6 7 astrata_8k-ex0406.htm CERTIFICATE OF DESIGNATION FOR SERIES C
**EXHIBIT 4.6**

### CERTIFICATE OF DESIGNATION OF THE RELATIVE RIGHTS AND PREFERENCES
### OF THE
### SERIES C CONVERTIBLE PREFERRED STOCK
### OF
### ASTRATA GROUP INCORPORATED

The undersigned, the Chief Executive Officer of Astrata Group Incorporated, a Nevada corporation (the "Company"), in accordance with the provisions of the Nevada Revised Statutes, does hereby certify that, pursuant to the authority conferred upon the Board of Directors by the Articles of Incorporation of the Company, the following resolution creating a series of preferred stock, designated as Series C Convertible Preferred Stock, was duly adopted on May 29, 2008, as follows:

RESOLVED, that pursuant to the authority expressly granted to and vested in the Board of Directors of the Company by provisions of the Articles of Incorporation of the Company (the "Articles of Incorporation"), there hereby is created out of the shares of the Company's preferred stock, par value $0.0001 per share, of the Company authorized in Article IV of the Articles of Incorporation (the "Preferred Stock"), a series of Preferred Stock of the Company, to be named "Series C Convertible Preferred Stock," consisting of One Million Six Hundred Ninety Six Thousand One Hundred Thirty One (1,696,131) shares, which series shall have the following designations, powers, preferences and relative and other special rights and the following qualifications, limitations and restrictions:

1.     Designation and Rank. The designation of such series of the Preferred Stock shall be the Series C Convertible Preferred Stock, par value $0.0001 per share (the "Series C Preferred Stock"). The maximum number of shares of Series C Preferred Stock shall be One Million Six Hundred Ninety Six Thousand One Hundred Thirty One (1,696,131) shares. The Series C Preferred Stock shall rank senior to the Company's common stock, par value $0.0001 per share (the "Common Stock"), and to all other classes and series of equity securities of the Company which by their terms do not rank senior to the Series C Preferred Stock ("Junior Stock"). The Series C Preferred Stock shall be subordinate to and rank junior to all indebtedness of the Company now or hereafter outstanding.

2.     Voting Rights.

(a)     Class Voting Rights. So long as any shares of the Series C Preferred Stock remain outstanding, the Company shall not, without the affirmative vote or consent of the holders of at least seventy-five percent (75%) of the shares of the Series C Preferred Stock outstanding at the time, given in person or by proxy, either in writing or at a meeting, in which the holders of the Series C Preferred Stock vote separately as a class: (i) authorize, create, issue or increase the authorized or issued amount of any class or series of stock, including but not limited to the issuance of any more shares of Preferred Stock, ranking pari passu or senior to the Series C Preferred Stock, with respect to the distribution of assets on liquidation, dissolution or winding up; (ii) amend, alter or repeal the provisions of the Series C Preferred Stock, whether by merger, consolidation or otherwise, so as to

adversely affect any right, preference, privilege or voting power of the Series C Preferred Stock; provided, however, that any creation and issuance of another series of Junior Stock shall not be deemed to adversely affect such rights, preferences, privileges or voting powers; (iii) repurchase, redeem or pay dividends on, shares of Common Stock or any other shares of the Company's Junior Stock (other than de minimus repurchases from employees of the Company in certain circumstances, and any contractual redemption obligations existing as of the date hereof as disclosed in the Company's public filings with the Securities and Exchange Commission); (iv) amend the Articles of Incorporation or By-Laws of the Company so as to affect materially and adversely any right, preference, privilege or voting power of the Series C Preferred Stock; provided, however, that any creation and issuance of another series of Junior Stock shall not be deemed to adversely affect such rights, preferences, privileges or voting powers; (v) effect any distribution with respect to Junior Stock other than as permitted hereby; (vi) reclassify the Company's outstanding securities; (vii) voluntarily file for bankruptcy, liquidate the Company's assets or make an assignment for the benefit of the Company's creditors; or (viii) materially change the nature of the Company's business.

(b)     General Voting Rights. Except with respect to transactions upon which the Series C Preferred Stock shall be entitled to vote separately as a class pursuant to Section 2(a) above and except as otherwise required by Nevada law, the Series C Preferred Stock shall have no voting rights. The Common Stock into which the Series C Preferred Stock is convertible shall, upon issuance, have all of the same voting rights as other issued and outstanding Common Stock of the Company, and none of the rights of the Preferred Stock.

3.     Liquidation Preference.

(a)     In the event of the liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, the holders of shares of Series C Preferred Stock then outstanding shall be entitled to receive, out of the assets of the Company available for distribution to its stockholders, an amount equal to $7.80 per share (the "Liquidation Preference Amount") of the Series C Preferred Stock before any payment shall be made or any assets distributed to the holders of the Common Stock or any other Junior Stock. If the assets of the Company are not sufficient to pay in full the Liquidation Preference Amount to the holders of outstanding shares of the Series C Preferred Stock and any series of Preferred Stock or any other class of stock ranking pari passu, as to rights on liquidation, dissolution or winding up, with the Series C Preferred Stock, then all of said assets will be distributed among the holders of the Series C Preferred Stock and the other classes of stock ranking pari passu with the Series C Preferred Stock, if any, ratably in accordance with the respective amounts that would be payable on such shares if all amounts payable thereon were paid in full. The liquidation payment with respect to each outstanding fractional share of Series C Preferred Stock shall be equal to a ratably proportionate amount of the liquidation payment with respect to each outstanding share of Series C Preferred Stock. All payments for which this Section 3(a) provides shall be in cash, property (valued at its fair market value as determined by an independent appraiser reasonably acceptable to the holders of a majority of the Series C Preferred Stock) or a combination thereof; provided, however, that no cash shall be paid to holders of Junior Stock unless each holder of the outstanding shares of Series C Preferred Stock has been paid in cash the full Liquidation Preference Amount. After payment of the full Liquidation Preference Amount, such holders of shares of Series C Preferred Stock will not be entitled to any further participation as such in any distribution of the assets of the Company.

2

(b)    A consolidation or merger of the Company with or into any other corporation or corporations, or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of related transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed, shall not be deemed to be a liquidation, dissolution, or winding up within the meaning of this Section 4. In the event of the merger or consolidation of the Company with or into another corporation, the Series C Preferred Stock shall maintain its relative powers, designations and preferences provided for herein and no merger shall result which is inconsistent therewith unless otherwise approved by at least seventy-five percent (75%) of the then outstanding shares of Series C Preferred Stock.

(c)    Written notice of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, stating a payment date and the place where the distributable amounts shall be payable, shall be given by mail, postage prepaid, no less than forty-five (45) days prior to the payment date stated therein, to the holders of record of the Series C Preferred Stock at their respective addresses as the same shall appear on the books of the Company.

4.    Conversion. The holder of Series C Preferred Stock shall have the following conversion rights (the "Conversion Rights"):

(a)    Right to Convert. At any time on or after the Issuance Date, the holder of any such shares of Series C Preferred Stock may, at such holder's option, subject to the limitations set forth in Section 6 herein, elect to convert (a "Conversion") all or any portion of the shares of Series C Preferred Stock held by such person into a number of fully paid and nonassessable shares of Common Stock equal to the quotient of (i) the Liquidation Preference Amount of the shares of Series C Preferred Stock being converted by (ii) the Conversion Price (as defined in Section 4(d) below) then in effect as of the date of the delivery by such holder of its notice of election to convert. In the event of a notice of redemption of any shares of Series C Preferred Stock pursuant to Section 7 hereof, the Conversion Rights of the shares designated for redemption shall terminate at the close of business on the last full day preceding the date fixed for redemption, unless the redemption price is not paid on such redemption date, in which case the Conversion Rights for such shares shall continue until such price is paid in full. In the event of a liquidation, dissolution or winding up of the Company, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Series C Preferred Stock. In the event of such a redemption or liquidation, dissolution or winding up, the Company shall provide to each holder of shares of Series C Preferred Stock notice of such redemption or liquidation, dissolution or winding up, which notice shall (i) be sent at least fifteen (15) days prior to the termination of the Conversion Rights (or, if the Company obtains lesser notice thereof, then as promptly as possible after the date that it has obtained notice thereof) and (ii) state the amount per share of Series C Preferred Stock that will be paid or distributed on such redemption or liquidation, dissolution or winding up, as the case may be.

(b)    Mechanics of Conversion. The Conversion of Series C Preferred Stock shall be conducted in the following manner:

3

(i)     Holder's Delivery Requirements. To convert Series C Preferred Stock into full shares of Common Stock on any date (the "Conversion Date"), the holder thereof shall (A) transmit by facsimile (or otherwise deliver), for receipt on or prior to 5:00 p.m., New York time on such date, a copy of a fully executed notice of conversion in the form attached hereto as Exhibit I (the "Conversion Notice"), to the Company at (310) 226-8553, Attention: Chief Executive Officer, and (B) surrender to a common carrier for delivery to the Company as soon as practicable following such Conversion Date the original certificates representing the shares of Series C Preferred Stock being converted (or an indemnification undertaking with respect to such shares in the case of their loss, theft or destruction) (the "Preferred Stock Certificates") and the originally executed Conversion Notice.

(ii)    Company's Response. Upon receipt by the Company of a facsimile copy of a Conversion Notice, the Company shall immediately send, via facsimile, a confirmation of receipt of such Conversion Notice to such holder. Upon receipt by the Company of a copy of the fully executed Conversion Notice, the Company or its designated transfer agent (the "Transfer Agent"), as applicable, shall, within three (3) business days following the date of receipt by the Company of the fully executed Conversion Notice, issue and deliver to the Depository Trust Company ("DTC") account on the Holder's behalf via the Deposit Withdrawal Agent Commission System ("DWAC") as specified in the Conversion Notice, or via physical certificate if so specified in the Conversion Notice, registered in the name of the holder or its designee, for the number of shares of Common Stock to which the holder shall be entitled. Notwithstanding the foregoing to the contrary, the Company or its Transfer Agent shall only be obligated to issue and deliver the shares to the DTC on a holder's behalf via DWAC if a registration statement providing for the resale of the shares of Common Stock issuable upon conversion of the Series C Preferred Stock is effective or such shares are otherwise eligible for legend removal, and if the Transfer Agent is a participant in the DWAC system. If the shares of Common Stock to be received pursuant to the Conversion Notice are not registered or otherwise eligible for legend removal, the Transfer Agent shall issue a physical certificate in the name of the holder representing such shares with a restrictive legend and a notation that such shares are deemed owned by the holder as of the Issuance Date for purposes of determining the holder's holding period under Rule 144 ("Rule 144") of the Securities Act of 1933, as amended. If the number of shares of Preferred Stock represented by the Preferred Stock Certificate(s) submitted for conversion is greater than the number of shares of Series C Preferred Stock being converted, then the Company shall, as soon as practicable and in no event later than three (3) business days after receipt of the Preferred Stock Certificate(s) and at the Company's expense, issue and deliver to the holder a new Preferred Stock Certificate representing the number of shares of Series C Preferred Stock not converted.

(iii)   Dispute Resolution. In the case of a dispute as to the arithmetic calculation of the number of shares of Common Stock to be issued upon conversion, the Company shall cause its Transfer Agent to promptly issue to the holder the number of shares of Common Stock that is not disputed and shall submit the arithmetic calculations to the holder via facsimile as soon as possible, but in no event later than two (2) business days after receipt of such holder's Conversion Notice. If such holder and the Company are unable to agree upon the arithmetic calculation of the number of shares of Common Stock to be issued upon such conversion within one (1) business day of such

4

disputed arithmetic calculation being submitted to the holder, then the Company shall within one (1) business day submit via facsimile the disputed arithmetic calculation of the number of shares of Common Stock to be issued upon such conversion to the Company's independent, outside accountant. The Company shall cause the accountant to perform the calculations and notify the Company and the holder of the results no later than seventy-two (72) hours from the time it receives the disputed calculations. Such accountant's calculation shall be binding upon all parties absent manifest error. The reasonable expenses of such accountant in making such determination shall be paid by the Company, in the event the holder's calculation was correct, or by the holder, in the event the Company's calculation was correct, or equally by the Company and the holder in the event that neither the Company's or the holder's calculation was correct. The period of time in which the Company is required to effect conversions or redemptions under this Certificate of Designation shall be tolled with respect to the subject conversion or redemption pending resolution of any dispute by the Company made in good faith and in accordance with this Section 5(b)(iii).

                (iv)        <u>Record Holder</u>. The person or persons entitled to receive the shares of Common Stock issuable upon a conversion of the Series C Preferred Stock shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the Conversion Date.

                (v)        <u>Company's Failure to Timely Convert</u>. If within three (3) business days of the Company's receipt of an executed copy of the Conversion Notice (so long as the applicable Preferred Stock Certificates and original Conversion Notice are received by the Company on or before such third business day) (the "Delivery Date"), the Transfer Agent shall fail to issue and deliver to a holder the number of shares of Common Stock to which such holder is entitled upon such holder's conversion of the Series C Preferred Stock or to issue a new Preferred Stock Certificate representing the number of shares of Series C Preferred Stock to which such holder is entitled pursuant to Section 5(b)(ii) (a "Conversion Failure"), in addition to all other available remedies which such holder may pursue hereunder and under the Amendment to Certain Warrants for the Purchase of Shares of Common Stock of the Company by and among the Company, Vision Opportunity Master Fund, Ltd. ("VOMF") and Vision Opportunity China Fund Limited ("VOC") dated as of May 29, 2008, the Warrant Exchange Agreement by and among Company and the holders signatory thereto dated as of May 29, 2008, the Preferred Stock Exchange Agreement by and among Company and the holders signatory thereto dated as of May 29, 2008 and the Lock-Up Agreement by and among the Company and the initial holders of the Series C Preferred Stock (collectively, the "Transaction Documents"), the Company shall pay additional damages to such holder on each business day after such third (3rd) business day that such conversion is not timely effected in an amount equal to 0.5% of the product of (A) the sum of the number of shares of Common Stock not issued to the holder on a timely basis pursuant to Section 5(b)(ii) and to which such holder is entitled and, in the event the Company has failed to deliver a Preferred Stock Certificate to the holder on a timely basis pursuant to Section 5(b)(ii), the number of shares of Common Stock issuable upon conversion of the shares of Series C Preferred Stock represented by such Preferred Stock Certificate, as of the last possible date which the Company could have issued such Preferred Stock Certificate to such holder without violating Section 5(b)(ii) and (B) the Closing Bid Price (as defined below) of the Common

5

Stock on the last possible date which the Company could have issued such Common Stock and such Preferred Stock Certificate, as the case may be, to such holder without violating Section 5(b)(ii). If the Company fails to pay the additional damages set forth in this Section 5(b)(v) within five (5) business days of the date incurred, then such payment shall bear interest at the rate of 2.0% per month (pro rated for partial months) until such payments are made. The term "Closing Bid Price" shall mean, for any security as of any date, the last closing bid price of such security on the OTC Bulletin Board or other quotation venue or principal exchange on which such security is traded as reported by Bloomberg, or, if no closing bid price is reported for such security by Bloomberg, the last closing trade price of such security as reported by Bloomberg, or, if no last closing trade price is reported for such security by Bloomberg, the average of the bid prices of any market makers for such security as reported by the Pink Sheets LLC. If the Closing Bid Price cannot be calculated for such security on such date on any of the foregoing bases, the Closing Bid Price of such security on such date shall be the fair market value as mutually determined by the Company and the holders of a majority of the outstanding shares of Series C Preferred Stock.

(vi)    Buy-In Rights. In addition to any other rights available to the holders of Series C Preferred Stock, if the Company fails to cause its Transfer Agent to transmit to the holder a certificate or certificates representing the shares of Common Stock issuable upon conversion of the Series C Preferred Stock on or before the Delivery Date, and if after such date the holder is required by its broker to purchase (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the holder of the shares of Common Stock issuable upon conversion of Series C Preferred Stock which the holder anticipated receiving upon such conversion (a "Buy-In"), then the Company shall (1) pay in cash to the holder the amount by which (x) the holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (A) the number of shares of Common Stock issuable upon conversion of Series C Preferred Stock that the Company was required to deliver to the holder in connection with the conversion at issue times (B) the price at which the sell order giving rise to such purchase obligation was executed, and (2) at the option of the holder, either reinstate the shares of Series C Preferred Stock and equivalent number of shares of Common Stock for which such conversion was not honored or deliver to the holder the number of shares of Common Stock that would have been issued had the Company timely complied with its conversion and delivery obligations hereunder. For example, if the holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (1) of the immediately preceding sentence the Company shall be required to pay to the holder $1,000. The holder shall provide the Company written notice indicating the amounts payable to the holder in respect of the Buy-In, together with applicable confirmations and other evidence reasonably requested by the Company. Nothing herein shall limit a holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock upon conversion of the Series C Preferred Stock as required pursuant to the terms hereof.

(c)    Intentionally omitted.

6

(d)    Conversion Price. The term "Conversion Price" shall mean $0.39, subject to adjustment under Section 4(e) hereof. Notwithstanding any adjustment hereunder, at no time shall the Conversion Price be greater than $0.39 per share except if it is adjusted pursuant to Section 4(e)(i).

(e)    Adjustments of Conversion Price.

(i)    Adjustments for Stock Splits and Combinations. If the Company shall at any time or from time to time after the Issuance Date, effect a stock split of the outstanding Common Stock, the Conversion Price shall be proportionately decreased. If the Company shall at any time or from time to time after the Issuance Date, combine the outstanding shares of Common Stock, the Conversion Price shall be proportionately increased. Any adjustments under this Section 4(e)(i) shall be effective at the close of business on the date the stock split or combination becomes effective.

(ii)    Adjustments for Certain Dividends and Distributions. If the Company shall at any time or from time to time after the Issuance Date, make or issue or set a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in shares of Common Stock, then, and in each event, the Conversion Price shall be decreased as of the time of such issuance or, in the event such record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Price then in effect by a fraction:

(1)    the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date; and

(2)    the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

(iii)    Adjustment for Other Dividends and Distributions. If the Company shall at any time or from time to time after the Issuance Date, make or issue or set a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in securities of the Company other than shares of Common Stock, then, and in each event, an appropriate revision to the applicable Conversion Price shall be made and provision shall be made (by adjustments of the Conversion Price or otherwise) so that the holders of Series C Preferred Stock shall receive upon conversions thereof, in addition to the number of shares of Common Stock receivable thereon, the number of securities of the Company which they would have received had their Series C Preferred Stock been converted into Common Stock on the date of such event and had thereafter, during the period from the date of such event to and including the Conversion Date, retained such securities (together with any distributions payable thereon during such period), giving application to all adjustments called for during such period under this Section 4(e)(iii) with respect to the rights of the holders of the Series C Preferred Stock; provided, however, that if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Conversion Price shall

7

be adjusted pursuant to this paragraph as of the time of actual payment of such dividends or distributions; and provided further, however, that no such adjustment shall be made if the holders of Series C Preferred Stock simultaneously receive (i) a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Series C Preferred Stock had been converted into Common Stock on the date of such event or (ii) a dividend or other distribution of shares of Series C Preferred Stock which are convertible, as of the date of such event, into such number of shares of Common Stock as is equal to the number of additional shares of Common Stock being issued with respect to each share of Common Stock in such dividend or distribution.

(iv)    Adjustments for Reclassification, Exchange or Substitution. If the Common Stock issuable upon conversion of the Series C Preferred Stock at any time or from time to time after the Issuance Date shall be changed to the same or different number of shares of any class or classes of stock, whether by reclassification, exchange, substitution or otherwise (other than by way of a stock split or combination of shares or stock dividends provided for in Sections 4(e)(i), (ii) and (iii), or a reorganization, merger, consolidation, or sale of assets provided for in Section 4(e)(v)), then, and in each event, an appropriate revision to the Conversion Price shall be made and provisions shall be made (by adjustments of the Conversion Price or otherwise) so that the holder of each share of Series C Preferred Stock shall have the right thereafter to convert such share of Series C Preferred Stock into the kind and amount of shares of stock and other securities receivable upon reclassification, exchange, substitution or other change, by holders of the number of shares of Common Stock into which such share of Series C Preferred Stock might have been converted immediately prior to such reclassification, exchange, substitution or other change, all subject to further adjustment as provided herein.

(v)    Adjustments for Reorganization, Merger, Consolidation or Sales of Assets. If at any time or from time to time after the Issuance Date there shall be a capital reorganization of the Company (other than by way of a stock split or combination of shares or stock dividends or distributions provided for in Section 4(e)(i), (ii) and (iii), or a reclassification, exchange or substitution of shares provided for in Section 4(e)(iv)), or a merger or consolidation of the Company with or into another corporation where the holders of outstanding voting securities prior to such merger or consolidation do not own over 50% of the outstanding voting securities of the merged or consolidated entity, immediately after such merger or consolidation, or the sale of all or substantially all of the Company's properties or assets to any other person (an "Organic Change"), then as a part of such Organic Change an appropriate revision to the Conversion Price shall be made if necessary and provision shall be made if necessary (by adjustments of the Conversion Price or otherwise) so that the holder of each share of Series C Preferred Stock shall have the right thereafter to convert such share of Series C Preferred Stock into the kind and amount of shares of stock and other securities or property of the Company or any successor corporation resulting from Organic Change. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 4(e)(v) with respect to the rights of the holders of the Series C Preferred Stock after the Organic Change to the end that the provisions of this Section 4(e)(v) (including any adjustment in the Conversion Price then in effect and the number of shares of stock or other securities deliverable upon conversion of the Series C Preferred Stock) shall be applied after that event in as nearly an equivalent manner as may be practicable.

8

(vi)        Intentionally Omitted.

(vii)       Intentionally Omitted.

(viii)      Intentionally Omitted.

(ix)        Record Date. In case the Company shall take record of the holders of its Common Stock or any other Preferred Stock for the purpose of entitling them to subscribe for or purchase Common Stock, then the date of the issue or sale of the shares of Common Stock shall be deemed to be such record date.

(x)        Certain Issues Excepted. Anything herein to the contrary notwithstanding, the Company shall not be required to make any adjustment to the Conversion Price upon (i) securities issued (other than for cash) in connection with a merger, acquisition, or consolidation, (ii) securities issued pursuant to the conversion or exercise of convertible or exercisable securities issued or outstanding on or prior to the date of the Transaction Documents or issued pursuant to the Transaction Documents (so long as the conversion or exercise price in such securities are not amended to lower such price and/or adversely affect the holders), (iii) securities issued in connection with bona fide strategic license agreements or other partnering arrangements so long as such issuances are not for the purpose of raising capital, (iv) Common Stock issued or the issuance or grants of options to purchase Common Stock pursuant to the Issuer's stock option plans and employee stock purchase plans outstanding as they exist on the date of the Transaction Documents, and (v) any warrants issued to the placement agent and its designees for the transactions contemplated by the Transaction Documents.

(f)        No Impairment. The Company shall not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Section 5 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series C Preferred Stock against impairment. In the event a holder shall elect to convert any shares of Series C Preferred Stock as provided herein, the Company cannot refuse conversion based on any claim that such holder or any one associated or affiliated with such holder has been engaged in any violation of law, unless (i) an order from the Securities and Exchange Commission prohibiting such conversion or (ii) an injunction from a court, on notice, restraining and/or adjoining conversion of all or of said shares of Series C Preferred Stock shall have been issued and the Company posts a surety bond for the benefit of such holder in an amount equal to 120% of the Liquidation Preference Amount of the Series C Preferred Stock such holder has elected to convert, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such holder in the event it obtains judgment.

9

(g)     Certificates as to Adjustments. Upon occurrence of each adjustment or readjustment of the Conversion Price or number of shares of Common Stock issuable upon conversion of the Series C Preferred Stock pursuant to this Section 4, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of such Series C Preferred Stock a certificate setting forth such adjustment and readjustment, showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon written request of the holder of such affected Series C Preferred Stock, at any time, furnish or cause to be furnished to such holder a like certificate setting forth such adjustments and readjustments, the Conversion Price in effect at the time, and the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon the conversion of a share of such Series C Preferred Stock. Notwithstanding the foregoing, the Company shall not be obligated to deliver a certificate unless such certificate would reflect an increase or decrease of at least one percent of such adjusted amount.

(h)     Issue Taxes. The Company shall pay any and all issue and other taxes, excluding federal, state or local income taxes, that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of shares of Series C Preferred Stock pursuant hereto; provided, however, that the Company shall not be obligated to pay any transfer taxes resulting from any transfer requested by any holder in connection with any such conversion.

(i)     Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile or three (3) business days following being mailed by certified or registered mail, postage prepaid, return-receipt requested, addressed to the holder of record at its address appearing on the books of the Company. The Company will give written notice to each holder of Series C Preferred Stock at least twenty (20) days prior to the date on which the Company closes its books or takes a record (I) with respect to any dividend or distribution upon the Common Stock, (II) with respect to any pro rata subscription offer to holders of Common Stock or (III) for determining rights to vote with respect to any Organic Change, dissolution, liquidation or winding-up and in no event shall such notice be provided to such holder prior to such information being made known to the public. The Company will also give written notice to each holder of Series C Preferred Stock at least twenty (20) days prior to the date on which any Organic Change, dissolution, liquidation or winding-up will take place and in no event shall such notice be provided to such holder prior to such information being made known to the public.

(j)     Fractional Shares. No fractional shares of Common Stock shall be issued upon conversion of the Series C Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Company shall round the number of shares to be issued upon conversion up to the nearest whole number of shares.

(k)     Reservation of Common Stock. The Company shall, so long as any shares of Series C Preferred Stock are outstanding, reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Series C Preferred Stock, such number of shares of Common Stock that are not issued or reserved for issuance as of the Issuance Date; provided, however, upon the Company filing the Charter Amendment (as defined in the Transaction Documents), the Company shall

10

take all action necessary to at all times have authorized, and reserved for the purpose of issuance, free of preemptive rights and other similar contractual rights of stockholders, a number of shares of Common Stock equal to one hundred fifty percent (150%) of the number of shares of Common Stock as shall from time to time be sufficient to effect the conversion of all of the shares of Series C Preferred Stock then outstanding. The initial number of shares of Common Stock reserved for conversions of the Series C Preferred Stock and any increase in the number of shares so reserved shall be allocated pro rata among the holders of the Series C Preferred Stock based on the number of shares of Series C Preferred Stock held by each holder of record at the time of issuance of the Series C Preferred Stock or increase in the number of reserved shares, as the case may be. In the event a holder shall sell or otherwise transfer any of such holder's shares of Series C Preferred Stock, each transferee shall be allocated a pro rata portion of the number of reserved shares of Common Stock reserved for such transferor.

(l)     Retirement of Series C Preferred Stock. Conversion of Series C Preferred Stock shall be deemed to have been effected on the Conversion Date. Upon conversion of only a portion of the number of shares of Series C Preferred Stock represented by a certificate surrendered for conversion, the Company shall issue and deliver to such holder at the expense of the Company, a new certificate covering the number of shares of Series C Preferred Stock representing the unconverted portion of the certificate so surrendered as required by Section 4(b)(ii).

(m)     Regulatory Compliance. If any shares of Common Stock to be reserved for the purpose of conversion of Series C Preferred Stock require registration or listing with or approval of any governmental authority, stock exchange or other regulatory body under any federal or state law or regulation or otherwise before such shares may be validly issued or delivered upon conversion, the Company shall, at its sole cost and expense, in good faith and as expeditiously as possible, endeavor to secure such registration, listing or approval, as the case may be.

5.     No Preemptive Rights. Except as provided in Section 4 hereof, no holder of the Series C Preferred Stock shall be entitled to rights to subscribe for, purchase or receive any part of any new or additional shares of any class, whether now or hereinafter authorized, or of bonds or debentures, or other evidences of indebtedness convertible into or exchangeable for shares of any class, but all such new or additional shares of any class, or any bond, debentures or other evidences of indebtedness convertible into or exchangeable for shares, may be issued and disposed of by the Board of Directors on such terms and for such consideration (to the extent permitted by law), and to such person or persons as the Board of Directors in their absolute discretion may deem advisable.

6.     Conversion Restriction. Notwithstanding anything to the contrary set forth in Section 4 of this Certificate of Designation, at no time may a holder of shares of Series C Preferred Stock convert shares of the Series C Preferred Stock if the number of shares of Common Stock to be issued pursuant to such conversion would cause the number of shares of Common Stock owned by such holder at such time to exceed, when aggregated with all other shares of Common Stock owned by such holder at such time, the number of shares of Common Stock which would result in such holder beneficially owning (as determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules

11

thereunder) in excess of 9.9% of the then issued and outstanding shares of Common Stock outstanding at such time; provided, however, that upon a holder of Series C Preferred Stock providing the Company with sixty-one (61) days notice (pursuant to Section 4(i) hereof) (the "Waiver Notice") that such holder would like to waive Section 6 of this Certificate of Designation with regard to any or all shares of Common Stock issuable upon conversion of Series C Preferred Stock, this Section 6(a) shall be of no force or effect with regard to those shares of Series C Preferred Stock referenced in the Waiver Notice.

7. Redemption.

(a) Redemption Option Upon Major Transaction. In addition to all other rights of the holders of Series C Preferred Stock contained herein, simultaneous with the occurrence of a Major Transaction (as defined below), each holder of Series C Preferred Stock shall have the right, at such holder's option, to require the Company to redeem all or a portion of such holder's shares of Series C Preferred Stock at a price per share of Series C Preferred Stock equal to one hundred fifty percent (150%) of the Liquidation Preference Amount plus any liquidated damages (the "Major Transaction Redemption Price"); provided that the Company shall have the sole option to pay the Major Transaction Redemption Price in cash or shares of Common Stock. If the Company elects to pay the Major Transaction Redemption Price in shares of Common Stock, the price per share shall be based upon the Conversion Price then in effect on the day preceding the date of delivery of the Notice of Redemption at Option of Buyer Upon Major Transaction (as hereafter defined) and the holder of such shares of Common Stock shall have demand registration rights with respect to such shares.

(b) Redemption Option Upon Triggering Event. In addition to all other rights of the holders of Series C Preferred Stock contained herein, after a Triggering Event (as defined below), each holder of Series C Preferred Stock shall have the right, at such holder's option, to require the Company to redeem all or a portion of such holder's shares of Series C Preferred Stock at a price per share of Series C Preferred Stock equal to one hundred twenty percent (120%) of the Liquidation Preference Amount, plus any liquidated damages the "Triggering Event Redemption Price" and, collectively with the "Major Transaction Redemption Price," the "Redemption Price"); provided that with respect to the Triggering Events described in clauses (i), (ii), (iii) and (vii) of Section 7(d), the Company shall have the sole option to pay the Triggering Event Redemption Price in cash or shares of Common Stock; and provided, further, that with respect to the Triggering Event described in clauses (iv), (v), (vi) and (viii) of Section 7(d), the Company shall pay the Triggering Event Redemption Price in cash. If the Company elects to pay the Triggering Event Redemption Price in shares of Common Stock in accordance with this Section 7(b), the price per share shall be based upon the Conversion Price then in effect on the day preceding the date of delivery of the Notice of Redemption at Option of Buyer Upon Triggering Event and the holder of such shares of Common Stock shall have demand registration rights with respect to such shares.

12

(c)        "Major Transaction". A "Major Transaction" shall be deemed to have occurred at such time as any of the following events:

(i)        the consolidation, merger or other business combination of the Company with or into another Person (other than (A) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company or (B) a consolidation, merger or other business combination in which holders of the Company's voting power immediately prior to the transaction continue after the transaction to hold, directly or indirectly, the voting power of the surviving entity or entities necessary to elect a majority of the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities).

(ii)       the sale or transfer of more than 50% of the Company's assets other than inventory in the ordinary course of business in one or a related series of transactions; or

(iii)      closing of a purchase, tender or exchange offer made to the holders of more than fifty percent (50%) of the outstanding shares of Common Stock in which more than fifty percent (50%) of the outstanding shares of Common Stock were tendered and accepted.

(d)        "Triggering Event". A "Triggering Event" shall be deemed to have occurred at such time as any of the following events:

(i)        so long as any shares of Series C Preferred Stock are outstanding, (i) the Company fails to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Section 13(a) or 15(d) of the Exchange Act, or (ii) if the Company is not required to file reports pursuant to Section 13(a) or 15(d) of the Exchange Act, it fails to prepare and furnish to the holders and make publicly available in accordance with Rule 144(c) promulgated under the Securities Act annual and quarterly financial statements, together with a discussion and analysis of such financial statements in form and substance substantially similar to those that would otherwise be required to be included in reports required by Section 13(a) or 15(d) of the Exchange Act, as well as any other information required thereby, in the time period that such filings would have been required to have been made under the Exchange Act.

(ii)       the suspension from listing or trading, without subsequent listing on any one of, or the failure of the Common Stock to be listed or traded on at least one of, the OTC Bulletin Board, the Nasdaq National Market, the Nasdaq Global Market, the New York Stock Exchange, Inc. or the American Stock Exchange, Inc., for a period of five (5) consecutive trading days;

(iii)      the Company's notice to any holder of Series C Preferred Stock, including by way of public announcement, at any time, of its inability to comply (including for any of the reasons described in Section 8) or its intention not to comply with proper requests for conversion of any Series C Preferred Stock into shares of Common Stock; or

13

(iv)     the Company's failure to comply with a Conversion Notice tendered in accordance with the provisions of this Certificate of Designation within ten (10) business days after the receipt by the Company of the Conversion Notice and the Preferred Stock Certificates; or

(v)     the Company deregisters its shares of Common Stock and as a result such shares of Common Stock are no longer publicly traded; or

(vi)     the Company consummates a "going private" transaction and as a result the Common Stock is no longer registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended; or

(vii)     the Company breaches any representation, warranty, covenant or other term or condition of the Transaction Documents, this Certificate of Designation or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated thereby or hereby, except to the extent that such breach would not have a material adverse effect on the Company and except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of a least ten (10) business days; or

(e)     Mechanics of Redemption at Option of Buyer Upon Major Transaction. No sooner than thirty (30) days nor later than ten (10) days prior to the consummation of a Major Transaction, but not prior to the public announcement of such Major Transaction, the Company shall deliver written notice thereof via facsimile and overnight courier ("Notice of Major Transaction") to each holder of Series C Preferred Stock. At any time after receipt of a Notice of Major Transaction (or, in the event a Notice of Major Transaction is not delivered at least ten (10) days prior to a Major Transaction, at any time within ten (10) days prior to a Major Transaction), any holder of Series C Preferred Stock then outstanding may require the Company to redeem, effective immediately prior to the consummation of such Major Transaction, all of the holder's Series C Preferred Stock then outstanding by delivering written notice thereof via facsimile and overnight courier ("Notice of Redemption at Option of Buyer Upon Major Transaction") to the Company, which Notice of Redemption at Option of Buyer Upon Major Transaction shall indicate (i) the number of shares of Series C Preferred Stock that such holder is electing to redeem and (ii) the applicable Major Transaction Redemption Price, as calculated pursuant to Section 7(a) above.

(f)     Mechanics of Redemption at Option of Buyer Upon Triggering Event. Within one (1) business day after the Company obtains knowledge of the occurrence of a Triggering Event, the Company shall deliver written notice thereof via facsimile and overnight courier ("Notice of Triggering Event") to each holder of Series C Preferred Stock. At any time after the earlier of a holder's receipt of a Notice of Triggering Event and such holder becoming aware of a Triggering Event, any holder of Series C Preferred Stock then outstanding may require the Company to redeem all of the Series C Preferred Stock by delivering written notice thereof via facsimile and overnight courier ("Notice of Redemption at Option of Buyer Upon Triggering Event") to the Company, which Notice of Redemption at Option of Buyer Upon Triggering Event shall indicate (i) the number of shares of Series C Preferred Stock that such holder is electing to redeem and (ii) the applicable Triggering Event Redemption Price, as calculated pursuant to Section 7(b) above.

(g)    Payment of Redemption Price. Upon the Company's receipt of a Notice(s) of Redemption at Option of Buyer Upon Triggering Event or a Notice(s) of Redemption at Option of Buyer Upon Major Transaction from any holder of Series C Preferred Stock, the Company shall immediately notify such holder of Series C Preferred Stock by facsimile of the Company's receipt of such Notice(s) of Redemption at Option of Buyer Upon Triggering Event or Notice(s) of Redemption at Option of Buyer Upon Major Transaction and each holder which has sent such a notice shall promptly submit to the Company such holder's Preferred Stock Certificates which such holder has elected to have redeemed. Other than with respect to the Triggering Event described in clause (iv) of Section 7(d), the Company shall have the sole option to pay the Redemption Price in cash or shares of Common Stock in accordance with Sections 7(a) and (b) and Section 8 of this Certificate of Designation. The Company shall deliver the applicable Major Transaction Redemption Price immediately prior to the consummation of the Major Transaction; provided that a holder's Preferred Stock Certificates shall have been so delivered to the Company; provided further that if the Company is unable to redeem all of the Series C Preferred Stock to be redeemed, the Company shall redeem an amount from each holder of Series C Preferred Stock being redeemed equal to such holder's pro-rata amount (based on the number of shares of Series C Preferred Stock held by such holder relative to the number of shares of Series C Preferred Stock outstanding) of all Series C Preferred Stock being redeemed. If the Company shall fail to redeem all of the Series C Preferred Stock submitted for redemption (other than pursuant to a dispute as to the arithmetic calculation of the Redemption Price), in addition to any remedy such holder of Series C Preferred Stock may have under this Certificate of Designation and the Transaction Documents, the applicable Redemption Price payable in respect of such unredeemed Series C Preferred Stock shall bear interest at the rate of 1.0% per month (prorated for partial months) until paid in full. Until the Company pays such unpaid applicable Redemption Price in full to a holder of shares of Series C Preferred Stock submitted for redemption, such holder shall have the option (the "Void Optional Redemption Option") to, in lieu of redemption, require the Company to promptly return to such holder(s) all of the shares of Series C Preferred Stock that were submitted for redemption by such holder(s) under this Section 7 and for which the applicable Redemption Price has not been paid, by sending written notice thereof to the Company via facsimile (the "Void Optional Redemption Notice"). Upon the Company's receipt of such Void Optional Redemption Notice(s) and prior to payment of the full applicable Redemption Price to such holder, (i) the Notice(s) of Redemption at Option of Buyer Upon Major Transaction or Notice(s) of Redemption at Option of Buyer Upon Triggering Event (as applicable) shall be null and void with respect to those shares of Series C Preferred Stock submitted for redemption and for which the applicable Redemption Price has not been paid and (ii) the Company shall immediately return any Series C Preferred Stock submitted to the Company by each holder for redemption under this Section 7(d) and for which the applicable Redemption Price has not been paid; provided that no adjustment shall be made if such adjustment would result in an increase of the Conversion Price then in effect. A holder's delivery of a Void Optional Redemption Notice and exercise of its rights following such notice shall not effect the Company's obligations to make any payments which have accrued prior to the date of such notice other than interest payments. Payments provided for in this Section 7 shall have priority to payments to other stockholders in connection with a Major Transaction.

15

(h)     Demand Registration Rights. If the Redemption Price upon the occurrence of a Major Transaction or a Triggering Event is paid in shares of Common Stock and such shares have not been previously registered on a registration statement under the Securities Act, a holder of Series C Preferred Stock may make a written request for registration under the Securities Act pursuant to this Section 7(h) of all of its shares of Common Stock issued upon such Major Transaction or Triggering Event. The Company shall use its reasonable best efforts to cause to be filed and declared effective as soon as reasonably practicable (but in no event later than the ninetieth (90th) day after such holder's request is made) a registration statement under the Securities Act, providing for the sale of all of the shares of Common Stock issued upon such Major Transaction or Triggering Event by sueh holder. The Company agrees to use its reasonable best efforts to keep any such registration statement continuously effeetive for resale of the Common Stock for so long as such holder shall request, but in no event shall the Company be required to maintain the effectiveness of such registration statement later than the date that the shares of Common Stock issued upon such Major Transaction or Triggering Event may be offered for resale to the public without volume restriction under Rule 144.

8.     Inability to Fully Convert.

(a)     Holder's Option if Company Cannot Fully Convert. If, upon the Company's receipt of a Conversion Notice, the Company cannot issue shares of Common Stock registered for resale under the Registration Statement for any reason, including, without limitation, because the Company (w) does not have a sufficient number of shares of Common Stock authorized and available, (x) is otherwise prohibited by applicable law or by the rules or regulations of any stock exchange, interdealer quotation system or other self-regulatory organization with jurisdiction over the Company or its securities from issuing all of the Common Stock which is to be issued to a holder of Series C Preferred Stock pursuant to a Conversion Notice or (y) subsequent to the effective date of the Registration Statement, fails to have a sufficient number of shares of Common Stock registered for resale under the Registration Statement, then the Company shall issue as many shares of Common Stock as it is able to issue in accordance with such holder's Conversion Notice and pursuant to Section 4 (b)(ii) above and, with respect to the unconverted Series C Preferred Stock, the holder, solely at such holder's option, can elect, within five (5) business days after receipt of notice from the Company thereof to:

(i)     require the Company to redeem from such holder those Series C Preferred Stock for which the Company is unable to issue Common Stock in accordance with such holder's Conversion Notice ("Mandatory Redemption") at a price per share equal to the Major Transaction Redemption Price as of such Conversion Date (the "Mandatory Redemption Price"); provided that the Company shall have the sole option to pay the Mandatory Redemption Price in cash or, subject to Section 7 hereof, shares of Common Stock;

(ii)    if the Company's inability to fully convert Series C Preferred Stock is pursuant to Section 8(a)(y) above, require the Company to issue restricted shares of Common Stock in accordance with such holder's Conversion Notice and pursuant to Section 4(b)(ii) above;

16

(iii)    void its Conversion Notice and retain or have returned, as the case may be, the shares of Series C Preferred Stock that were to be converted pursuant to such holder's Conversion Notice (provided that a holder's voiding its Conversion Notice shall not effect the Company's obligations to make any payments which have accrued prior to the date of such notice); or

(iv)    exercise its Buy-In rights pursuant to and in accordance with the terms and provisions of Section 4(b)(vi) hereof.

(b)    Mechanics of Fulfilling Holder's Election. The Company shall immediately send via facsimile or overnight courier to a holder of Series C Preferred Stock, upon receipt of an original or facsimile copy of a Conversion Notice from such holder which cannot be fully satisfied as described in Section 8(a) above, a notice of the Company's inability to fully satisfy such holder's Conversion Notice (the "Inability to Fully Convert Notice"). Such Inability to Fully Convert Notice shall indicate (i) the reason why the Company is unable to fully satisfy such holder's Conversion Notice, (ii) the number of Series C Preferred Stock which cannot be converted and (iii) the applicable Mandatory Redemption Price. Such holder shall notify the Company of its election pursuant to Section 8(a) above by delivering written notice via facsimile to the Company ("Notice in Response to Inability to Convert").

(c)    Payment of Redemption Price. If such holder shall elect to have its shares redeemed pursuant to Section 8(a)(i) above, the Company shall pay the Mandatory Redemption Price to such holder within thirty (30) days of the Company's receipt of the holder's Notice in Response to Inability to Convert, provided that prior to the Company's receipt of the holder's Notice in Response to Inability to Convert the Company has not delivered a notice to such holder stating, to the satisfaction of the holder, that the event or condition resulting in the Mandatory Redemption has been cured and all Conversion Shares issuable to such holder can and will be delivered to the holder in accordance with the terms of Section 7 (g). If the Company shall fail to pay the applicable Mandatory Redemption Price to such holder on a timely basis as described in this Section 8(c) (other than pursuant to a dispute as to the determination of the arithmetic calculation of the Redemption Price), in addition to any remedy such holder of Series C Preferred Stock may have under this Certificate of Designation and the Transaction Documents, such unpaid amount shall bear interest at the rate of 2.0% per month (prorated for partial months) until paid in full. Until the full Mandatory Redemption Price is paid in full to such holder, such holder may (i) void the Mandatory Redemption with respect to those Series C Preferred Stock for which the full Mandatory Redemption Price has not been paid, (ii) receive back such Series C Preferred Stock, and (iii) require that the Conversion Price of such returned Series C Preferred Stock be adjusted to the lesser of (A) the Conversion Price and (B) the lowest Closing Bid Price during the period beginning on the Conversion Date and ending on the date the holder voided the Mandatory Redemption.

(d)    Pro-rata Conversion and Redemption. In the event the Company receives a Conversion Notice from more than one holder of Series C Preferred Stock on the same day and the Company can convert and redeem some, but not all, of the Series C Preferred Stock pursuant to this Section 8, the Company shall convert and redeem from each holder of Series C Preferred Stock electing to have Series C Preferred Stock converted and redeemed at such time an amount equal to such holder's pro-rata amount (based on the number shares of Series C Preferred Stock held by such holder relative to the number shares of Series C Preferred Stock outstanding) of all shares of Series C Preferred Stock being converted and redeemed at such time.

17

9.    Vote to Change the Terms of or Issue Preferred Stock. The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting, of the holders of not less than seventy-five percent (75%) of the then outstanding shares of Series C Preferred Stock (in addition to any other corporate approvals then required to effect such action), shall be required (a) for any change to this Certificate of Designation or the Company's Articles of Incorporation which would amend, alter, change or repeal any of the powers, designations, preferences and rights of the Series C Preferred Stock or (b) for the issuance of shares of Series C Preferred Stock other than pursuant to the Transaction Documents.

10.    Lost or Stolen Certificates. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of any Preferred Stock Certificates representing the shares of Series C Preferred Stock, and, in the case of loss, theft or destruction, of any indemnification undertaking by the holder to the Company that is reasonably acceptable to the Company and, in the case of mutilation, upon surrender and cancellation of the Preferred Stock Certificate(s), the Company shall execute and deliver new preferred stock certificate(s) of like tenor and date; provided, however, that the Company shall not be obligated to re-issue Preferred Stock Certificates if the holder contemporaneously requests the Company to convert such shares of Series C Preferred Stock into Common Stock.

11.    Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Certificate of Designation shall be cumulative and in addition to all other remedies available under this Certificate of Designation, at law or in equity (including a decree of specific performance and/or other injunctive relief), no remedy contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit a holder's right to pursue actual damages for any failure by the Company to comply with the terms of this Certificate of Designation. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the holder thereof and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the holders of the Series C Preferred Stock and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the holders of the Series C Preferred Stock shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

12.    Specific Shall Not Limit General; Construction. No specific provision contained in this Certificate of Designation shall limit or modify any more general provision contained herein. This Certificate of Designation shall be deemed to be jointly drafted by the Company and all initial purchasers of the Series C Preferred Stock and shall not be construed against any person as the drafter hereof.

13.    Failure or Indulgence Not Waiver. No failure or delay on the part of a holder of Series C Preferred Stock in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18

IN WITNESS WHEREOF, the undersigned has executed and subscribed this Certificate and does affirm the foregoing as true this 29th day of May, 2008.

**ASTRATA GROUP INCORPORATED**

By:/s/ Martin George Euler

Name: Martin George Euler
Title: Chief Executive Officer

19

EXHIBIT I

## ASTRATA GROUP INCORPORATED
## CONVERSION NOTICE

Reference is made to the Certificate of Designation of the Relative Rights and Preferences of the Series C Preferred Stock of Astrata Group Incorporated (the "Certificate of Designation"). In accordance with and pursuant to the Certificate of Designation, the undersigned hereby elects to convert the number of shares of Series C Preferred Stock, par value $0.0001 per share (the "Preferred Shares"), of Astrata Group Incorporated, a Nevada corporation (the "Company"), indicated below into shares of Common Stock, par value $0.0001 per share (the "Common Stock"), of the Company, by tendering the stock certificate(s) representing the share(s) of Preferred Shares specified below as of the date specified below.

Date of Conversion: _____

Number of Preferred Shares to be converted: _____

Stock certificate no(s). of Preferred Shares to be converted: _____

The Common Stock are being contemporaneously sold pursuant to the Registration Statement: YES ____ NO ____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to be issued: _____

Number of shares of Common Stock beneficially owned or deemed beneficially owned by the Holder on the Date of Conversion: _____

Please issue the Common Stock into which the Preferred Shares are being converted and, if applicable, any check drawn on an account of the Company in the following name and to the following address:

Issue to: _____
_____

Facsimile Number: _____

Authorization: 

By: _____

Title: _____

Dated: _____

20

**EXHIBIT D**

```
<DOCUMENT>
<TYPE>SC 13D
<SEQUENCE>1
<FILENAME>astrata_13d.txt
<DESCRIPTION>SC 13D
<TEXT>
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

SCHEDULE 13D

INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT
TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO
RULE 13d-2(a)

(Amendment No. __)*

ASTRATA GROUP INCORPORATED
------------------------------------------------------------
(Name of Issuer)

Common Stock, par value $0.0001 per share
------------------------------------------------------------
(Title of Class of Securities)

04634R106
------------------------------------------------------------
(CUSIP Number)

Vision Capital Advisors, LLC
20 West 55th Street, 5th Floor
New York, NY 10019
Attention: Antti Uusiheimala

Tel: 212.849.8226
------------------------------------------------------------
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

July 29, 2009
------------------------------------------------------------
(Date of Event Which Requires Filing of this Statement)

     If the filing person has previously filed a statement on Schedule 13G to
report the acquisition that is the subject of this Schedule 13D, and is filing
this schedule because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the
following box [X].

     Note. Schedules filed in paper format shall include a signed original and
five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other
parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's

initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes.)

<PAGE>

CUSIP No.:  04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     Adam Benowitz

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     AF

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6.   CITIZENSHIP OR PLACE OF ORGANIZATION

     United States

| NUMBER OF | 7 | SOLE VOTING POWER   –   0 |
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER   –   58,278,818 |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER   –   0 |
| REPORTING | | |
| PERSON WITH | 10 | SHARED DISPOSITIVE POWER   – 58,278,818 |

11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     58,278,818

12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     67.1%

14   TYPE OF REPORTING PERSON

     IN

                                   2
<PAGE>

CUSIP No.: 04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     Vision Capital Advisors, LLC

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     AF

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Delaware

| NUMBER OF | 7 | SOLE VOTING POWER   -   0 |
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER   -   58,278,818 |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER   -   0 |
| REPORTING | | |
| PERSON WITH | 10 | SHARED DISPOSITIVE POWER   -   58,278,818 |

11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     58,278,818

12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     67.1%

14   TYPE OF REPORTING PERSON

     IA

                                    3
<PAGE>

CUSIP No.: 04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     Vision Opportunity China Fund Limited

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     AF

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Guernsey

| NUMBER OF | 7 | SOLE VOTING POWER    -    0 |
| SHARES |  |  |
| BENEFICIALLY | 8 | SHARED VOTING POWER    -    See Item 5 |
| OWNED BY |  |  |
| EACH | 9 | SOLE DISPOSITIVE POWER    -    0 |
| REPORTING |  |  |
| PERSON WITH | 10 | SHARED DISPOSITIVE POWER    -    See Item 5 |

11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

      See Item 5

12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

      See Item 5

14    TYPE OF REPORTING PERSON

      CO

                                        4
<PAGE>

CUSIP No.:  04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     Vision Opportunity China LP

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     WC

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6    CITIZENSHIP OR PLACE OF ORGANIZATION

Guernsey

| NUMBER OF | 7 | SOLE VOTING POWER      -    0 |
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER     -   See Item 5 |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER   -    0 |
| REPORTING | | |
| PERSON WITH | 10 | SHARED DISPOSITIVE POWER    -   See Item 5 |

11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

       See Item 5

12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

       See Item 5

14    TYPE OF REPORTING PERSON

       PN

                                    5
<PAGE>

CUSIP No.:  04634R106

1     NAME OF REPORTING PERSON
      S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

      Vision Opportunity China GP Limited

2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
      (a) [ ]
      (b) [X]

3     SEC USE ONLY

4     SOURCE OF FUNDS

      AF

5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
      2(d) or 2(e) [ ]

6     CITIZENSHIP OR PLACE OF ORGANIZATION

      Guernsey

| NUMBER OF | 7 | SOLE VOTING POWER      -    0 |
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER     -   See Item 5 |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER   -    0 |
| REPORTING | | |
| PERSON WITH | 10 | SHARED DISPOSITIVE POWER    -   See Item 5 |

11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

    See Item 5

12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     See Item 5

14   TYPE OF REPORTING PERSON

     CO

                                          6
<PAGE>

CUSIP No.:  04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     Vision Opportunity Master Fund, Ltd.

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     WC

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Cayman Islands

NUMBER OF              7    SOLE VOTING POWER    -    0
SHARES
BENEFICIALLY           8    SHARED VOTING POWER      -   See Item 5
OWNED BY
EACH                   9    SOLE DISPOSITIVE POWER    -    0
REPORTING
PERSON WITH           10    SHARED DISPOSITIVE POWER     -   See Item 5

11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     See Item 5

12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     See Item 5

14   TYPE OF REPORTING PERSON

CO

7

<PAGE>

CUSIP No.:  04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     Vision Capital Advantage Fund, L.P.

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     WC

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Delaware

| NUMBER OF | 7 | SOLE VOTING POWER   -   0 |
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER   -   See Item 5 |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER   -   0 |
| REPORTING | | |
| PERSON WITH | 10 | SHARED DISPOSITIVE POWER   -   See Item 5 |

11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     See Item 5

12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     See Item 5

14   TYPE OF REPORTING PERSON

     PN

8

<PAGE>

CUSIP No.:  04634R106

1    NAME OF REPORTING PERSON
     S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON

     VCAF GP, LLC

2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP
     (a) [ ]
     (b) [X]

3    SEC USE ONLY

4    SOURCE OF FUNDS

     AF

5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM
     2(d) or 2(e) [ ]

6    CITIZENSHIP OR PLACE OF ORGANIZATION

     Delaware

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 7 | SOLE VOTING POWER      -    0 |
|---|---|---|
| | 8 | SHARED VOTING POWER     -   See Item 5 |
| | 9 | SOLE DISPOSITIVE POWER    -    0 |
| | 10 | SHARED DISPOSITIVE POWER    -   See Item 5 |

11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

     See Item 5

12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES [ ]

13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

     See Item 5

14   TYPE OF REPORTING PERSON

     OO

                                    9

<PAGE>

ITEM 1.  Security and Issuer.

     The class of equity securities to which this Statement relates is the
common stock, par value $0.0001 per share (the "Common Stock"), of Astrata Group
Incorporated (the "Issuer"), whose principal executive offices are located at
14027 Memorial Drive, Suite 355, Houston, TX 77079.

ITEM 2.  Identity and Background.

     (a)      This Statement is being filed by (i) Vision Opportunity China
LP, a limited partnership organized under the laws of Guernsey (the "China
Fund"), (ii) Vision Opportunity China GP Limited, a corporate entity organized
under the laws of Guernsey (the "China Fund GP"), which serves as the general
partner of the China Fund, (iii) Vision Opportunity China Fund Limited, a
corporate entity organized under the laws of Guernsey (the "China Fund Ltd."),
which controls the China Fund GP, (iv) Vision Opportunity Master Fund, Ltd., a
Cayman Islands exempted company (the "Master Fund"), (v) Vision Capital

Advantage Fund, L.P., a Delaware limited partnership ("VCAF"; and, together with the Master Fund and the China Fund, the "Funds"); (vi) VCAF GP, LLC, a Delaware limited liability company (the "General Partner"), which serves as the general partner of VCAF, (vii) Vision Capital Advisors, LLC, a Delaware limited liability company (the "Investment Manager"), which serves as the investment manager of the Funds, and (viii) Adam Benowitz, a United States citizen who serves as Managing Member of the Investment Manager and the General Partner (all of the foregoing, collectively, "Vision" and/or the "Reporting Persons"). Each Fund is an investment vehicle formed for the purpose of investing and trading in a wide variety of securities and financial instruments. The Funds directly own all of the shares reported in this Statement. Mr. Benowitz and the Investment Manager (and the China Fund GP and the China Fund Ltd., with respect to the shares owned by the China Fund; and the General Partner, with respect to the shares owned by VCAF) may be deemed to share with the Funds voting and dispositive power with respect to such shares.

The principal business of each of the China Fund, the China Fund Ltd., VCAF and the Master Fund is that of a private investment vehicle engaged in investing and trading in a wide variety of securities and financial instruments for its own account. The principal business of the China Fund GP is acting as the general partner of the China Fund. The principal business of the General Partner is acting as the general partner of VCAF. The principal business of the Investment Manager is providing investment management services to the Funds and other investment vehicles. Mr. Benowitz's principal occupation is serving as Managing Member of the Investment Manager.

Attached as Schedule I hereto and incorporated herein by reference is a list containing the (a) name, business address and citizenship, (b) present principal occupation or employment, and (c) the name, principal business and address of any corporation or other organization in which such employment is conducted, for each director and executive officer of the China Fund Ltd. and the Master Fund (the "Directors and Officers").

(b)        The principal business office of each of the Investment Manager, the General Partner, VCAF and Mr. Benowitz is:

        20 West 55th Street, 5th Floor
        New York, New York 10019
        USA

        The principal business office of each of the China Fund, the China Fund GP and the China Fund Ltd. is:

        Suites 13 and 15
        Sarnia House
        Le Truchot
        St Peter Port
        Guernsey GY1 4NA

        The principal business office of the Master Fund is:

        c/o Citi Hedge Fund Services (Cayman) Limited
        P.O. Box 1748
        Cayman Corporate Centre
        27 Hospital Road, 5th Floor
        Grand Cayman KY1-1109
        Cayman Islands

10

<PAGE>

(c)       See Item 2(a) and 2(b) above.

(d)-(e)   During the last five years, none of the Reporting Persons or,
the knowledge of the Reporting Persons, the Directors and Officers, has been (A)
convicted in a criminal proceeding (excluding traffic violations or similar
misdemeanors) or (B) a party to a civil proceeding of a judicial or
administrative body of competent jurisdiction and as a result of such proceeding
was or is subject to a judgment, decree or final order enjoining future
violations of, or prohibiting or mandating activities subject to, Federal or
State securities laws or finding any violation with respect to such laws.

(f)       See Item 2(a) above.

ITEM 3.  Source and Amount of Funds or Other Consideration

The source of funds for the securities covered by this Statement is
working capital of the Funds in an aggregate amount of approximately
$13,000,000.

ITEM 4.  Purpose of Transaction.

On July 29, 2009, the Reporting Persons sent a letter to the Issuer's
Board of Directors (the "Board") expressing concern with the actions taken by
the Issuer and its management during the last three months (the "Letter"). The
Reporting Persons believe that these actions reflect mismanagement and the
failure of the Issuer's Board to exercise its fiduciary duties in good faith on
behalf of the Issuer's stockholders. The Reporting Persons indicated their
intent to reverse the Issuer's recent actions and take certain actions to revive
the Issuer. The complete text of the Letter is attached hereto as Exhibit 2 and
is incorporated herein by reference.

All of the shares of Common Stock reported herein as being beneficially
owned by the Reporting Persons were acquired for investment purposes. Except as
set forth herein, none of the Reporting Persons or, to the knowledge of the
Reporting Persons, the Directors and Officers, has any plans or proposals that
relate to or would result in any of the transactions described in subparagraphs
(a) through (j) of Item 4 of Schedule 13D.

The Reporting Persons reserve the right to acquire, or cause to be
acquired, additional securities of the Issuer, to dispose of, or cause to be
disposed, such securities at any time or to formulate other purposes, plans or
proposals regarding the Issuer or any of its securities, to the extent deemed
advisable in light of general investment and trading policies of the Reporting
Persons, market conditions or other factors.

ITEM 5.  Interest in Securities of the Issuer.

(a)       The Funds collectively own (i) 2,574,058 shares of Common
Stock, (ii) have the ability to acquire an additional 55,704,760 shares of
Common Stock through the exercise or conversion of derivative securities and
(iii) thus beneficially own 58,278,818 shares of Common Stock, representing
67.1% of all of the Issuer's outstanding Common Stock. Mr. Benowitz and the
Investment Manager (and the China Fund GP and the China Fund Ltd., with respect
to the shares of Common Stock owned by the China Fund; and the General Partner,
with respect to the shares of Common Stock owned by VCAF) may each be deemed to
beneficially own the shares of Common Stock beneficially owned by the Funds.
Each disclaims beneficial ownership of such shares. The foregoing is based on
31,113,819 shares of Common Stock outstanding as of January 8, 2009, as reported
on the Issuer's Form 10-Q filed on January 14, 2009.

(b)       The Reporting Persons have shared power (with each other and not with any other third party), to vote or direct the vote of and to dispose or direct the disposition of the 58,278,818 shares of Common Stock reported herein.

(c)       Except as described in Item 4, the Reporting Persons and, to the knowledge of the Reporting Persons, the Directors and Officers, did not effect any transactions in the Issuer's securities within the past 60 days.

(d)       No other person is known to have the right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the Reporting Persons' securities.

(e)       Not applicable.

11

<PAGE>

ITEM 6.  Contracts, Arrangements, Understandings or Relationships With Respect to Securities of the Issuer.

Except as disclosed in Item 4 above, there are no contracts, arrangements, understandings or relationships (legal or otherwise) among the Reporting Persons and any other person with respect to any securities of the Issuer, including, but not limited to transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies.

ITEM 7.  Material to be Filed as Exhibits.

Exhibit No.  Document

1         Joint Filing Agreement

2         Letter to Issuer's Board of Directors dated July 29, 2009

12

<PAGE>

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: August 10, 2009

                         ADAM BENOWITZ
                         VISION CAPITAL ADVISORS, LLC
                         VISION OPPORTUNITY MASTER FUND, LTD.
                         VCAF GP, LLC
                         VISION CAPITAL ADVANTAGE FUND, L.P.

                         By: /s/ Adam Benowitz
                             -------------------------------------
                             Adam Benowitz, for himself, as
                             Managing Member of the Investment
                             Manager, as Managing Member of VCAF

                                    GP (for itself and as general partner
                                    of VCAF) and as a Director of the
                                    Master Fund

                          VISION OPPORTUNITY CHINA LP
                          VISION OPPORTUNITY CHINA GP LIMITED
                          VISION OPPORTUNITY CHINA FUND LIMITED

                          By: /s/ David Benway
                          -------------------------------------
                                    David Benway, as a Director of the
                                    China Fund GP (for itself and as
                                    general partner of the China Fund)
                                    and the China Fund Ltd.

13

<PAGE>

SCHEDULE I

The following information sets forth the (a) name, business address and
citizenship, (b) present principal occupation or employment and (c) the name,
principal business and address of any corporation or other organization in which
such employment is conducted, for each of the directors and executive officers
of the China Fund Ltd. and the Master Fund, respectively.

CHINA FUND LTD. DIRECTORS

Christopher Norman Fish (British Citizen)
Professional Director
LeVillocq Farmhouse
Le Villocq, Castel, Guernsey, GY5 7SA

Dr. Randolph Baer Cohen (US Citizen)
Vision Capital Advisors, LLC
20 West 55th Street, Fifth Floor
New York, New York 10019

David William Benway (US Citizen)
Director of Business Development
Vision Capital Advisors, LLC
20 West 55th Street, Fifth Floor
New York, New York 10019

Ruiping Wang (Hong Kong Citizen)
Managing Director
TDR Capital International Ltd.
Room 1201, Tower Two
Lippo Centre, 89 Queensway, Hong Kong

Dr. Christopher Keith Polk (US Citizen)
Professor of Finance
London School of Economics and Political Science
Houghton Street, London, WC2A2AE, UK

CHINA FUND LTD. EXECUTIVE OFFICERS

None.

MASTER FUND DIRECTORS

Adam Benowitz (US Citizen)
Managing Member
Vision Capital Advisors, LLC (a private investment management firm)
20 West 55th Street, Fifth Floor
New York, New York 10019

Robert Arnott (British/Cayman Citizen)
Box 31695
One Breezy Pines
Bel Air Drive, South Sound
Grand Cayman KY1-1207
Cayman Islands
Mr. Arnott is a Chartered Accountant and performs consultancy services when
required for trust companies, management companies and banks.

<PAGE>

Peter Young (Cayman Citizen)
27 Hospital Road, George Town
Grand Cayman KY-1109
Cayman Islands
Mr. Young is a Certified Public Accountant currently serving as Executive Vice
President of Citi Hedge Fund Services (Cayman) Ltd. (a hedge fund administration
firm).

MASTER FUND EXECUTIVE OFFICERS

None.

<PAGE>

EXHIBIT INDEX

Exhibit No.    Document

   1           Joint Filing Agreement

   2           Letter to Issuer's Board of Directors dated July 29, 2009

<PAGE>

Exhibit 1

JOINT FILING AGREEMENT

In accordance with Rule 13d-1(k) under the Securities Exchange Act of 1934, as
amended, the persons named below agree to the joint filing on behalf of each of
them of a statement on Schedule 13D (including amendments thereto) with respect
to the Common Stock, par value $0.0001 per share, of Astrata Group Incorporated,
and further agree that this Joint Filing Agreement be included as an Exhibit to
such joint filing. In evidence thereof, the undersigned hereby execute this
Agreement.

Dated: August 10, 2009

ADAM BENOWITZ

VISION CAPITAL ADVISORS, LLC
VISION OPPORTUNITY MASTER FUND, LTD.
VCAF GP, LLC
VISION CAPITAL ADVANTAGE FUND, L.P.

By: /s/ Adam Benowitz
--------------------------------------

    Adam Benowitz, for himself, as
    Managing Member of the Investment
    Manager, as Managing Member of VCAF
    GP (for itself and as general partner
    of VCAF) and as a Director of the
    Master Fund


VISION OPPORTUNITY CHINA LP
VISION OPPORTUNITY CHINA GP LIMITED
VISION OPPORTUNITY CHINA FUND LIMITED

By: /s/ David Benway
--------------------------------------

    David Benway, as a Director of the
    China Fund GP (for itself and as
    general partner of the China Fund)
    and the China Fund Ltd.


<PAGE>

Exhibit 2

July 29, 2009

Board of Directors
Astrata Group Incorporated
14027 Memorial Drive, Suite 355
Houston, TX 77079-6826

Gentlemen,

        The undersigned, Vision Opportunity China Fund Limited, Vision Capital
Advantage Fund, L.P. and Vision Opportunity Master Fund, Ltd. (collectively,
"Vision") and Jed Frost are major investors in Astrata Group Incorporated (the
"Company" or "Astrata") and are majority stockholders of the Company. Vision has
been an investor in the Company since 2006 and is the beneficial holder of
Series A2 Convertible Preferred Stock, Series B Convertible Preferred Stock,
Series C Convertible Preferred Stock and common stock. In total, Vision has
invested over $12,500,000 in the Company. On an "as converted" basis and taken
together with Vision current common stock ownership, Vision is the beneficial
owner of 58,278,818 shares of the Company's common stock which represents over
sixty percent (60%) of the Company's outstanding shares of common stock. Jed
Frost has made loans to the Company with an aggregate principal and interest in
the amount of $3,655,373.88 which converts into shares of the Company's common
stock, in addition to which he directly holds a significant number of shares of
the Company's common stock.

        Each of the undersigned is extremely troubled by the actions taken by
the Company and its management with the approval of the Company's Board of
Directors during the last three months. These actions reflect mismanagement and
the failure of the Board of Directors to exercise its fiduciary duties in good

faith on behalf of the Company's stockholders. In fact management's actions have led the Company to its dire state. As majority stockholders and on behalf of all other similarly situated stockholders of the Company, we intend to reverse the Company's recent actions and take the following actions to revive the Company:

1.  Vision and Frost will vote against the proposed Restructuring Plan. Since Vision holds in excess of 91% of the preferred stock and Frost holds in excess of 35% of the unsecured debt, Vision's and Frost's vote against the Plan will effectively block Scenario 1 as described in the Disclosure Document. In addition, Frost will not vote in favor of Scenario 2 - Chapter 11 Filing, effectively blocking Scenario 2 as described in the Disclosure Document.

<PAGE>

2.  The pledge of 100% of the shares of Astrata (Asia Pacific) Pte Ltd. to secure the Fame facility required shareholder approval since it amounted to a sale of substantially all of Astrata's assets. In addition, the credit facility, coupled with the Restructuring Plan, reflect a series of interested party transactions that failed to have the approval of the Company's stockholders. Moreover, we believe that the Fame facility was part of a series of transactions that constituted a fraudulent conveyance under both the federal Bankruptcy Code and applicable state laws. We also believe that the transactions violated applicable Singapore law.

3.  Finally, the Company violated the Securities Exchange Act of 1934 by failing to disclose publicly the credit facility within four (4) business days of entering the facility.

4.  We believe that there is alternative financing available from third parties who have indicated they will only finance the Company if the Board of Directors is reconstituted. To that end, we propose that the Board be reconstituted immediately as follows: two (2) members appointed by Vision/Jed Frost, one (1) member appointed by Fame Trading, one (1) existing board member, and three (3) independent members acceptable to Vision and Frost with John Clough remaining as one of the independent directors.

5.  We request that the company agree to a standstill period of 45 days which will be sufficient time to reconstitute the Board of Directors, restructure the Company's operations and arrange for alternative financing. During this standstill period and until the Company's Board has been reconstituted, we request that the Company shall refrain from any actions that might potentially harm Vision and Jed Frost, including but not limited to, deviating from its ordinary course of business, incurring of additional debt, repaying debt, modifying or entering into employment agreements, and drawing down additional amounts under the Fame Trading credit line.

We have gathered specific knowledge that the relationships with several key clients would be severely and potentially irreparably harmed should the company seek reorganization under Chapter 11 or protection under Chapter 7 of the Bankruptcy Code. We would, therefore, like to resolve this matter amicably. Accordingly, we request that you respond to the requests set forth in this letter by Thursday, July 30, by 6:00 p.m. EST. If you do not respond within that

time period or if you refuse to work together to resolve the issues facing the
Company, we intend to enforce our rights and remedies and to contest the senior
status of Fame's debt. We request that the company send a copy of this letter to

2

<PAGE>

the principals of Fame Trading without undue delay. Each of the undersigned
reserves its rights and remedies under the transaction documents relating to its
investment in the Company.

                              Very truly yours,

                              Vision Opportunity China Fund Limited
                              Vision Capital Advantage Fund, L.P.
                              Vision Opportunity Master Fund, Ltd.


                              By: /s/ Adam Benowitz
                                  ------------------------------------
                                  Adam Benowitz
                                  Director

                              By: /s/ Jed Frost
                                  ------------------------------------
                                  Jed Frost


Kramer Levin Naftalis & Frankel LLP
Greene Radovsky Maloney Share & Hennigh LLP

3

</TEXT>
</DOCUMENT>

**EXHIBIT E**

Preliminary Injunction - Martin Euler Declaration
Common Stock Support

| | | |
|---|---|---|
| Shareholder List | 2/28/2009 | 31,527,156 |
| | | |
| Unissued certificates | | |
| Josh Bradberry | | 2,663 |
| Anthony Harrison | | 500,000 |
| Loughran & Co | | 500,000 |
| Frank Jacobsen | | 100,000 |
| Stan Schwartz | | 100,000 |
| Jake Franks | | 100,000 |
| Hemming | | 10,000 |
| Dominick | | 20,000 |
| Nanthane D/O Vitalingam | | (2,500) |
| Law Kam Long | | (5,000) |
| Tan Aik Hau | | (2,500) |
| Ooi Teik Mun | | (10,000) |
| PG Iskandar Zulkarnaim Pg HJ Ali | | (1,000) |
| | | |
| Issued & Outstanding | 2/28/2009 | 32,838,819 |
| | | |
| | | |
| Shareholder List | 5/31/2009 | 32,857,156 |
| | | |
| Unissued certificates | | |
| Josh Bradberry | | 2,663 |
| Nanthane D/O Vitalingam | | (2,500) |
| Law Kam Long | | (5,000) |
| Tan Aik Hau | | (2,500) |
| Ooi Teik Mun | | (10,000) |
| PG Iskandar Zulkarnaim Pg HJ Ali | | (1,000) |
| Dominick | | 20,000 |
| Dominick | | 20,000 |
| Dominick | | 20,000 |
| | | |
| Issued & Outstanding | 8/11/2009 | 32,898,819 |