UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| In Re: | . | Docket No. BK-N 09-52652-GWZ |
| | . | |
| ASTRATA GROUP | . | Reno, Nevada |
| INCORPORATED, | . | October 9, 2009 |
| | . | 9:41:48 p.m. |
| Debtor. | . | |

. . . . . . . . . . .

| | | |
|---|---|---|
| ASTRATA GROUP | . | |
| INCORPORATED, | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| vs. | . | ADV. 09-05074 |
| | . | |
| VISION OPPORTUNITY | . | |
| CHINA, LP and | . | |
| VISION OPPORTUNITY | . | |
| MASTER FUND, LTD, | . | |
| et al., | . | |
| | . | |
| Defendants.. | | |

. . . . . . . . . . .

HEARING
ON APPLICATION TO EMPLOY LEVENE, NEALE,
BENDER, RANKIN & BRILL LLP AS GENERAL
BANKRUPTCY COUNSEL; APPLICATION
TO EMPLOY LEWIS AND ROCA LLP AS
CO-COUNSEL TO DEBTOR; AMENDED DISCLOSURE
STATEMENT; APPLICATION FOR ORDER
AUTHORIZING POST-PETITION FINANCING
ON A SECURED BASIS PURSUANT TO
11 U.S.C.(c)(2) AND (3); MOTION FOR

Electronic Court Recorder:   Sylvia Tilton

Transcription:               Typewrite Services Inc.
                             P.O. Box 5804
                             Sparks, Nevada 89432-5804

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

TEMPORARY RESTRAINING ORDER ENJOINING
PREFERRED SHAREHOLDER FROM CONVERTING
STOCK AND REPLACING BOARD MEMBERS, ORDER
HOLDING THAT ANY SUCH ACTION WOULD BE IN
VIOLATION OF THE AUTOMATIC STAY, IN ADDITION
TO MOTION FOR PRELIMINARY INJUNCTION
HEARING ON ISSUANCE OF INJUNCTION TO
PREVENT STOCK CONVERSION AND BOARD
REPLACEMENT DURING THE COURSE OF THIS
CHAPTER 11 CASE
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GREGG W. ZIVE
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                  Levene, Neale, Bender,
                                 Rankin & Brill L.L.P.
                                 10250 Constellation Blvd.
                                      Suite 1700
                                 Los Angeles, CA 90067-6200

Also Present:                    JOHN BRYAN
                                 Chief Restructuring Officer

For Walter Jared Frost:          Jones Vargas
                                 BY: JANET L. CHUBB, ESQ.
                                 100 W. Liberty St., 12th Floor
                                 Reno, Nevada 89504

For the Vision Group:            McDonald Carano Wilson LLP
                                 BY: KAARAN E. THOMAS, ESQ.
                                 BY: MARK DUNAGAN, ESQ.
                                 100 W. Liberty Street
                                      10th Floor
                                 Reno, Nevada 89505

Also Present:                    ANTTI UUSIHEIMALA

For Fame Trading:                Woodburn and Wedge
                                 BY: JOHN F. MURTHA, ESQ.
                                 6100 Neill Road - #500
                                 Reno, Nevada 89511

Local Counsel for               Lewis and Roca LLP
the Debtor:                      BY: LAURY MACAULEY, ESQ.
                                 50 West Liberty Street
                                      Suite 410
                                 Reno, Nevada 89501

4

```
 1            THE COURT:  Please be seated.

 2            This is in the matter of Astrata Group

 3  Incorporated.

 4            May I have appearances, please.

 5            MR. BRILL:  Good morning, your Honor.  Martin

 6  Brill, of Levene, Neale, Bender, Rankin & Brill, attorneys

 7  for the debtor.

 8            Also present is John Bryan, the chief

 9  restructuring officer for the debtor.

10            MS. CHUBB:  Good morning, your Honor.  Janet Chubb

11  for Walter Jared Frost, an unsecured creditor.

12            MS. THOMAS:  Good morning, your Honor.  Kaaran

13  Thomas, of McDonald Carano, for the Vision group of

14  companies.

15            Also with me is Mr. Mark Dunagan of my office and

16  Mr. Antti Uusiheimala, who is the president of Vision.

17            Thank you.

18            MR. MURTHA:  Good morning, your Honor.  John

19  Murtha appearing on behalf of Fame Trading, the DIP lender.

20            MS. MACAULEY:  Good morning, your Honor.  Laury

21  Macauley, of Lewis and Roca, appearing as local counsel on

22  behalf of the debtor.

23            THE COURT:  All right.

24            I have several matters on the calendar this

25  morning.  The first is the application to employ Levene,
```

1  Neale, Bender, Rankin & Brill as counsel for the debtor.

2          I have reviewed the application in docket number

3  36 and the declaration of Martin Brill filed in support

4  thereof;

5          I have not seen any opposition to this motion and

6  application.

7          MR. BRILL:  Your Honor, we've received no

8  opposition.

9          THE COURT:  All right.

10          The motion is granted.

11          MR. BRILL:  Thank you, your Honor.

12          THE COURT:  Thank you.

13          Have the U.S. Trustee sign off on the order,

14  please.

15          MR. BRILL:  Thank you.

16          THE COURT:  Then the next matter I have is an

17  application -- I should point out that I was aware that

18  there had been a 150,000-dollar retainer, of which twenty

19  thousand dollars was retained on behalf of Lewis and Roca;

20          That it had been drawn down by some sixty-six

21  thousand two hundred and ninety-six dollars prior to the

22  filing of the petition on August 6th;

23          That the balance in the retainer is sixty-three

24  thousand seven hundred and four dollars approximately.

25          MR. BRILL:  That's correct, your Honor.

1          THE COURT:  And next is the application of Lewis

2  and Roca as co-counsel.

3          MS. MACAULEY:  Yes, your Honor.

4          THE COURT:  I've read the application, docket

5  number 38;

6          Read the declaration of Bruce Beesley filed in

7  support.

8          Apparently your firm does have a 20,000-dollar

9  retainer; is that correct?

10          MS. MACAULEY:  Yes, your Honor.

11          THE COURT:  All right.

12          I've reviewed the application.  There's been no

13  opposition.

14          I am going to grant the application.

15          Please have the Office of the U.S. Trustee sign

16  off on it --

17          MS. MACAULEY:  Thank you.

18          THE COURT:  -- under Local Rule 9021.

19          The next matter I have is the amended -- hearing

20  on the amended disclosure statement.

21          In that respect, I have read the following

22  pleadings:

23          The amended disclosure statement that was filed on

24  September 11th, docket number 41, and it also incorporates

25  the plan of reorganization;

7

1           I reviewed the notice of hearing, docket number

2  42;

3           I do know that I was requested to sign an order

4  granting conditional approval of a prior disclosure

5  statement.

6           There had been opposition filed regarding that

7  matter and -- by McDonald Carano on behalf of Vision.  And

8  that I declined to sign the proposed order and denied it on

9  August 21, 2009, docket number 19.

10           I have not seen any opposition to the disclosure

11  statement.

12           Is there any by anybody here?

13           MS. THOMAS:  No, your Honor.

14           THE COURT:  All right.

15           The disclosure statement, as I understand it, does

16  as follows:

17           I'm familiar with the alleged background.

18           I've read the number of declarations.

19           That Fame Trading, Ltd. is to provide a total of

20  8.5 million dollars in financing.  But some of that has

21  already been in fact provided to the debtor either in the

22  form of loans or the debtor has collateralized its guaranty

23  for Asia Pacific, which is an entity that is owned -- the

24  equity is owned by the debtor and is apparently the primary

25  asset of the debtor.

1          What is going to happen is that the obligations

2    that are extant in favor of Fame will be converted to

3    equity.

4          Fame, if the plan is confirmed, will then have

5    96.5 percent of the ownership interest in the debtor.

6          Unsecured creditors are to receive 3.5 percent

7    together with a note payable in two years, I believe

8    starting--if I've read it correctly--on May 29th of this

9    year and which they will receive five percent of the

10   aggregate cash flow.

11         Then there will be a liquidation trust that would

12   be created and Mr. Bryan would be the trustee.

13         And proceeds from any litigation would then be

14   paid.

15         That liquidation trust will be funded by at least

16   seventy-five thousand dollars if I approve the DIP

17   financing of three hundred thousand dollars.

18         And when I indicated that the 8.5 was not all

19   cash, what is going to happen as I understand it is that in

20   May there was an 8.5-million-dollar loan from Fame through

21   an entity known -- Fame was contacted through an entity

22   known as Jaker Investments, which was an existing

23   shareholder of the debtor.

24         And there was a 90-day loan and a 150,000-dollar

25   credit which has now been over-advanced.  That's described

1  as the AGI loan.

2          And then there was a loan to Asia Pacific that was

3  drawn down by four million dollars.  So a total, as I

4  understand it, right now outstanding of four million two

5  hundred and fifty-five thousand dollars of those two loans.

6          The loan to Asia Pacific was guarantied by the

7  debtor and the debtor pledged most if not all of its

8  assets.

9          Fame, I understand, is what has been described as

10 a single-purpose entity.  It's chartered under the British

11 Virgin Islands and it has entered into these financing

12 arrangements;

13         It will forgive that debt.  So when it says that

14 the financing is not less than 8.5 million it's actually

15 new money, what I would consider a new value then to the, I

16 guess more technical, of about three million seven hundred

17 and eighty-five thousand dollars.

18         So I understand the structure.

19         And then the company will continue to do business

20 primarily through Asia Pacific.  It's in the business of

21 certain technology dealing with global GPS and other

22 tracking devices.

23         Apparently the present management is critical for

24 Fame, based on the declarations that I've read.

25         I have read the letters of July 29, 2009, the

1  proposed resolution of August 5, 2009, the letters of

2  August 5th and August 6, 2009, from Vision.

3          Actually there's three--maybe more than that--

4  Vision entities.  That it appears that Vision Capital is

5  the manager for those others though.

6          When I refer to Vision I think it's really Vision

7  Capital that's acting.

8          Is that correct, Ms. Thomas?

9          MR. DUNAGAN:  Yes.

10          THE COURT:  Okay, good.  That didn't sound like

11  Ms. Thomas but I'll take that as a yes.

12          MS. THOMAS:  Yes.

13          THE COURT:  Okay.  Thank you.  So I think I

14  understand.

15          And I know that Ms. Chubb's client is purportedly

16  a fairly significant creditor owed, at least according to

17  the July, I think it's the July letter--or one of the

18  August letters--of about 3.8 million dollars.  I thought

19  that's what I read.

20          I know that there was an attempt to convert

21  preferred stock to common stock in over fifty-eight--the

22  numbers are kind of staggering --

23          MS. THOMAS:  Sixty-one, your Honor.

24          THE COURT:  Huh?

25          MS. THOMAS:  Sixty-one percent.

1           THE COURT:  No.  I'm not talking about percents.

2           MS. THOMAS:  Days.  Sixty-one day.

3           THE COURT:  I'm talking about numbers.

4           MR. BRILL:  About fifty-eight million.

5           THE COURT:  About fifty-eight million.

6           And the most recent calculation by one declaration

7    is there's a little over thirty-two million outstanding

8    shares.  So you would have to--if I understand this

9    correctly--add those two together to figure out the

10   percentage.

11          And now Ms. Thomas is telling me that's about 61

12   percent.

13          There is an assertion that Nevada Revised

14   Statutes, in particular NRS 78.3351, requires two-thirds of

15   the outstanding to replace the board of directors.

16          I'm not here at this time to resolve the merits of

17   that dispute.

18          So that's what I understand is in the disclosure

19   statement and I understand what the plan of reorganization

20   is.

21          Does anybody -- have I missed anything, Mr. Brill?

22          MR. BRILL:  The only correction I would make, your

23   Honor, is the Court indicated that there was a drawn-down

24   at the Asia Pacific level of four million dollars.

25          And you said as --

1          THE COURT:  That's what I thought it was.

2          MR. BRILL:  -- as of today's date.  Well, as of

3    today's date it's higher.

4          THE COURT:  Oh, it's gone up?

5          MR. BRILL:  There's been ongoing funding.

6          THE COURT:  I think the disclosure statement says

7    four million.

8          MR. BRILL:  The disclosure statement?  Because

9    that was as --

10         THE COURT:  That's what -- all I was saying.

11         MR. BRILL:  -- we said as of a certain date it was

12   four million dollars.

13         But it's --

14         THE COURT:  Okay.  That's my point.  That's what

15   it said in the disclosure statement.

16         MR. BRILL:  Yes.  It's higher.

17         THE COURT:  And there's at least a footnote in one

18   of these that it would go up and that would reduce the

19   financing under the plan of reorganization on a dollar-for-

20   dollar basis.

21         MR. BRILL:  That's correct, your Honor.

22         THE COURT:  Yeah.

23         MR. BRILL:  Yes.

24         THE COURT:  I'm aware of that.

25         MR. BRILL:  Yes.

13

1          THE COURT:  Is there anything else?

2          MR. BRILL:  I believe your Honor accurately

3   outlined what the plan and disclosure statement provides.

4          THE COURT:  All right.

5          Does anybody wish to be heard?

6          MS. THOMAS:  Your Honor, Kaaran Thomas for Vision.

7          It's been very difficult for us to get

8   information.

9          We understand through the grapevine, --

10         THE COURT:  Wasn't this --

11         MS. THOMAS:  -- however --

12         THE COURT:  Wasn't this served on you?

13         MS. THOMAS:  Pardon?

14         THE COURT:  Wasn't the amended disclosure

15   statement served upon you?

16         MS. THOMAS:  Yes.  But --

17         THE COURT:  All right.

18         MS. THOMAS:  -- there's additional information we

19   believe.

20         We believe that recently a hundred preferred

21   shares of stock were issued to Fame, a hundred preferred

22   shares of Asia Pacific.  Which would basically put the

23   control of Asia Pacific in the hands of Fame as of now.

24         We need to just know, and I think it should also

25   be disclosed, if that was correct.

1            THE COURT:  Why didn't you file a pleading?

2            MS. THOMAS:  Your Honor, because what good would

3    it do?

4            I went to the meeting of creditors.

5            THE COURT:  I know.

6            MS. THOMAS:  I talked to --

7            THE COURT:  I read your declaration.

8            MS. THOMAS:  I talked to Mr. Brill --

9            THE COURT:  I'll get to that.

10            MS. THOMAS:  I talked to Mr. Brill.  I said Mr.

11    Harrison has signed a declaration.  When can we depose Mr.

12    Harrison?

13            Mr. Harrison is in Singapore.  Sorry.  You'll have

14    to go to Singapore.

15            How about Mr. Euler?

16            Oh, he just moved to Singapore.

17            How about the records?

18            Oh, the records are in Houston at Mr. Euler's old

19    house.  And maybe we'll get that back.

20            I asked for some information regarding bank

21    records.  Didn't get it.

22            I asked for information regarding what was

23    happening with the expenses --

24            THE COURT:  When did you make --

25            MS. THOMAS:  -- of the company.

1            THE COURT:  When did you make those requests?

2            MS. THOMAS:  September 15th at the meeting of

3    creditors.

4            THE COURT:  And what's today?

5            MS. THOMAS:  Today is October 9th.

6            THE COURT:  Don't you think I would have liked --

7    enjoyed reading that?

8            MS. THOMAS:  Your Honor, this is our issue.  And

9    it is my client's decision, you know, for better or for

10   worse.

11           THE COURT:  To what?

12           MS. THOMAS:  To exercise their conversion rights.

13           The idea that we can --

14           THE COURT:  Who made the decision not to file a

15   pleading where I could study this, where I could have

16   declarations?

17           Ms. Thomas, that's how we do things here.

18           MS. THOMAS:  We did.  We made that decision, your

19   Honor.

20           And we have not waived our right to object to the

21   plan.  We have not waived our right to --

22           THE COURT:  I haven't said you did.

23           MS. THOMAS:  -- to file a plan.

24           But in terms of disclosure, you know, the idea

25   that we can -- and Mr. Bryan is basically a newcomer to

1  this.

2          So, you know, how do we get the information that

3  we want?  Do we have to spend a fortune in going to

4  Singapore?  Do we have to spend a fortune trying to compel

5  people to appear and present evidence when they've signed

6  declarations before this Court?

7          You know, we have a choice.

8          THE COURT:  My point is this.

9          I understand what you're saying.  But that --

10 frankly if you were that -- if your clients were that

11 concerned about it prior to today's hearing, they should

12 have filed a pleading telling me about it.  They didn't.

13         And it should be apparent that when I read your

14 opposition to the ex parte request that I take these

15 matters seriously.

16         And we have rules that require pleadings.

17         I'm not -- if you're having difficulty in

18 obtaining information -- was there a request for a 2004

19 exam?

20         MS. THOMAS:  No.

21         THE COURT:  Okay.

22         Has there been any procedure followed?

23         MS. THOMAS:  No, your Honor.  There's

24 been --

25         THE COURT:  Then I'm frankly not all --

1          MS. THOMAS:  There have been --

2          THE COURT:  -- that concerned about it.

3          MS. THOMAS:  And we have not asked the Court to be

4  concerned about it.

5          THE COURT:  Then why are you telling me about it?

6          MS. THOMAS:  Because something has happened that

7  we are concerned about that we found out about recently,

8  and we need to understand if it's true.

9          Our understanding is -- again our ability to get

10 information here --

11         THE COURT:  Any post-petition --

12         MS. THOMAS:  -- is very limited.

13         THE COURT:  -- transaction that affects property

14 of the estate would be of considerable import to me as

15 well.

16         MS. THOMAS:  And all we'd like to know is, your

17 Honor, did that happen?

18         But you've already seen --

19         THE COURT:  Let's find out.

20         MS. THOMAS:  You've already --

21         THE COURT:  Let's find out.

22         Mr. Brill, can you answer the question?

23         MR. BRILL:  Yes.

24         THE COURT:  Who has effective control of what I've

25 been told is the primary asset of the debtor, which is the

1  equity in Asia Pacific?

2          MR. BRILL:  The debtor.

3          THE COURT:  Now?

4          MR. BRILL:  Now.

5          THE COURT:  And that's not going to change unless

6  somebody comes here?

7          MR. BRILL:  Unless -- unless --

8          THE COURT:  Because that's critical for the

9  success of this plan.

10         MR. BRILL:  Your Honor, unless there's a default

11 and the lender comes into bankruptcy court and seeks relief

12 from stay in order to --

13         THE COURT:  What was the point of the August 29th

14 transaction with Fame?

15         MR. BRILL:  The August 29th, your Honor?

16         THE COURT:  I think that's the date.

17         MR. BRILL:  That was an order to -- for Fame to

18 put a director on the -- directors on the board.

19         THE COURT:  There's a supplemental debenture.

20 What is that?

21         MR. BRILL:  Your Honor, that was at the time that

22 the -- if the Court will recall, that was a 90-day

23 obliga -- it was a 90-day obligation.

24         At --

25         THE COURT:  The 90-day obligation was on the --

19

1   what is now a 255,000-dollar --

2            MR. BRILL:  No.  No.  It was also at the --

3            THE COURT:  For the 8.5?

4            MR. BRILL:  -- 8.5 as well, your Honor.

5            That was just interim financing while the parties

6   went out and tried to find some permanent financing.

7            THE COURT:  But that's a -- fine.  Now it's due.

8   Now they're a creditor.

9            And then what occurs post-petition addition -- is

10  the supplemental debenture some type of enhanced security?

11           Because now I read in the pleadings and the

12  declarations that Fame will in fact enforce its rights

13  under that supplemental debenture unless present management

14  stays in.

15           MR. BRILL:  Your Honor?

16           THE COURT:  Did I read that correctly?

17           MR. BRILL:  Yeah.  That's correct, your Honor.

18           As a result of the threaten -- threats that were

19  made and the letters that were received by the debtor and

20  management of the debtor and management of the subsidiary,

21  Fame became -- obviously became nervous because it's loaned

22  a great deal of money to the subsidiary corporation.

23           So when the loan came due it asked, as any lender

24  would ask, for additional protections, put a person on the

25  board at the subsidiary level and provided certain

1  additional defaults, mechanisms upon default.

2         THE COURT:  And how does that affect the debtor's

3  obligation under its guaranty?

4         MR. BRILL:  Well, your Honor, in order to -- I

5  would think that in order for Fame to be able to foreclose

6  on the collateral and enforce its remedies, it would have

7  to come to the bankruptcy court and get relief from stay.

8         THE COURT:  I would imagine so.

9         MR. BRILL:  And nobody said otherwise, your Honor.

10         MS. THOMAS:  Well --

11         MR. BRILL:  You know, I mean nobody said

12  otherwise.  But those protections for the lender were put

13  in place.

14         THE COURT:  Okay.  Thank you.

15         MS. THOMAS:  Your Honor, you know, the Asia

16  Pacific assets are outside the jurisdictional boundaries of

17  the United States.

18         THE COURT:  The only -- so what?

19         MS. THOMAS:  Fame has a lien on -- now apparently

20  has a lien on all of them.

21         And I don't think Mr. Brill specifically answered

22  the question of whether preferred shares of Asia Pacific

23  have been issued to Fame.

24         THE COURT:  You know what?  The interest that the

25  debtor has in Asia Pacific is the ownership of the common

1  stock voting interest.

2         I'm assuming that's why Mr. Brill answered my

3  question in the manner that he did, is that the management

4  in effective control of that entity is still with the

5  debtor.

6         Is that correct?

7         MR. BRILL:  That's correct.

8         THE COURT:  And it's only if those preferred

9  shares are converted to common shares that in fact that

10 could change.

11        Is that correct?

12        MR. BRILL:  That's correct.

13        THE COURT:  All right.  Thank you.

14        I'm assuming that there were then.  The answer to

15 Ms. Thomas' question is that there was a transaction

16 involving preferred shares.

17        Is that correct?

18        MR. BRILL:  That's correct, your Honor.

19        THE COURT:  And is that the August 29th

20 transaction?

21        MR. BRILL:  Yes, your Honor.  If that's the date.

22  I believe that's the date.

23        THE COURT:  Well, you've known about it for a long

24 time.  Because you mentioned it in your response that you

25 filed in a declaration.

1          Okay.  Please be seated.

2          I'm approving the disclosure statement.

3          There's been no opposition and we'll set the plan

4    for hearing.

5          Mr. Murtha.

6          MR. MURTHA:  Yes, your Honor.

7          I have no objection to the disclosure statement of

8    course.  But just for the order.  I'd like to make sure

9    that there's a provision in the order that allows for

10   modification prior to the time of the hearing pursuant

11   to --

12         THE COURT:  Well, we --

13         MR. MURTHA:  -- Local Rule --

14         THE COURT:  We typically do that.

15         MR. MURTHA:  -- 3019.

16         THE COURT:  I'm going to ask Mr. Brill --

17         MR. MURTHA:  But I wanted --

18         THE COURT:  No.  Mr. Brill will prepare the order.

19         We'll provide the date for the hearing on the plan

20   confirmation.

21         MR. MURTHA:  Okay.

22         It's just that the local rule requires that that

23   statement be in the order, and I wanted to make sure it

24   was.

25         THE COURT:  I expect it to be in there.

1            MR. MURTHA:  Okay.  Great.

2            MS. THOMAS:  And your Honor?

3            THE COURT:  One moment.

4        (Discussion off the record between the Court and the

5    courtroom deputy)

6            THE COURT:  November 30th at?

7            COURTROOM DEPUTY:  At 2:00, your Honor.

8            THE COURT:  So we'll want any objections to the

9    plan filed no later than Friday, November 20th.

10           And then the ballot summary should be filed by

11    Friday -- well, that's Thanksgiving, isn't it?

12        (Discussion off the record between the Court and the

13    courtroom deputy)

14           THE COURT:  What I'm going to do is have the

15    objections, then, I'm going to shorten that to November

16    16th.

17           I want the ballot summary by the -- Monday the

18    25th.

19           Do you folks want to have the hearing on November

20    30th or not?

21           MR. BRILL:  Yes, your Honor.

22           THE COURT:  Okay.

23           I'll be here, so it doesn't make any difference to

24    me

25           MR. BRILL:  Okay.

1          MS. THOMAS:  So long as again -- and I don't mean

2     to parade this in court, your Honor, but so long as we have

3     Mr. Harrison, Mr. Euler, Mr. Harmon available in this

4     country.

5          THE COURT:  I'm not making any ruling.

6          There are established procedures to bring those

7     matters in front of me.  I'll deal with it when it's in

8     front of me.

9          I expect the debtor to cooperate.

10          Now if those folks are all in Singapore, maybe you

11     take one airplane and go to Singapore.  I don't know.  I

12     don't know the answer to those questions.

13          And I don't know they ever come to the United

14     States.

15          It strikes me that there should be a way for

16     counsel to be able to arrive at some type of consensual

17     resolution;

18          If not, I'll be glad to do it when it's in front

19     of me.

20          MS. THOMAS:  Okay.

21          THE COURT:  Fair enough?

22          MS. THOMAS:  Yes, your Honor.

23          THE COURT:  I refuse to start doing things on a

24     totally ad hoc basis.  We're just too busy.

25          MR. BRILL:  We need --

1          THE COURT:  Prepare the order.  You've got the

2   date.

3          MR. BRILL:  We need a --

4          THE COURT:  You have the date for the ballot

5   summary.

6          MR. BRILL:  Okay.  The ballot summary.  And

7   there's an objections to plan date.  Is that the same date

8   for voting on the plan, your Honor?

9          THE COURT:  Yes.

10     (Discussion off the record between the Court and the

11   courtroom deputy)

12          THE COURT:  I think it would be kind of

13   interesting actually to have a plan confirmation hearing.

14   We're going to have another one in October.  All I've had

15   for two years are 363 sales.  So it's going to be kind

16   of --

17          MR. BRILL:  Well, here we go, your Honor.

18   Something different.

19          THE COURT:  It certainly is.

20          MR. BRILL:  Yeah.

21          THE COURT:  Okay.  Thank you.

22          MR. BRILL:  Thank you, your Honor.

23          THE COURT:  The next matter that I have on

24   calendar is the application for an order authorizing post-

25   petition financing pursuant to Sections 364(c)(2) and (3).

1           I have reviewed the motion in docket number 45;

2           The declaration of Anthony Harrison filed in

3   support.  You know, there's a common theme through this

4   declaration and one of Bryan's and I think at least one

5   other, where there's one mistake that's consistently made

6   in the repetitive statement of what had occurred in 2009

7   and the need for money.

8           For example, at Page 4, paragraph 7, line --

9   straight on line 12 it states:

10          "AGI and Asia Pacific's capital shortage became

11          acute in the first quarter of the financial year

12          ending February 28, 2010."

13          I know it's 2009.  Okay.  And that's found

14   throughout.

15          I would say the complaint got it right.

16          MR. BRILL:  I'm sorry, your Honor.

17          THE COURT:  And the motion.

18          MR. BRILL:  I'm sorry.  What -- what -- I'm sorry.

19    What are you referring to, your Honor?

20          THE COURT:  Paragraph 7 of the declaration of Mr.

21   Harrison.

22          MR. BRILL:  Your Honor, let me just take a look at

23   that.

24          THE COURT:  The first quarter, this is 2009.

25          MR. BRILL:  No, no, your Honor.  It's a fiscal

1  quarter and that -- and I went over that with my client.

2  That is the correct date.

3          THE COURT:  How can that be?

4          MR. BRILL:  Well, --

5          THE COURT:  How can the quarter, first quarter --

6  oh, I see.

7          MR. BRILL:  Okay.

8          THE COURT:  What you're saying is --

9          MR. BRILL:  I'm sorry, your Honor.

10          THE COURT:  Maybe I misunderstood.  The fiscal,

11  the first quarter of the fiscal year.  So the fiscal year

12  ends February 28th.  The first quarter then would be early

13  in 2009.

14          MR. BRILL:  Correct, your Honor.

15          THE COURT:  My in --

16          MR. BRILL:  Correct, your Honor.

17          THE COURT:  My misunderstanding.

18          MR. BRILL:  Yeah.

19          THE COURT:  Thank you.

20          MR. BRILL:  I had to go over that with my client a

21  couple of times.  Because --

22          THE COURT:  No.  I appreciate that.

23          MR. BRILL:  -- I kept saying that's wrong.

24          And they said no, this is -- this is the correct

25  date.

1          THE COURT:  Because I kept doing the -- yeah.

2          No, I misread it.  That's absolutely correct.

3  That's my fault.  Thank you.

4          At any rate I've read it.

5          I didn't see any opposition to this motion.

6          MR. BRILL:  No opposition, your Honor.

7          THE COURT:  There's three hundred thousand

8  dollars.  Actually it's going to be, if I've read it

9  correctly, two hundred and eighty-five thousand because

10  there's a five-percent fee.

11          Correct?

12          MR. BRILL:  That's correct, your Honor.

13          THE COURT:  And all assets, stock pledge; correct?

14          MR. BRILL:  That's correct, your Honor.

15          THE COURT:  Mr. Murtha, do you have anything you

16  want to tell me about this transaction?

17          MR. MURTHA:  No, your Honor.  I don't think

18  there's anything to add other than what's in the pleadings.

19          THE COURT:  All right.

20          Asia Pacific stock is pledged as collateral for

21  the guaranty?

22          MR. BRILL:  Yes, your Honor.  And if you'll

23  recall --

24          THE COURT:  And it's a -- just a junior lien?

25          MR. BRILL:  That's correct, your Honor.

1          THE COURT:  And all the assets, including the

2    subsidiary stock, are already encumbered?

3          MR. BRILL:  That's separate.  Not 100 percent of

4    the subsidiary stock was encumbered initially because one

5    of the certificates was missing.

6          And --

7          THE COURT:  Right.  That was in --

8          MR. BRILL:  Right.  And so --

9          THE COURT:  -- on the original loan.

10         MR. BRILL:  That's on the original loan.  So that

11   additional shares will be pledged as part of this.

12         THE COURT:  Good.  All right.

13         Does anybody else wish to be heard?

14         MS. THOMAS:  Yes, your Honor.

15         Vision is prepared to also make a debtor-in-

16   possession financing loan on the same terms.

17         THE COURT:  Okay.  Well, it would have been nice

18   to have them in writing.

19         I'm not going to interfere with the debtor's

20   business judgment.  I think deference is given to that.

21   I'd have no -- I don't have any pleadings, anything to

22   support that.

23         I appreciate it.  But I'm going to approve the

24   request made by the debtor-in-possession.

25         MR. BRILL:  Thank you, your Honor.

1          THE COURT:  The next matter I have is in Adversary

2     09-0504.  That was commenced by a complaint filed on

3     October 6.

4          I have read the complaint, docket number 1, in the

5     adversary.

6          And the docket numbers I'm now going to put on the

7     record are from the adversary, not from the main case.

8          Then there's plaintiff's motion for a temporary

9     restraining order enjoining the first shareholder from

10    converting stock, replacing board members, order holding

11    any such action to be in violation of the automatic stay,

12    and hearing on issuance of injunction to prevent stock

13    conversion and board replacement during the course of the

14    Chapter 11 case.

15         On the same date, October 6, as docket number 9,

16    was a motion for an order shortening time to hear this

17    matter today.  I read that motion;

18         I read the declaration of Mr. Bryan and all the

19    exhibits attached thereto, docket number 10, also filed on

20    the 6th of October.  And that contains letters of August

21    5th regarding the conversion -- or attempted conversion of

22    the preferred -- a letter of August -- excuse me.

23         Exhibit 3 is the consent to an action taken which

24    is to remove all of the present board members with the

25    exception, as I've read this, of John Clough.  If I'm

1   pronouncing that correctly.

2            MS. THOMAS:  Correct.

3            THE COURT:  And signed by three Vision entities.

4            That there is another letter of August 11th which

5   is a reply to a letter sent apparently by the debtor

6   raising the conversion restriction issue.  And I've read

7   this letter.  And it's interesting.  It raises a number of

8   legal issues.

9            At that point Vision asserted that it had 67.1

10  percent of the company's outstanding shares.  And since

11  conversion would not and could not cause Vision's

12  beneficial ownership interest to exceed .9 percent because

13  it had already happened.  In other words, it wasn't

14  prospective but had occurred.  Interesting argument.

15           It also refers to a letter of August 7th that was

16  sent by Mr. Brill.

17           Once again just to be clear.  I am not making any

18  determination regarding the matters contained in those

19  letters.  I'm not resolving any of those disputes at this

20  time.

21           That was docket number 10.

22           Docket number 11 was the declaration of--and I

23  know I'm going to mispronounce this name--Krikor J.

24  Meshefejian--sorry.  And he is an attorney at your law

25  firm?

1           MR. BRILL:  That's correct, your Honor.

2           THE COURT:  And I've read it.  And it describes

3    certain communications between he and Ms. Thomas.

4           Proof of service is docket number 12.

5           Then as I mentioned earlier, I did read Ms.

6    Thomas' objection filed on behalf of her clients, docket

7    number 13, filed on the 7th of October.  I'm familiar with

8    it.

9           And I note that there's a -- I had said August

10   29th.  There's a reference here to August 28th.  One of

11   those two dates that that occurred.

12          And I read Ms. Thomas' supporting declaration,

13   docket number 14.

14          As a result of those I did enter an order, docket

15   number 16, setting -- shortening time for the hearing

16   today.

17          I have also read the declaration of John Bryan,

18   docket number 5, in support of this request;

19          The declaration of Martin Euler.  Is that how it's

20   pronounced?

21          MR. BRILL:  That's correct, your Honor.

22          THE COURT:  Together with the exhibit attached

23   thereto;

24          And this includes the letters of August 27, 2009,

25   the letter of July 29, 2009.  And that's--and I was wrong--

1  Mr. Frost.  It wasn't three eight.  It's three million six

2  hundred and fifty-five thousand three hundred and seventy-

3  three dollars.  So I've read that.

4          I'm aware of the assertion that:

5          "Relationships with several key clients would be

6          severely and potentially irreparably harmed should

7          the company seek reorganization under Chapter 11

8          or protection under Chapter 7."

9          So everybody understands the issues that are

10  involved and the potential effect upon this company's

11  business.

12          And I have read the other exhibits as well.

13          Docket number 7 was filed on the 6th of October,

14  the declaration of Mr. Harmon.  I have read that and the

15  exhibit attached thereto.  Which is the supplemental

16  facility agreement.

17          And I was in error earlier.  It is dated August 28

18  not August 29.  I've read it;

19          It refers to the May 18, 2009, 8.5-million-dollar

20  facility and indicates that this could be increased up to

21  sixteen million dollars.  And as a result -- that is an

22  agreement with Asia Pacific.

23          And it raises in my mind at least some question

24  about the applicability of Section 549 of the Code.  But

25  that's not in front of me today.

1          I have the request for judicial notice, docket

2    number 8.

3          And I've already placed on the record all but the

4    debtor's schedules of assets and liability which are

5    attached as Exhibit 1.  And I'm going to take judicial

6    notice of those unless there's some objection to that.

7          MS. THOMAS:  No objection, your Honor.

8          THE COURT:  All right.

9          And I reviewed the notice, docket number 40.

10         All right.  I'm going to set forth right now, so

11   that there's no confusion, the legal standard that I am

12   going to apply for this hearing and this request.

13         As I understand it this request is being made

14   pursuant to Rule -- Federal Rule of Bankruptcy Procedure

15   7065 and Section 105 of the Code.

16         Is that correct, Mr. Brill?

17         MR. BRILL:  That's correct, your Honor.

18         THE COURT:  All right.

19         Let's make sure that we all understand then

20   exactly what the standards are.

21         The Ninth Circuit's long-standing basis for a

22   preliminary injunction was found to be too lenient by the

23   United States Supreme Court in a case named Winter vs.

24   Natural Resources Defense Council, found at 129 Supreme

25   Court 365.  That was decided last November.

1          And that was cited in the moving points and

2    authorities.

3          What is the test for a preliminary injunction, at

4    least in a non-bankruptcy case, I think is set forth at

5    Page 374 of that opinion:

6          "A plaintiff seeking a preliminary injunction must

7          establish that he is likely to succeed on the

8          merits, that he is likely to suffer irreparable

9          harm in the absence of preliminary relief, that

10         the balance of equities tips in his favor, and

11         that an injunction is in the public interest."

12         The Ninth Circuit had a rule that said that it

13   only had to be a possibility of irreparable harm rather

14   than a likelihood of irreparable harm.

15         And the Supreme Court said that that was simply

16   too lenient, and so therefore there must be a likelihood

17   rather than a possibility.

18         All right.  That's fine.

19         There is still, so far as I can determine, a

20   continuum as has been described by Ninth Circuit cases.  In

21   other words, the greater the possibility of irreparable

22   injury the less likely success on the merits and vice

23   versa.

24         Okay.  That's fine.

25         There is also a slightly different analysis that

1   is utilized when requests are being made pursuant to 105.

2          The test that I've just articulated I would think

3   would be applicable under Rule 7065 because it incorporates

4   Federal Rule of Civil Procedure 65, and that's what the

5   United States Supreme Court was dealing with.

6          There is, as I said, a little bit different

7   standard in a bankruptcy case.

8          There's no doubt that bankruptcy courts do have

9   authority to issue injunctions that do not require a movant

10  to meet all three of the requirements in a traditional

11  test;

12         First of all, likelihood of success on the merits,

13  likelihood of irreparable injury, balancing of the

14  hardships and of the public interest.  There may actually

15  be four.

16         But these cases such as In re L&S Industries, at

17  989 F.2d 929, a 1993 decision of the Seventh Circuit,

18  found:

19              "A bankruptcy court can enjoin proceedings in

20              other courts when it's satisfied that such

21              proceedings would defeat or impair its

22              jurisdiction."

23         Well, I don't have that issue.  Those are

24  decisions that deal with existing orders issued by a

25  bankruptcy court.

1          I've got a distinct issue where, does this Court

2    have the ability to enter an order when there has not been

3    already an order entered that is -- that a party is seeking

4    to enforce.

5          I tend to follow the same procedure as outlined in

6    an opinion that was filed in <u>PTI Holding Corporation</u> in an

7    order entered in the -- that one doesn't have a date.  We

8    didn't do it then.  It appears to me that it was June of

9    2006.

10          But at any rate, this is the test:

11          "The first requirement there must be imminent or

12          irreparable harm to the estate or the debtor's

13          ability to reorganize."

14          That's the irreparable injury in a bankruptcy

15    context.

16          "There must be a reasonable likelihood of

17          successful reorganization."

18          And that test like most tests before a

19    confirmation hearing, doesn't rise to the same level.  It's

20    sort of like the 362(d)(3) analysis, the one under 1112,

21    whether a case should be dismissed, those types of

22    analyses.

23          "Third, the court must balance the relative harm

24          as between the debtor and the creditor who would

25          be restrained;

1          "Fourth, the court must consider the public

2              interest."

3          And the public interest does include the

4  reorganization benefits to the public, to creditors, to the

5  debtor, to employees.

6          In other words, the policy that underlines the

7  whole fundamental tenet of reorganization as set forth by

8  the Ninth Circuit in the Adam's Apple case.

9          And as noted in In re Monroe Well Service, which

10  is a good case, found at 67 BR 746:

11          "Considering the public interest requires a

12          balancing of the public interest in successful

13          bankruptcy reorganizations with other competing

14          societal interests."

15          Collier indicates that:

16          "The most important element will be the balancing

17          of harms.  In this regard the bankruptcy court is

18          a court of equity, has almost preliminary

19          discretion in fashioning the injunction so as to

20          maximize protection and minimize prejudice.  The

21          court can condition the continuing effectiveness

22          under the injunction on continued positive

23          progress in the case, can require security to

24          ensure lack of harm to the creditor or can require

25          the protected individual to agree to restriction

1          on the transfer of his or her assets."

2          And let's look at that.

3          It's being alleged and supported by declarations

4    that unless the present management is retained that there

5    could be and probably would be the loss of a significant

6    amount of business, especially contracts with Asia Pacific

7    that are approximately in one hundred -- have a value of

8    one hundred million dollars;

9          That Fame would not finance;

10          That the plan then could not be confirmed.  It

11    would be dead on arrival;

12          That that would cause employees to leave their

13    positions, as evidenced by that one letter of August that's

14    attached as an exhibit.

15          That there would be or there's a significant

16    likelihood or probability that certain intellectual

17    property would be lost as a result.

18          In other words, these declarations all indicate

19    that it would be catastrophic at this point to change the

20    management.

21          All right.

22          There is obviously a ongoing dispute regarding

23    corporate governance.

24          I must say that that to me strikes me as a

25    secondary issue that can be resolved notwithstanding plan

1  confirmation.  Because there are remedies that are

2  available.

3          I do not intend at this time to issue any type of

4  a permanent injunction.  I haven't been asked to do so.

5          I think the request that I've had, Mr. Brill, may

6  go too far.

7          I am willing, at least preliminarily as I read

8  this, to probably enter some type of a preliminary

9  injunction, set a hearing on the issuance of a permanent

10  injunction, and combine it with a trial on the merits as

11  I'm allowed to do under Rule 65 to get this matter

12  resolved.

13          I don't know what it means, candidly, when I've

14  been asked that -- to have this preliminary injunction.  I

15  guess what you're really asking for is a hearing on the

16  issuance and to prevent stock conversion and board

17  replacement during the course of the Chapter 11 case.

18          Well I don't know what that means, during the

19  course of the case.  Cases don't end upon plan

20  confirmation, for example, especially when there's a

21  liquidation trust.

22          And the management of a corporation surely would

23  affect the assets that might be in that liquidation trust.

24          Because as I understand it, the primary litigation

25  that is contemplated would be where?  The entities that are

41

1    seeking to change the composition of the board.  That's

2    what I thought.

3            MR. BRILL:  Not all of them, your Honor.

4            The primary target of the debtor at the present

5    time is the director John Clough.  That's the party that

6    we've identified --

7            THE COURT:  This is a fellow that may or may not

8    have some arrangement with the vendor or whatever?

9            MR. BRILL:  That's correct, your Honor.

10           THE COURT:  Yeah.  Okay.

11           And I don't -- just by me saying it, I don't need

12   to hear people say that he doesn't.  I understand that it's

13   disputed.

14           So that's where I find myself.

15           I have obviously reviewed the pleadings.

16           I've now placed the standard that I believe is

17   applicable for my determination on the record.

18           So if you disagree with the legal standard I've

19   articulated, you need to tell me now.  Because your -- I

20   would point out that your points and authorities, I think,

21   are going to have to be changed.

22           Because at Page 19, at line -- starting at line

23   10, you say:

24           "In the Ninth Circuit the moving party may meet

25              its burden by demonstrating either a combination

42

1          of probable success on the merits and the

2          possibility of irreparable harm."  And you cite

3          Continental.

4          That was clearly the holding in Continental.  But

5     it's no longer the law as a result of the Supreme Court.

6          MR. BRILL:  Sorry about that.

7          THE COURT:  It's the likelihood.  There's no

8     question about that.

9          And then I think your points and authorities about

10    what occurs in a Chapter 11 are accurate.  Okay?

11         MR. BRILL:  Yes. your Honor.

12         And I don't disagree with the standard that the

13    Court enunciated.

14         THE COURT:  Is there any disagreement with the

15    legal standards I placed on the record?

16         MS. THOMAS:  No, your Honor.  No.

17         THE COURT:  Okay.  Good.  Let's go forward.

18         Okay.  That opinion I referred to, by the way, is

19    docket number 58 in Case Number 06-50140, entered on July

20    5, 2006.  And this says it was signed by Judge Markell.

21    That's my -- I signed one, too.  We all signed it.  Very

22    weird.

23         Okay.

24         MS. THOMAS:  You were on vacation, your Honor.

25         THE COURT:  But I signed both.

1          MS. THOMAS:  Oh, okay.

2          THE COURT:  I signed one and he signed one.

3          MS. THOMAS:  Okay.  Yeah.

4          THE COURT:  So we're just like what the Ninth

5    Circuit just did last -- we're either both right or we're

6    both wrong.

7          MR. BRILL:  Your Honor, I think the Court has

8    enunciated the correct legal standard and I think the Court

9    has gone through the evidence that's been presented.  And

10   there's been no opposition filed.

11          I think we've made a case that shows that there'll

12   be irreparable harm to this bankruptcy estate if Vision is

13   allowed to go forward with converting its preferred stock

14   to common stock and then trying to oust current management.

15          Current management is required, necessary and

16   indispensable to this bankruptcy case.

17          Fame made its loan at both the subsidiary level

18   and at the level of this bankruptcy case based upon

19   existing management.  Because it knows that existing

20   management has the contacts with the various important

21   vendors -- or customers in Singapore and in other places in

22   Asia.

23          It's those relationships that have been built up

24   over many many years that are the basis of those contracts

25   and obtaining those contracts.

44

1          THE COURT:  This company which is a holding

2    company, but its subs have been in business since when,

3    1986?

4          MR. BRILL:  Yes, your Honor.  Yes, your Honor.

5          And in fact, as set forth in the declaration, one

6    of the major customers required that Mr. Harrison move from

7    London--at great expense to him--to Singapore and spend

8    three years in Singapore during the life of that contract

9    in order to ensure that that contract is performed and that

10   he's the spokesperson and the person that they can deal

11   with in connection with that contract.

12         It's based upon that that Fame was willing to go

13   forward and loan money knowing that Mr. Harrison and Mr.

14   Euler, the current management, would be moving to Singapore

15   and moving forward with this hundred-million-dollar

16   contract.

17         That contract is in jeopardy, your Honor.  As we

18   set forth in our initial papers that are filed with this

19   court, we hope to do an out-of-court restructuring.

20   Because even as acknowledged by Vision, a Chapter 11

21   for this case is very difficult and makes it very difficult

22   for the debtor to continue to do business and for its

23   subsidiaries to continue to do business with its existing

24   customers.

25         The customers in Asia don't understand Chapter 11,

1  they think it's a bank -- they think it's a liquidation

2  proceeding.

3          They're concerned that there's going to be other

4  management put in.

5          In one of the contracts there is a provision that

6  if a trustee is appointed and they can turn -- they can get

7  their -- the -- there's an escrow that was established, and

8  I think we alluded to that, your Honor, and certain

9  information that would allow them to proceed with their

10 contract without --

11          THE COURT:  Isn't that the IP that we -- I saw?

12          MR. BRILL:  The IP, your Honor.  Yes, your Honor.

13          The IP would allow them to access the IP if

14 there's a trustee appointed at the parent level.

15          So they're very con -- they're very concerned

16 about bankruptcy proceedings and they don't know the

17 difference between a Chapter 11 reorganization and a

18 Chapter 7.

19          So the thought was to try and avoid filing a

20 Chapter 11 at all, do an out-of-court restructure.

21          We met with, you know, Vision initially to try and

22 work out a deal with Vision because they're the ones that

23 put money into this entity beforehand.

24          They expressed no desire to do that, so we went

25 and found another source, Fame.  Fame put the money in.  It

46

1  was only after Fame put the money in that Vision started

2  complaining.

3          Your Honor, it's clear that this company, the

4  debtor, is insolvent.  That Equity is out of the money.

5  That they're -- that they're not -- that Vision has not

6  filed anything which we had expected in connection with the

7  hearing on the disclosure statement, in connection with the

8  borrowing motion.

9          We, you know, to be candid with your Honor, I was

10  rather shocked that we didn't receive any opposition

11  pleadings to those -- to those pleadings which we filed.

12          Certainly --

13          THE COURT:  What's the amount of the unsecured

14  obligations?

15          MR. BRILL:  I'm sorry, your Honor?

16          THE COURT:  The amount --

17          MR. BRILL:  About ten million.

18          THE COURT:  Huh?

19          MR. BRILL:  There's about ten million dollars in

20  unsecured obligations.

21          THE COURT:  Non-insider?

22          MR. BRILL:  Insiders probably make up about half

23  of that, your Honor.

24          THE COURT:  Oh.

25          MR. BRILL:  It depends on whether Mr. Frost is --

47

1          THE COURT:  Is there any other secured debt other
2     than that owed to Fame?
3          MR. BRILL:  No, your Honor.
4          As I was saying, your Honor, we were rather
5     shocked that --
6          THE COURT:  That would mean that--I keep
7     forgetting the name and I apologize--Mr. Frost; is that
8     correct?
9          MR. BRILL:  Yes.
10         THE COURT:  Is he the largest single --
11         MR. BRILL:  He's the largest unsecured creditor,
12    your Honor.  He loaned money to the company and it's been
13    unpaid for a long period of time.  He's owed about three,
14    almost three seven, 3.7 million dollars.
15         He's not an officer and director, although the
16    debtor believes that he may be classified as an insider, a
17    non-statutory insider.  But that would remain to be seen.
18         THE COURT:  All right.
19         MR. BRILL:  The irreparable harm to the estate,
20    your Honor, I think that's really the key.  And I think the
21    Court focused on that.
22         That we have a reorganization that was voted for
23    almost unanimously by creditors pre-petition.
24         That we were unsuccessful as a result of action by
25    Mr. Frost and Vision to implement that.  So we attempted to

1   get this company in and out of bankruptcy as quickly as

2   possible so that the contracts are not lost.

3          We attempted to have the hearing on the disclosure

4   statement combined with the hearing on confirmation.  And

5   as the Court knows, the Court denied that order.

6          So we set a hearing on the disclosure statement as

7   soon as possible.

8          This was the earliest date.  The Court has now

9   approved the disclosure statement.

10          We now have a hearing on confirmation set for

11   November 30th, and we're confident that we will get the

12   requisite votes to confirm the plan of reorganization.

13          We have the financing the Court -- which the Court

14   just approved from Fame, which will allow us to implement

15   the plan, pay the administrative expenses that have been

16   incurred.

17          Without that financing and without Fame financing

18   this debtor, the case would be administratively insolvent.

19          When the case was filed there was less than two

20   thousand dollars in the bank account for the debtor

21   corporation.

22          The balancing of the harm, your Honor, I mean I

23   don't think there can be any doubt that the harm to the

24   debtor if management is removed is tremendous.  It

25   basically is the end of this bankruptcy estate and it'll be

1  insolvent.  Fame will not finance the subsid -- it will

2  adversely affect the subsidiary.

3       And the business of the subsidiary versus the harm

4  to Vision is, you know, I can't even figure out what it is.

5   It's relatively minor, your Honor.

6       They're a preferred shareholder now that's out of

7  the money.  They want to convert and be a shareholder, a

8  common shareholder holding a majority of the shares of an

9  insolvent company.

10       The only purpose that could be served by them

11  wanting to do this is to replace management, as they've

12  indicated.

13       But they have no alternative plan, your Honor.

14  What I really had expected to rec -- to see from Vision was

15  a alternative plan.  And we -- and management would have

16  been happy.

17       Mr. Bryan, as the chief restructuring officer,

18  would wel -- would have welcomed a competing plan, one that

19  would have financed the operations of the debtor, would

20  have put in the fifteen million dollars or so that's

21  required at the subsidiary level.  But that was never

22  offered.

23       There have been negotiations ongoing, not between

24  the debtor and Vision as much as between Fame and Vision.

25       Because Fame is the entity that is going to be

1  owning the debtor and it controls the money.  It controls

2  what, you know, really what the terms of the plan are.

3  That's the debtor's plan.  It's Fame that's giving up the

4  equity and it's Fame that's going to give up the cash

5  collateral note to creditors.

6          And so it is Fame that really is the party that

7  Vision needed to negotiate with.  And --

8          THE COURT:  Fame's not giving up the equity.  Fame

9  is getting the equity.

10          MR. BRILL:  Well, I'm sorry.  Your Honor,

11  they're -- well, they're getting 96.5 percent of the equity

12  but they're giving -- they're allowing --

13          THE COURT:  They're giving up the 3.5.

14          MR. BRILL:  -- 3.5 percent.  That's what I meant,

15  your Honor.

16          They're giving 3.5 to the creditors and they're

17  allowing creditors to get paid out of this cash -- the cash

18  flow note, five percent of the cash flow note for a two-

19  year period.  And if the creditors aren't paid within the

20  two years 75 percent, then it'll go on for a year.

21          So Vision is really the party that -- I'm sorry.

22  Fame was really the party that Vision needed to negotiate

23  with.  And my understanding is that those negotiations have

24  been ongoing and were -- took place as recently as two

25  weeks ago.

1          So in response to Ms. Thomas' declaration that I

2    never called her and, you know, negotiated with regard to

3    these issues, the parties that had the real interest were

4    negotiating.

5          And it was only when those negotiations broke down

6    that -- and we knew the intent of Vision to go forward with

7    the conversion, that we, you know, prepared and filed our

8    papers for the preliminary injunction, your Honor.

9          So that explains why even though the Vision says

10   that we've known about this for almost sixty days, which is

11   true--we've known of their intent, they gave us the 61-day

12   notice--but we were hopeful that it would get resolved by

13   the business people.

14         Unfortunately that has not happened yet.  I still

15   hold out hope that it may happen, but it hasn't happened as

16   of today's date.  But their actions that they can take as

17   early as October 11th would threaten this reorganization.

18         THE COURT:  Okay.

19         MR. BRILL:  Your Honor, and I believe everything

20   that -- all of the evidence to support the standards is in

21   the papers and I think the Court did a good job of

22   analyzing it.

23         If the Court wants anything more from me, I'll be

24   happy to elaborate on it.

25         THE COURT:  Ms. Thomas.

52

1          MS. THOMAS:  Thank you, your Honor.

2          First I'd like to talk about the standard of

3     irreparable harm.  And I think that, you know, that when

4     the Supreme Court talked about the need to prove up

5     irreparable harm it meant it.

6          And the hearsay declarations, from people who are

7     not here, about how the customers are going to be lost and

8     how the financing is going to be done, you know, are

9     hearsay.

10         What is there in Mr. Euler's declaration that is

11    not hearsay?  What employees are going to do, what

12    customers are going to?  Is there a single declaration from

13    a customer?  No.

14         My client is here.  He's ready to be put on the

15    stand and deposed about this.  This is not -- the things

16    that are being said are not true.

17         Let's start with the idea that oh, they came to

18    Vision and Vision wouldn't finance the operations of AGI

19    and so they had to go to Fame.  That's not true.

20         They came to Vision.  Vision said first, see if

21    you can raise equity.  But second, give us financial

22    information.  And they didn't do it.

23         Why didn't they do it?  They didn't do it because

24    Mr. Bryan and his father and his company Watley have a deal

25    with Fame to give them five percent of the loan proceeds.

1  They have a five-percent commission on this.  That's why.

2       They went to Dominic & Dominic.  And Dominic &

3  Dominic is an investment banker.  And Dominic & Dominic had

4  several people who are ready to finance this company.  But

5  they wouldn't give Dominic & Dominic the information.

6       There's a buyer out there ready to buy this

7  company.  We don't know how much because the buyer can't

8  get any information about the company.

9       Mr. Clough, the director who they say is so evil,

10 tried to get -- he's evil because he tried to get financial

11 information about the company.

12       I think that it was armed -- wasn't it armed

13 guards prevented him?

14       These preferred issuance of shares and things that

15 are being done, they're being done without Mr. Clough's

16 input.  Mr. Clough is the independent director.  But yes,

17 he's the evil one.

18       Let's look at the -- so where is the standard of

19 irreparable harm here other than hearsay?

20       The reason we didn't respond, your Honor, was, A,

21 because of time, but, B, because your Honor said that there

22 would be no response -- deadline for the response.  So we

23 didn't.

24       But I did bring my client here.  And he's ready to

25 be -- to testify under oath about what's going on with this

54

Uusiheimala - Direct

1  company.

2          What's going on with this company is that people

3  are --

4          THE COURT:  Then put him on the stand.

5          MS. THOMAS:  Yeah.  Absolutely.

6          People are telling --

7          THE COURT:  Put him on the stand.

8          MS. THOMAS:  Yeah.

9          ANTTI UUSIHEIMALA, VISION'S WITNESS, SWORN

10                      DIRECT EXAMINATION

11  BY MS. THOMAS:

12  Q   Would you state your name for the record.

13  A   Antti Uusiheimala.

14  Q   And could you spell your last name.

15  A   U-u-s-i-h-e-i-m-a-l-a.

16  Q   And could you spell your first name.

17  A   A-n-t-t-i.

18  Q   Mr. Antti, what is your position with the Vision

19  companies?

20  A   Investment manager.

21  Q   Okay.

22          And of what company?

23  A   Of Vision Capital Advisors, which oversees and manages

24  the investments by the three Vision funds.

25  Q   Okay.

55

Uusiheimala - Direct

1          How long have you?

2     A    Since the beginning of the fund, June of '05.

3     Q    Okay.

4          Are you familiar with the relationship between the

5     Vision companies, I'm going to call them, and Astrata?

6     A    Yes.

7     Q    And tell me how you first learned about the Astrata

8     investment.

9     A    Well, I was with the company from the day we made the

10    first investment to the company and had been following the

11    company from I guess, if my memory serves me right, 2006

12    onwards and have subsequently, you know, been helping other

13    individuals at Vision in trying to figure out what is going

14    on at Astrata since they went dark in June and then and so

15    on.

16    Q    When you say Astrata went dark in June, tell the Court

17    what you mean by that.

18    A    They contacted us, I believe it was in the beginning of

19    June --

20          THE COURT:  Of what year?

21          THE WITNESS:  Oh, of this year.

22          -- claiming that the cost of being a public

23    company was such a huge burden on them and it really would

24    help the company if they would be allowed to go dark and

25    start filing under Section 13 of the Act.

Uusiheimala - Direct

1         And at that point we had no idea that the company

2  was in -- had plans of seeking senior secret debt

3  practically.

4         Practically management was negotiating a

5  management buyout with Fame.  We had no idea of that at the

6  time and they decided not to disclose this to us.  Nor did

7  they disclose any of the agreements with Fame that had been

8  signed at the time.

9  BY MS. THOMAS:

10  Q   Were they required to disclose those agreements?

11  A   Yes, unless --

12  Q   Why were they required to disclose those agreements?

13  A   As a public company you're required to disclose all

14  material agreements.

15         And the company knowingly--that's my

16  interpretation, knowingly--decided not to file those in

17  hopes of getting our approval to go dark.

18         And, you know, we felt misled obviously at the

19  time.

20  Q   So explain to the Court, did Vision actually refuse

21  financing for the company?

22  A   So the company came to Vision asking for additional

23  capital.

24         At the time we had already funded thirteen million

25  dollars and we encouraged the company to go and seek equity

Uusiheimala - Direct

1 financing from the market, and once they would have a term

2 sheet we would sort have a look at the terms and see to

3 what extent and if we were going to participate.  But at

4 least we wanted to find out what other financing would be

5 available for the company.

6 Q   What happened then?

7 A   Then we didn't hear from the company for a long time

8 until we learned about this transaction with Fame.

9 Q   So between the time that you told the company to come

10 back with term sheets and the time that the Fame

11 transaction was put in place, did the company ever come to

12 you and ask for financing?

13 A   To my recollection, no.

14        I mean there were discussions about, you know,

15 capital rates and complaining that they -- they complained

16 to us that they couldn't find capital.  But there was never

17 any mention on them trying to seek, you know, to take over

18 that instant equity.

19        THE COURT:  When did you first tell a

20 representative of the debtor to see what funds might be

21 available in the equity market?  When did that happen?

22        THE WITNESS:  This was -- and again I wasn't the

23 lead person at the time.  But I believe that was --

24        THE COURT:  So you didn't participate in this

25 discussion?

Uusiheimala - Direct

1         THE WITNESS:  I was not -- it was another

2  investment manager of Vision.  But I was aware of the

3  process as --

4         THE COURT:  Somebody told you about it?

5         THE WITNESS:  No, no.  We had discussions

6  internally with Vision.  So I was --

7         THE COURT:  But you didn't have these discussions?

8         THE WITNESS:  Not directly with -- right.

9         THE COURT:  I think I'll overlook all the hearsay.

10       THE WITNESS:  No.  This is --

11       MS. THOMAS:  Your Honor, and that would be fine.

12  If you would overlook the hearsay from Mr. Euler's

13  declaration as well.

14       THE COURT:  I'm overlooking all of the hearsay.

15       MS. THOMAS:  All of it.

16       THE COURT:  I'm trying to find out what's going on

17  here.  I'm at a temporary --

18       MS. THOMAS:  Right.

19       THE COURT:  -- restraining order stage.

20       MS. THOMAS:  Right.

21       THE COURT:  I haven't even decided if I'm going to

22  issue that, much less a preliminary injunction.

23       MS. THOMAS:  Right.

24       THE COURT:  When did that -- when did you find out

25  that Vision had asked the debtor to see what was available

                          Uusiheimala - Direct
1   in the equity markets?

2              THE WITNESS:  This was in the spring of this year.

3              THE COURT:  Prior to them asking to go dark?

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.

6              And when did you or Vision find out about the --

7   first know about the transaction between the debtor and

8   Fame?

9              THE WITNESS:  I believe that was June 22nd or --

10  on or about June 22nd when they eventually filed the 8(k)

11             THE COURT:  Who -- the 8(k).  Is that how you

12  found out, it was in the 8(k)?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.

15             And who would have had the discussions in the

16  spring of 2009 with the debtor's representatives?

17             THE WITNESS:  It was Andrew Merkatz, Merkatz of

18  Vision.

19             THE COURT:  Would you spell that for me.

20             THE WITNESS:  M-e-r-k-a-t-z.

21             THE COURT:  And who is he?

22             THE WITNESS:  He's another investment manager at

23  Vision.

24             THE COURT:  How many Vision investment managers

25  are there involved in this -- in the relationship with the

Uusiheimala - Direct

1    debtor?

2              THE WITNESS:  Andy and myself.

3              THE COURT:  Okay.

4              And both of you have equal responsibility and

5    authority; is that correct?

6              THE WITNESS:  Yeah.  Yes.  With respect to this

7    matter.

8              THE COURT:  You don't work for him, he doesn't

9    work for you?

10             THE WITNESS:  No.

11             THE COURT:  Okay.

12             Now I have a timeline.  Thank you.

13             Go ahead.

14   BY MS. THOMAS:

15   Q    Subsequently did you learn about the commissions that

16   were being received by Mr. John Bryan and Mr. Anthony Bryan

17   and their company Watley?

18   A    Yes.

19   Q    From the Fame loan?

20   A    Yes.

21   Q    Can you describe those.

22   A    The disclosure, what they filed, I think they were

23   supposed to be paid five percent of the maximum amount of

24   the loan facility within 180 days and then another five

25   percent of the loans actually -- of the amounts actually

Uusiheimala - Direct

1  drawn under the facility.

2          And I don't know what happened to that.  Once the

3  facility was increased from eight and a half to sixteen

4  million, now are they going to get 1.6 million?  I don't

5  know.  I haven't seen those agreements.  But that's -- that

6  would be my read.

7  Q   Okay.

8          Now Judge Zive mentioned the declaration of Mr.

9  Euler regarding the terrible damage that would happen --

10 A   Right.

11 Q   -- if management was changed.

12 A   Um-hmm.

13 Q   Okay.

14         First of all with respect to the financing, the

15 loss of the Fame financing.

16 A   Um-hmm.

17 Q   Is Vision -- does Vision have the funds necessary to

18 replace the Fame financing if required?

19 A   If required, absolutely.  Yes.

20 Q   Okay.

21         And what would you require in order to replace all

22 of the Fame financing up to the -- up to the maximum amount

23 under the plan?

24 A   We would need to have the same access to information as

25 Fame has had.

                    Uusiheimala - Direct
1  Q    And have you tried to get that information?

2  A    We tried.  We sent a letter to the company requesting

3  them to send financial information to us, which they did to

4  a limited amount up to the time prior to the Fame

5  transaction.  So everything that was of interest to us

6  obviously was omitted from the information package.

7           And we also requested that the management and the

8  officers of the company make themselves available for

9  discussion and fact finding.  Which they refused.

10 Q    Okay.

11          Was there also a problem with the negotiation of

12 the Fame loan in terms of communications with AGI and the

13 counsel for Fame that did not take place through Fame's

14 counsel -- I'm sorry -- through AGI's counsel?

15 A    Yeah.  My end --

16 Q    Can you describe that.

17 A    And again this is -- our primary source of information

18 is the independent director, the only independent director

19 of Astrata, John Clough, who is now, you know, not a party

20 of this management buyout transaction.

21          And he sent -- and the e-mails that I've seen

22 indicate clearly that Anthony Harrison had direct

23 negotiations with Fame's counsel.

24          And when Astrata's counsel, City Legal (pho),

25 instructed Mr. Harrison of the dangers of, you know,

63

Uusiheimala - Direct

1  bypassing the company counsel and dealing directly with

2  Fame counsel, Mr. Harrison basically told them not to worry

3  about it.

4           So it looked to me like Harrison and Euler were in

5  direct discussions with Fame, bypassing company's counsel

6  and their fiduciary obligations.

7  Q    Okay.

8           Now the other irreparable harm that's -- that is

9  alleged to have taken place or will take place --

10 A    Um-hmm.

11 Q    -- is loss of customers?

12 A    Um-hmm.

13 Q    Okay.

14          Do you know anything about that and how necessary

15 Mr. Harrison is for the continuation of business with the

16 customers of Asia Pacific?

17 A    Well, here's what I know.  And one problem as part of

18 an equity investor we make, you know, we typically make in-

19 depth -- do relations of customers and make sure that the

20 customer relationship is there and the contracts are real.

21          In this case, the main customer is of such a

22 nature that they prefer not to communicate over e-mails or

23 phones and only prefer to have face-to-face meetings, which

24 is why we've had to have the independent director have

25 these discussions and feed us information from Tridex.

Uusiheimala - Direct

1          And our impression, based on those discussions,

2    are quite the opposite of what the management is

3    disclosing.  We don't think Mr. Harrison or Euler are

4    necessary for the company going forward.  As a matter of

5    fact, we think that Tridex would prefer management be

6    changed.

7          My understanding is that Mr. Harrison has been

8    unable to have meetings with the major customer.

9          I think he succeeded to have one limited meeting

10   two months ago, but certainly he hasn't -- doesn't have the

11   relationship he claims he has, whereas John Clough, the

12   independent director, has very good working relationship

13   with the major customer, the sixty -- hundred-million

14   dollar contract that we're talking about.

15         It is my understanding that John Clough together

16   with some other key people from Singapore are fully

17   competent and capable -- able and competent in running the

18   company.  They will hit the ground running and Euler, and

19   Harrison are not necessary.  As a matter of fact, I think

20   Tridex would, like I said, would prefer to have Mr.

21   Harrison mo --

22         THE COURT:  What's the name of the customer?

23         THE WITNESS:  Tridex.

24         THE COURT:  T-r-i-d-e --

25         THE WITNESS:  T-r-i-d-e-x.

                        Uusiheimala - Direct
1           THE COURT:   Thank you.

2    BY MS. THOMAS:

3    Q    Would you be seeking to take control of the company if

4    you thought your control would destroy the company

5    business?

6    A    Absolutely not.

7    Q    And how much did you invest in this company?

8    A    Thirty million dollars.

9    Q    Okay.

10          You were invited by Mr. Bryan to file a competing

11   plan.  Are you prepared to file a competing plan?

12   A    Yes, we are.

13   Q    And in fact if the Judge denies you the right to assume

14   control of this company and assuming that you get the

15   information that's required to examine the finances of the

16   subsidiary companies and the parent company, would you be

17   prepared to file a plan?

18   A    We would file a plan.  But I mean we'll need access to

19   the company and we'd need to know that our, you know,

20   conversion, you know, leads us to, you know -- enables us

21   to take control of the company.

22          THE COURT:  Well, there's other ways of doing it,

23   such as --

24          THE WITNESS:  Or replacing --

25          THE COURT:  -- a plan of reorganization.

                        Uusiheimala - Direct
1            MS. THOMAS:  Such as filing a competing plan?

2            THE COURT:  Yeah.

3            THE WITNESS:  Right.

4            THE COURT:  So I'll determine --

5            THE WITNESS:  Right.

6            THE COURT:  -- the way to do it.  Okay?  Thank

7    you.

8            THE WITNESS:  If I --

9    BY MS. THOMAS:

10   Q   Go ahead, Mr. --

11   A   If I may add one more thing.

12           I mean, to us we don't care whether we have

13   control of the company as long as the company is run by

14   independent board that looks after the interests of the

15   shareholders like they should have done from the day one.

16   Q   Okay.

17           In your opinion what's the value of a plan that

18   provides 3.5 percent of the stock of the company?

19   A   It's practically zero.  It's nonexistent.

20   Q   Okay.

21           How about five percent of the "aggregate

22   cumulative cash flow" --

23   A   If they say --

24   Q   -- over two years?

25   A   It's worth -- practically worthless.

Uusiheimala - Direct

1  Q    And did you also have experience with the moneys that

2  were being spent by Mr. Harrison and by Astrata that have

3  led to some of the financial problems of this company?

4  A    I mean these are the concerns that the independent

5  director has raised with us as the main shareholder.  He's

6  under the impression and having had access to the company's

7  informa -- records --

8            THE COURT:  I don't want to hear what he has to

9  say.

10            THE WITNESS:  Right.

11            THE COURT:  He hasn't even filed a declaration.

12  Sorry.

13            MS. THOMAS:  What --

14            THE COURT:  I'm stopping it.

15            THE WITNESS:  Fair enough.

16            MR. BRILL:  Thank you, your Honor.

17            THE COURT:  We've had enough hearsay.  I'm

18  stopping it.  That's enough.

19  BY MS. THOMAS:

20  Q    What did the financial information that was provided

21  for the company indicate were the expenditures by officers

22  and directors?

23            THE COURT:  Not what Mr. Clough told you, but what

24  you know --

25            THE WITNESS:  We've seen --

68

Uusiheimala - Direct/Cross

1    THE COURT:  -- of your own personal knowledge.

2  BY MR. THOMAS:

3  Q   Right.  From the financial --

4  A   Right.

5  Q   -- information filed by the company.

6  A   We witnessed exorbitant travel expenses.  I think

7  corporate salaries were excessive.  The benefits that both

8  Harrison and Euler enjoy were excessive as well.

9         And we believed just by cutting those expenses the

10  company would probably be close to break-even.

11  Q   Was the company spending money on new offices, for

12  example?

13  A   Yes, they were.

14  Q   All right.

15  A   In Singapore.  Lavish offices, if I may add.

16         I don't think they're in a position to, you know,

17  invest in offices at this point.

18  Q   Okay.

19         Pass the witness.

20                    CROSS-EXAMINATION

21  BY MR. BRILL:

22  Q   You indicated that Astrata went dark in June of 2009;

23  is that correct?

24  A   Um-hmm.

25  Q   That means it's not --

69
Uusiheimala - Cross

1        THE COURT:  No.  You have to answer audibly,

2   please.

3        THE WITNESS:  Yes.

4        THE COURT:  Thank you.

5   BY MR. BRILL:

6   Q   And that means it stopped filing its reports with the

7   SEC?

8   A   Oh, May or June, yes.  Stopped filing their --

9   basically they filed Form 15(g) -- 1512(g).

10  Q   And were you present at a meeting with representatives

11  of Astrata when they explained the reasons for going dark?

12  A   It was a phone conversation or an e-mail, not a

13  meeting.

14  Q   Were you present at a meeting that was held in early

15  June of 2009 at your offices with myself, Mr. Euler, Mr.

16  Clough and Mr. Tony Bryan?

17  A   No.

18  Q   And so you don't know at that meeting that it was

19  discussed the reasons why the company was going dark at

20  that time?

21  A   I have a good rapport with Andy and I got very good

22  briefing of that meeting.

23  Q   And you're saying that you weren't advised as a result

24  of that meeting that the company was advised of the Fame

25  loan to the subsidiary Asia Pacific at that time?

Uusiheimala - Cross

1  A   No.

2           Was this prior -- this was at the meeting at --

3  Q   This was at the meeting I think that was at your

4  offices that I was at.

5  A   Prior to the company going dark or after the company

6  going dark?

7  Q   It was just subsequent to the company going dark.

8  A   Subsequent to the company going dark.  Yes.

9  Q   Just subsequent?

10  A   Yes.  We learned about the company -- company's

11  transaction with Fame after they went dark.

12  Q   And that was --

13          THE COURT:  But you told me that you'd learned

14  that upon the filing of the 8(k).

15          Mr. Brill is asking whether Vision was informed at

16  the time of that meeting which was prior to the filing of

17  the 8(k).

18          MR. BRILL:  That's correct, your Honor.

19          THE WITNESS:  That's fair enough.

20          I think now that my memory comes back, I think

21  Andy, Andy Merkatz was in that meeting.  He learned some

22  details about some financing that was going on.  Full

23  details came appearing to us in the filing.

24          But it was all subsequent to, subsequent to the

25  company going dark.  Obviously it wasn't disclosed to us

Uusiheimala - Cross

1  before that.

2  BY MR. BRILL:

3  Q    You indicated that you're aware of some fees that were

4  being paid to Watley for putting together a loan?

5  A    Um-hmm.  Yes, based on the agreement that was

6  disclosed.

7  Q    And do you know if any fees were paid to Watley?

8  A    No.

9  Q    You indicated that Vision has the ability to finance

10  the reorganization --

11  A    Uh-huh.

12  Q    -- and the equity.

13          Is Vision prepared to finance the reorganization

14  and the subsidiary company?

15  A    Yes.  We manage about six hundred and fifty million

16  dollars and we certainly have the wherewithal to finance

17  the company.

18          Again we would need to know what is going on and

19  confirm some of our suspicions.

20  Q    Do you have personal knowledge with regard to whether

21  or not Mr. Harrison meets with Tridex?

22  A    No personal knowledge, no.

23  Q    Do you know that Mr. Harrison meets with Tridex at

24  least on a weekly or biweekly basis?

25  A    No, I don't know that.

Uusiheimala - Cross

1   Q    The source of your information is Mr. Clough?

2   A    Yes.

3   Q    And you know that the debtor company has a dispute with

4   Mr. Clough and has targeted him as being a potential party

5   to a lawsuit?

6   A    I'm aware of the allegations, yes.

7   Q    Were you advised as a result of that meeting in the

8   early -- in early June that the company was unable to

9   obtain equity from other sources due to the condition of

10  the market and due to the fact in the company's view that

11  the preferred stock of Vision discouraged any equity

12  investments?

13  A    I was informed by the banker himself that his efforts

14  to try to raise capital for the company were blocked by the

15  management in form of them not responding to his e-mails,

16  calls or information requests.

17          THE COURT:  Who informed you of that?

18          THE WITNESS:  Todd DeMateo of Dominic & Dominic,

19  who is the lead vendor.

20  BY MR. BRILL:

21  Q    And you indicated that the company has refused to

22  listen to any offers from Mr. DeMateo.

23          Are you aware of any written offers that were made

24  through Mr. DeMateo?

25  A    That's at the -- how the pros work.  You don't get

                              Uusiheimala - Cross
1  written offering -- written offers before the company --

2  the clients have a possibility to do due diligence which

3  the management has effectively followed.

4  Q   Do you know if Mr. DeMateo -

5              THE COURT:  So that would mean there are no

6  written offers?

7              THE WITNESS:  No.  No written offers.

8              THE COURT:  That was the question.

9              THE WITNESS:  Correct.

10             THE COURT:  That's the answer?

11             THE WITNESS:  Yes.

12             THE COURT:  Thank you.

13  BY MR. BRILL:

14  Q   And are you aware of the fact that Mr. DeMateo was

15  requested by the company to obtain a written proposal

16  before -- so that the company could vet any potential

17  offers?

18  A   No, I'm not aware.

19             MR. BRILL:  I have no further questions, your

20  Honor.

21             THE COURT:  Thank you.

22             Redirect?

23                         REDIRECT EXAMINATION

24  BY MS. THOMAS:

25  Q   Mr. Uusiheimala, what is required in order to have a

Uusiheimala - Redirect

1  written offer from a capital investor or a lender?

2  A   Well, first of all the -- you know, the potential

3  investor needs to understand the company's financials.

4  They need to understand, you know, they need to do due

5  diligence of a company.  And then typically they would come

6  up with a term sheet which they would negotiate with the

7  company the terms of the financing and go out there and

8  solicit the offering.

9       But it requires the company's cooperation and

10 information disclosure.

11 Q   And that's what didn't happen in this case?

12 A   Never happened, no.

13 Q   Okay.

14      Are you also aware of potential buyers for this

15 company?

16 A   Todd DeMateo has disclosed to me there is a company

17 that is a company of Astrata which is very int -- very keen

18 and interested in pursuing a merger and/or a buyout of

19 Astrata.

20      But obviously those negotiations have not been --

21 have not led anywhere because of the current situation of

22 the company.

23      MS. THOMAS:  Pass the witness.

24      THE COURT:  Thank you.  You may step down.

25      Any other witnesses?

1          MS. THOMAS:  No, your Honor.

2          I would just like the Court though --

3          THE COURT:  No other witnesses?

4          MS. THOMAS:  No other witnesses, your Honor.

5   Thank you.

6          I would though object to the declarations of Mr.

7   Euler --

8          THE COURT:  No.  I'm going to allow them.

9          Go ahead and make your objection.

10         MS. THOMAS:  Yeah.

11         THE COURT:  I've heard hearsay from your witness.

12   I'm just at the temporary restraining order phase and I

13   just was going back through them.

14         Mr. Bryan's declaration of October 6, for example,

15   he states:

16              "The debtor has been contacted by concerned

17              customers."  That's not hearsay.  "And the

18              landlord with threats of term" --

19         MS. THOMAS:  Well --

20         THE COURT:  Let me finish.

21              "-- threats of termination of non-debtor."

22         Fine.  He's saying that's what they've been

23   contacted with.  That doesn't go to establish the truth the

24   statement, simply reporting what they have been told.

25         And I don't know if these people are really going

1  to pull their contracts.  I understand that.

2          I've also looked once again.  And there are some

3  issues regarding these declarations.

4          But the witness I just heard had very little

5  personal knowledge of most of what he testified to.

6          But I need that information in order so that I can

7  exercise my discretion.  And I'm willing to consider it.

8          MS. THOMAS:  Thank you.

9          THE COURT:  And that's the same analysis that I

10  apply to these declarations.

11          And I know these people aren't here.

12          And before I would ever issue a permanent

13  injunction or perhaps even a preliminary injunction, I

14  would require a far more vigorous evidentiary proceeding.

15          MS. THOMAS:  We appreciate that, your Honor.

16          I would also ask the Court in terms of irreparable

17  harm to take note of the terms of the plan itself and the

18  disclosure statement in terms of what these people, the

19  people who are signing declarations, are getting.

20          THE COURT:  I under -- I fully understand that.

21          MS. THOMAS:  Okay.  And I know your Honor reads

22  everything.

23          I did want to point out that in -- back in the

24  back of the disclosure statement, when they discuss the

25  original plan--it's on Page -- document 41-1 in the main

1  case on Page 7--they discuss that Fame is giving 20 percent

2  of the stock of this company to off -- options for 20

3  percent of the stock of the company to officers and

4  directors.

5           Yeah.  So that's who you're looking at.

6           In terms of the motivation of this, in terms of

7  the motivation behind these declarations, I think the Court

8  has to take into consideration that these people are not

9  disinterested.

10          And, you know, they may be officers and directors

11 of the debtor.  But this plan is a management buyout plan.

12          THE COURT:  Okay.

13          MS. THOMAS:  Everyone is getting nothing.  Where

14 is there to go but up from this one?

15          THE COURT:  Thank you.

16          MS. THOMAS:  Thank you.

17          THE COURT:  Mr. Brill, do you have any witnesses

18 you want to put on the stand?

19          MR. BRILL:  Yes, your Honor.  I'd like to call Mr.

20 John Bryan to the stand.

21          THE COURT:  Thank you.

22   ANTHONY JOHN ADRIAN BRYAN, JR., DEBTOR'S WITNESS, SWORN.

23          THE COURT:  Please state your full name and spell

24 your last.

25          THE WITNESS:  John Bryan.

Bryan - Court Examination

1              THE COURT:  What is your full name?

2              THE WITNESS:  Anthony John Adrian Bryan, Jr.

3              THE COURT:  And who's your father?

4              THE WITNESS:  Anthony John Adrian Bryan.

5              THE COURT:  And was he a member of the board of

6     directors of this entity?

7              THE WITNESS:  Yes, he is.

8              THE COURT:  All right.

9              And what is your role with this ent -- with the

10    debtor?

11             THE WITNESS:  My role is chief restructuring

12    officer.

13             THE COURT:  And how long have you been the chief

14    restructuring officer?

15             THE WITNESS:  Since August 8th of '9.

16             THE COURT:  August 8th of 2009?

17             THE WITNESS:  Correct.

18             THE COURT:  And what is -- are you being paid

19    thirty-two thousand five hundred dollars a month?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  And have those payments been paid

22    current?

23             THE WITNESS:  No, your Honor, they haven't.

24             THE COURT:  When was the last time you've been

25    paid?

                      Bryan - Court Examination
 1              THE WITNESS:  The last time I've been paid for

 2   chief restructuring officer work was I think in August,

 3   sir.

 4              THE COURT:  So how much have you been paid for

 5   your services as chief restructuring officer?

 6              THE WITNESS:  Actually by the debtor, zero.  I'm

 7   sorry.  I'm sorry.

 8              THE COURT:  And who had paid you anything?

 9              THE WITNESS:  Prior to the filing for Chapter 11 I

10   was engaged by a shareholder, Jaker Investments, Limited as

11   a candidate for chief restructuring officer.  And they were

12   paying me a monthly fee to advise on how to get the company

13   restructured.

14              THE COURT:  And that's the same entity that

15   introduced the debtor to Fame Trading?

16              THE WITNESS:  That's correct.

17              THE COURT:  And when did you be -- you became

18   chief restructuring officer on the 8th --

19              THE WITNESS:  August 8th.

20              THE COURT:  Post-pet--

21              THE WITNESS:  Post-petition.

22              MR. BRILL:  Of August --

23              THE COURT:  When was this case filed?

24              MR. BRILL:  August 6th.  I think he was appointed

25   on August 7th, if I'm not mistaken, your Honor.

Bryan - Court Examination

1           THE COURT:  That type of employment typically,

2    chief restructuring officer, don't --

3           MR. BRILL:  He's not -- it's not -- your Honor,

4    that's just the title.

5           THE COURT:  Well, yeah.  But that's a fairly

6    significant title.

7           MR. BRILL:  Well, your Honor, it's no different

8    than -- it's like chief executive officer or chief

9    financial officer, which this company already had.

10          THE COURT:  This is a large salary for a company

11   that had two thousand dollars in its bank account when it

12   filed.

13          Who's paying it?  Who's paying it?

14          MR. BRILL:  Your Honor, it has not been paid.  It

15   has not been paid yet.  It will be paid --

16          THE COURT:  Have you received any payment as the

17   chief restructuring officer?

18          THE WITNESS:  No, your Honor.

19          THE COURT:  You indicated to me that -- you said

20   not from the debtor.  What did that mean?

21          THE WITNESS:  Prior to the filing for Chapter 11,

22   I was being paid by an engagement from Jaker Investments to

23   be the candidate or chief restructuring advisor.

24          THE COURT:  How much were you paid by -- is it

25   Jaker?

Bryan - Court Examination

1        THE WITNESS:  Yes.  Jaker Investments was paying

2   me approximately thirty-two thousand a month.

3        THE COURT:  And how much did that entity pay you?

4        THE WITNESS:  It paid me approximate -- since --

5   they engaged me in January, so I was paid from January

6   through August.

7        THE COURT:  Okay.

8        And please describe to me your relationship, if

9   any, with Fame Trading.

10       THE WITNESS:  I have none.

11       THE COURT:  Do you have any type -- you or your

12  father have any type of an agreement to be paid a

13  commission or any other remuneration, based upon any

14  transaction or transactions with Fame?

15       THE WITNESS:  No, your Honor.

16       THE COURT:  I just heard testimony that there was

17  a five-percent commission that was to be paid to your

18  company of which you are a principal.

19       THE WITNESS:  It's not my -- it is to Jaker.  The

20  agreements state clearly that Jaker Investments, Limited is

21  the entity which has a five-percent commission.

22       THE COURT:  And do you share in that at all?

23       THE WITNESS:  No, your Honor.  Only in the salary

24  that I received my chief restructuring work.

25       THE COURT:  For which you have not been paid?

Bryan - Court Examination
1            THE WITNESS:  For the -- prior to the Chapter 11,

2    Jaker was paying me from the January period to August.

3            THE COURT:  And why did Jaker get -- what did

4    Jaker -- what was Jaker's arrangement with Fame?

5            THE WITNESS:  They got a five-percent commission

6    and then I believe another five percent on September 30th,

7    on or about September 30th.

8            THE COURT:  Five percent of what?

9            THE WITNESS:  Five percent of the aggregate amount

10   funded to the subsidiary or parent.

11           THE COURT:  Okay.

12           We know that at that time the facility was a

13   hundred and fifty thousand dollars to the debtor.

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  So it would have been five percent of

16   that amount.

17           THE WITNESS:  Yes, your Honor.

18           THE COURT:  And five percent of 8.5 million?

19           THE WITNESS:  No.  It would have just been five

20   percent of the amount funded of the 8.5 million.

21           THE COURT:  So it would be five percent of two

22   hundred and fifty-five thousand because that's funded to

23   AGI?

24           THE WITNESS:  Yes, your Honor.

25           THE COURT:  And five percent of more than four

Bryan - Court Examination

1   million dollars?

2           THE WITNESS:  Yes, your Honor.

3           THE COURT:  Okay.

4           And that was paid to Jaker?

5           THE WITNESS:  Yes, your Honor.

6           THE COURT:  And you received nothing from that?

7           THE WITNESS:  Absolutely nothing.

8           THE COURT:  And you have not -- when was that

9   commission paid to Jaker?

10          THE WITNESS:  I believe upon each funding.  Every

11  time that Jaker funded -- I mean Fame funded, Jaker

12  received its commission.

13          THE COURT:  All right.

14          Is Jaker to receive any type of a commission,

15  based upon the post-petition funding that is set forth in

16  the disclosure statement, which is new money of about three

17  million seven hundred and eighty-five thousand dollars?

18          THE WITNESS:  I believe so, your Honor.  I'm not

19  certain of that.  I'm not certain.

20          THE COURT:  It's not disclosed in the disclosure

21  statement.

22          THE WITNESS:  No, sir.  No, your Honor.

23          THE COURT:  What is the position of Jaker -- or

24  excuse me -- what is the relationship of Jaker with the

25  debtor?

Bryan - Court Examination

1          THE WITNESS:  It has just been -- just introduced

2    Fame Trading, the entity which was -- funded the loan.

3          THE COURT:  Why would it do that?

4          THE WITNESS:  Because they were a shareholder and

5    they were one of the original founders.

6          THE COURT:  That's my question.

7          Is it -- does Jaker have an equity interest in the

8    debtor?

9          THE WITNESS:  Jaker may or may not.  I don't know,

10   your Honor.  I'm not part of Jaker, so I don't know if

11   they're a shareholder or not.

12         THE COURT:  In the declaration it said that Jaker

13   introduced Fame to the debtor.

14         THE WITNESS:  Yes, your Honor.

15         THE COURT:  Through you?

16         THE WITNESS:  Not through me.  They had -- they

17   were also one of the founding shareholders.

18         THE COURT:  Of?

19         THE WITNESS:  Of Astrata.

20         THE COURT:  Okay.

21         So we know that --

22         THE WITNESS:  And so was Tim Harmon, the principal

23   of Fame.  So they knew each other from that time period.

24         THE COURT:  All right.

25         THE WITNESS:  They were both initial investors in

Bryan - Court Examination

1    the initial funding of the company.

2             THE COURT:  There was just a reference made to the

3    disclosure statement.  And let's pull that out.

4        (Pause in proceedings)

5             THE COURT:  Docket number 41-1.

6             MS. THOMAS:  At the top it says Page 7 of 85, your

7    Honor.

8             THE COURT:  I'm there.

9        (Pause in proceedings)

10            MS. THOMAS:  I have it marked in pink so you can

11   see it.

12            THE COURT:  Well, I -- .

13       (Pause in proceedings)

14            THE COURT:  This apparently -- Mr. Brill, when I

15   read the disclosure statement, as I understood what this

16   disclosure document was restructuring is what was

17   circulated as part of the out-of-court attempted

18   resolution.

19            Is that correct?

20            MR. BRILL:  That's correct, your Honor.

21            THE COURT:  Because it accompanies your letter of

22   July 16, 2009; isn't that correct?

23            MR. BRILL:  That's correct, your Honor.

24            THE COURT:  All right.

25            And this -- I did not study this in-depth because

Bryan - Court Examination

1  I was more concerned about what I had in front of me, and

2  since this was not approved I was more concerned about what

3  I would -- .

4          Now let me ask you this, Mr. Bryan.  Is there any

5  agreement or understanding that any of the equity that Fame

6  would acquire as a result of a confirmed plan of

7  reorganization, as proposed, would be subject to any right

8  by existing management, officers or directors to

9  participate?

10          THE WITNESS:  At this time there's no agreement

11  whatsoever.

12          THE COURT:  What does that mean --

13          THE WITNESS:  There is --

14          THE COURT:  -- at this time?

15          THE WITNESS:  Well, there's -- the -- the lender

16  Fame has discussed with management and said we want to have

17  you either post-petition or during the course of the

18  bankruptcy enter into agreements which would include

19  management getting an equity position in the company.

20          THE COURT:  That should be in a disclosure

21  statement, shouldn't it?

22          MR. BRILL:  The discussions, your Honor?

23          THE COURT:  I think that the fact that the lender

24  may in fact be encouraging management to enter into some

25  type of an arrangement where management may in fact obtain

Bryan - Court Examination

1  some equity in the reorganized debtor, I think that's

2  germane.

3          MR. BRILL:  Your Honor?

4          THE COURT:  And as a hypothetical investor, don't

5  you think I'd want to know that, Mr. Brill?

6          MR. BRILL:  Your Honor, the -- my understanding is

7  is that there's -- it was discussed there being a proposed

8  employee stock --

9          THE WITNESS:  -- stock option plan.

10         MR. BRILL:  -- stock option plan.  I did -- okay?

11         THE COURT:  The fact that that's even proposed, --

12         MR. BRILL:  No.  I'll -- I'll -- okay.  I'll --

13         THE COURT:  -- I think should be in there.

14         MR. BRILL:  Okay.  I'll add to the disclosure

15  statement that there's a proposed stock option plan of

16  which management may participate.

17         THE COURT:  I would like to know the terms of the

18  proposal.

19         MR. BRILL:  I -- your Honor, I don't know of any.

20         THE COURT:  I think you should find out.

21         MR. BRILL:  Okay.  I don't --

22         THE WITNESS:  What I have heard Fame say --

23         THE COURT:  I don't care what Fame -- I now know

24  there's a proposal.

25         Counsel for Fame is here.  I want the terms of

Bryan - Cross

1  that proposal in the disclosure statement.

2           MR. BRILL:  Yeah.  I don't know if there is --

3  well, I'll find out.

4           THE COURT:  Then just state --

5           MR. BRILL:  Okay.

6           THE COURT:  -- that I think that then that should

7  be disclosed that there was testimony that there may be a

8  stock option plan.  And upon further investigation either

9  place what the terms of the proposal were in the disclosure

10  statement or the fact that there will not be any such

11  proposal.

12           We need an answer to the question.

13           MR. BRILL:  Fine, your Honor.

14           THE COURT:  I think that's important.

15           MR. BRILL:  Okay.

16           THE COURT:  Do you have any questions?  I found

17  out a whole lot.  Do you have any questions?

18                         CROSS-EXAMINATION

19  BY MR. BRILL:

20  Q   Mr. Bryan, could you describe your describe your steps

21  that you've taken to try and obtain financing or a

22  transaction for Astrata in connection with the bankruptcy

23  case other than the Fame transaction?

24  A   Well, I'm really cur -- I'm really handling most of

25  those discussions.  I'm in discussions with two or three

Bryan - Cross

1  parties right now, at a fairly significant stage, to try to

2  create an alternative plan to the Fame, I'll call it the

3  Fame plan which is the plan that is the existing plan.

4       So we have ongoing discussions with two or three

5  of -- I guess it's exactly three groups, one of which is

6  more advanced than the other two.

7       And of course the Fame discussions, I've been in

8  ongoing negotiations with them.

9  Q   And Mr. Bryan, are you aware of the relationship

10 between the debtor and Tridex in connection with that

11 contract which has been referred to previously by the

12 previous witness?

13 A   Yes, I am.

14 Q   And --

15 A   As well as other customers.

16 Q   And do you know if --

17 A   And I've directly met with many of those customers.

18 Q   Right.

19      THE COURT:  Why don't you let your lawyer ask the

20 question.  Okay?

21      MR. BRILL:  Okay.  Yeah.

22 BY MR. BRILL:

23 Q   Did you travel to Singapore to meet with management of

24 the debtor?

25 A   Yes, on several occasions.

Bryan - Cross

1  Q    And was the Tridex contract discussed?

2  A    At length.

3  Q    And do you know if Mr. Harrison has met with the Tridex

4  parties?

5  A    Yes, he does on an -- on an infrequent basis.  There

6  are operational meetings virtually every week.

7  Q    And do you know the scope of that contract?

8  A    Yes, I do.  It's a contract to supply approximately six

9  hundred thousand tracking systems.

10 Q    And what is the estimate of the debtor -- or do you

11 know what the estimate of the subsidiary is to carry out

12 that contract, to perform that contract; how much it will

13 cost?

14 A    Approximately in the realm of about seventy million or

15 thereabouts.

16 Q    I'm sorry.  What's the --

17 A    Approximately seventy to seventy-five million dollars.

18 Q    I'm talking about the cost, I'm sorry, the cost to

19 perform the contract.

20 A    Yes.  The cost to perform.  So therefore the margin, is

21 that what you're asking?

22      THE COURT:  No.  He asked you the cost.  You

23 answered the question.

24      MR. BRILL:  Yes.  Okay.

25      THE WITNESS:  Yeah.  I think I answered.

91
                              Bryan - Cross
 1          THE COURT:  What would be the profit, assuming

 2   that's the cost?

 3          THE WITNESS:  The management estimate is anywhere

 4   between twenty-two million and about thirty million,

 5   depending on what the final contracts are for the

 6   suppliers.

 7          There's further costs for the actual manufacture,

 8   but since that's for the working capital to build the units

 9   and then supply them, there's a considerable cash flow to -

10   -for a 90-day period to do that.

11   BY MR. BRILL:

12   Q   Has the debtor suffered monetarily as a result of the

13   filing of the bankruptcy case in connection with the Tridex

14   contract?

15   A   Yes, it has.

16   Q   In what respect?

17   A   Tridex has already withheld several payments that they

18   usually make, which are approximately two hundred thousand

19   a month, and they've withheld the last two payments to the

20   total of four hundred thousand.

21          THE COURT:  Those payments go to Asia Pacific?

22          THE WITNESS:  Yes, they do.

23   BY MR. BRILL:

24   Q   And did they indicate that those payments would resume

25   once the debtor is out of bankruptcy?

Bryan - Cross

1  A    Once they -- the way they've termed it, once there's a

2  resolution and they're confident of how this is going to

3  turn out, how the bankruptcy process is going to -- that

4  it's not going to result in liquidation, that the company

5  will still be in business.

6         So there's great concern over what this is, if I

7  may say it that way.

8  Q    Mr. Bryan, are you aware of the fact that Vision has

9  contacted certain former employees and employees of Asia

10 Pacific?

11 A    Yes, I am.

12 Q    And what was the nature of that contact?

13 A    They've been working with a fellow by the name of Hoyt

14 Larsen, I believe that -- Liten--don't know how to

15 pronounce his last name--who was the former chief technical

16 officer, and a number of other employees and John Clough, a

17 gentleman by the name of Robin Littell whom they've been

18 sort of trying to assemble a management team that would be

19 sort of a replacement management team for the existing

20 team.

21 Q    And are you aware of any documentation that exists with

22 regard to agreement between Tridex and Mr. Harrison in

23 connection with his relationship and employment by Astrata?

24 A    Yes, I am.  There's an agreement -- or there an

25 agreement that --

                          Bryan - Cross
 1          MS. THOMAS:  Your Honor, again I --

 2          THE COURT:  He can tell me what he knows.

 3          MR. BRILL:  Yes.

 4          MS. THOMAS:  I think the agreement is subject to

 5  the best evidence rule, isn't it?

 6          THE COURT:  It would be.  And at some point --

 7          THE WITNESS:  Sure.

 8          THE COURT:  -- I'd like to see it.

 9          But he can tell me what he knows or his

10  understanding.

11          MR. BRILL:  Your Honor, if we're to produce the

12  agreement I would ask that it shown only in camera.  It's a

13  confidence -- that's a highly confident --

14          THE COURT:  There's way of dealing with that

15  pursuant to the rules.

16          MR. BRILL:  Yeah.  It's a highly confidential

17  agreement, your Honor.  So.

18          But you are aware --

19          THE COURT:  Well then, I don't want to hear any

20  testimony about it.

21          THE WITNESS:  Yeah.

22          MR. BRILL:  But I just wanted --

23          THE COURT:  That's fine.

24          MR. BRILL:  -- to establish that he's aware of it.

25          THE COURT:  I'm not going to listen now when he

94
Bryan - Cross

1    can't tell me about it.

2            MR. BRILL:  Right.

3            THE WITNESS:  Right.

4            THE COURT:  It doesn't make any sense to me.

5            MR. BRILL:  I don't have any further questions,

6    your Honor.

7            THE COURT:  Cross.

8                    CROSS-EXAMINATION

9    BY MS. THOMAS:

10   Q   Mr. Bryan, at the meeting of creditors you and I had

11   some dialogue about the issuance of preferred shares in

12   Astrata; correct?  I mean not Astrata, Asia Pacific;

13   correct?

14   A   I don't believe so about Asia Pacific.

15   Q   Well, recall that I discussed with you why it was that

16   during the pendency of the bankruptcy case shares had been

17   issued --

18   A   I don't believe we discussed that --

19   Q   -- out of Asia Pacific?

20   A   -- at the 341(a) meet -- hearing.

21   Q   And you said that there was a board of directors

22   meeting that approved it so you didn't need bankruptcy

23   court approval?

24   A   For the subsidiary loan?

25   Q   Yes, for the subsidiary shares.

Bryan - Cross

1  A   Correct.  For the renewal of the --

2

3  Q   Yeah.

4  A   -- subsidiary loan with Fame Trading.

5          The Fame Trading loan ended in August on its 90-

6  day initial term and it had to be renegotiated in order to

7  get more funding.

8          And that loan facility was renewed and at the

9  subsidiary level and the terms of that were negotiated and

10  the loan was renewed.  That's correct.

11  Q   Right.  And we discussed the fact that the warrants,

12  debentures, whatever there were issued to Fame during the

13  bankruptcy case, required approval of the board of

14  directors of Astrata; correct?

15  A   There were no warrants issued to Fame Trading.

16  Q   Isn't that -- a debenture was issued.  Correct?

17  A   A -- the loan was --

18  Q   Just yes or no, Mr. Bryan.

19  A   -- renewed.

20  Q   And a debenture was issued; correct?

21  A   A debenture was not.  It was renew -- no, it wasn't.  A

22  new debenture was not issued.

23          MR. DUNAGAN:  Preferred shares.

24  BY MS. THOMAS:

25  Q   Preferred shares were issued?

Bryan - Cross

1  A   Preferred shares were issued as part of the renewal of

2  the loan facility, that's correct.

3  Q   Okay.

4      And they were issued during the pendency of this

5  bankruptcy case; correct?

6  A   They were not issued at the AGI level, they were issued

7  at the Asia Pacific level.

8  Q   Right.  But the shares or the stockholder interest of

9  Asia Pacific is property of this bankruptcy estate; isn't

10 that true?

11 A   The common stock of the subsidiary is property of the

12 bankruptcy estate and that common stock was not interfered

13 with, the voting of that or no other impairment to that

14 common stock.

15 Q   I think -- Mr. Bryan, I think the answer to the

16 question was that preferred stock was issued to Asia

17 Pacific during the pendency of this bankruptcy estate.

18     THE COURT:  No, that's not true.  Preferred stock

19 was issued of Asia Pacific.

20     MS. THOMAS:  Of Asia Pacific.

21     THE WITNESS:  Correct.

22     MS. THOMAS:  Correct.

23     THE COURT:  And that's clear.  I've got the

24 exhibit.

25     THE WITNESS:  Right.

97

Bryan - Cross

1  BY MS. THOMAS:

2  Q    Now you discussed the relationship of Jaker Investments

3  to bringing Fame into this loan transaction.

4           You and your father, I believe, have a company

5  called Watley Investments?

6  A    Correct.  It's not my father.

7  Q    Okay.

8  A    My father --

9  Q    It's you.

10  A    -- retired from it in 2000.

11  Q    Okay.

12           So your father retired from Watley.  What was your

13  father's relationship with Astrata?

14  A    He was on the board of directors.

15  Q    Okay.

16           When was he put on the board of directors?

17  A    I believe in 2004, although I'm not exactly certain.

18  Q    Okay.

19           And how did that happen?

20  A    Mr. Harrison and Mr. Euler invited him to go onto the

21  board of directors.

22  Q    Okay.

23           Now what is the relationship between Watley and

24  Jaker?

25  A    There is no relationship other than an engagement.

Bryan - Cross

1   Q   Okay.

2         And what is the engagement?

3   A   The engagement is for me to provide chief restructuring

4   officer service -- or restructuring services as Jaker

5   requests since, I believe it was in January.  I'm not

6   exactly certain of the date it was signed.

7   Q   And Watley continues to have that engagement with

8   Jaker?

9   A   Watley does continue to have that engagement with

10  Jaker. although since the filing of the bankruptcy case it

11  has been really put on hold because now I've been actually

12  formally appointed as chief restructuring officer.

13  Q   Okay.

14        And what's the compensation that Watley gets

15  through that employment agreement with Jaker?

16  A   Watley was prior to the bankruptcy case being filed,

17  receiving I believe it was thirty-two or thirty-five

18  thousand dollars per month --

19  Q   Okay.

20  A   -- since January.

21  Q   Is there a commission component --

22  A   None.

23  Q   -- of the Watley relationship with Jaker?

24  A   No.

25  Q   Okay.

Bryan - Cross

1            I believe you said that you knew that there were

2   operational meetings between Tridex and Asia Pacific;

3   right?

4   A    Well, they're constantly --

5   Q    All right.

6   A    -- those are constant over a period time.

7   Q    Okay.

8            But you don't know of any executive meetings, at

9   the executive level?

10  A    Yes, I am.  There have been executive meetings.

11           THE COURT:  He said infrequent.

12  BY MS. THOMAS:

13  Q    Infrequent?

14  A    Correct.

15  Q    When was the last one?

16  A    As is normal.  Over the past two years --

17  Q    Now when --

18  A    -- my estimate would be every two months.

19  Q    Okay.

20           When was the last one?

21  A    Two months ago.

22  Q    Okay.

23           You've accused I believe Mr. Clough of interfering

24  with the relationship with Tridex; correct?

25  A    Can you repeat that?

Bryan - Cross

1   Q    Yes.  You -- I believe one of the allegations that the

2   debtor has made is that Mr. Clough, the independent

3   director, is attempting to interfere with the relationship

4   with Tridex?

5   A    I don't believe we've accused Mr. Clough of interfering

6   with the relationship with Tridex.  We've accused him of

7   other things, but I'm not sure -- I don't believe he's ever

8   met with nor discussed anything directly with Tridex.

9   Q    You don't know whether he has or not, do you?

10          THE COURT:  He just said he -- what he believed.

11  BY MS. THOMAS:

12  Q    You said you believe.  You don't know?

13  A    I believe.  I believe that and I believe that through

14  the --

15  Q    Do you know, Mr. Bryan?

16          THE COURT:  You asked him what he believed.

17          THE WITNESS:  Yeah.

18          THE COURT:  And he can tell you and he can tell

19  you why.

20          Go ahead.

21          THE WITNESS:  I believe that to be true because

22  our discussions as of this week with Tridex and their

23  representatives have been that they've never met with Mr.

24  Clough, nor never discussed this contract with him.

25  BY MS. THOMAS:

Bryan - Cross

1  Q    Who did you -- who at Tridex told you this this week?

2  A    Tridex's counsel and Tridex's --

3  Q    What -- excuse me.  Who is Tridex --

4  A    -- operational manager of this contract.

5  Q    Okay.

6           Who is Tridex's counsel?

7  A    I'm not -- I don't remember his name.  He works for a

8  law firm in Singapore.

9  Q    Okay.

10          And who is the manager?

11 A    Again I'd have to look at my notes to see what his name

12 is.

13          And I think they'd prefer to be fairly --

14          MS. THOMAS:  Could I have a minute?

15          THE COURT:  It doesn't matter.  I don't care what

16 they prefer.

17     (Discussion off the record between Ms. Thomas and Mr.

18 Uusiheimala)

19          MS. THOMAS:  Pass the witness.

20          THE COURT:  Redirect?

21          MR. BRILL:  None, your Honor.

22          THE COURT:  You may step down.

23          THE WITNESS:  Thank you, your Honor.

24          THE COURT:  Any further witnesses, Mr. Brill?

25          MR. BRILL:  No, your Honor.

1          THE COURT:  All right.  Then the evidentiary

2    portion of this hearing is concluded.

3          All right.  Here's what I understand, based upon

4    the evidence that I've read and the evidence that I've

5    heard and the documents that I've studied.

6          This is not all that remarkable.  We have a

7    governance dispute.

8          We have diametrically opposed rendition of how

9    this company finds itself in the position it is in based

10   upon a certain amount of speculation, misunderstanding and

11   probably a failure to be as open and transparent as one

12   would expect, probably the result of both parties being

13   very suspicious of the motive of the other parties.

14         One party believes that existing management has

15   acted in a manner that caused economic damage to the

16   corporation in furtherance of their own self-interest.

17         Present management doesn't think that's what

18   occurred.

19         I do not know what exactly would be the correct

20   evaluation of management's performance.

21         I am somewhat troubled by the fact that it would

22   appear that certain information that might be appropriate

23   and to be disclosed, consistent with the laws of the state

24   of the incorporation of the debtor and with the articles

25   and bylaws of the corporation, should be available.

1          However complaints about the failure to provide
2    that disclosure, when there has been no evidence other than
3    the testimony I heard today of the requests that were
4    denied, are problematic for me.
5          It should have been no surprise to Vision that the
6    debtor would be seeking the type of relief that it is
7    seeking today based upon the correspondence and the
8    rejection of the earlier plan that was attempted to be
9    arrived at consensually out of court.
10          It is of far more benefit to I think any trier of
11    fact to be aware prior to the time of the hearing of the
12    position taken in opposition to the requested relief.
13          I am fully cognizant of the short time period.
14    But I would point out the Court was able to read these
15    pleadings to be able to arrive at certain -- or to be able
16    to educate itself.
17          I was aware that there was no deadline for a
18    response to the order shortening time to consider the
19    request for a temporary restraining order.
20          But there had been a previous opposition to the ex
21    parte request for conditional approval of the disclosure
22    statement and still there's no opposition filed to the
23    disclosure statement in front of me.
24          If Vision intended or thought that it had the
25    ability to finance on the same terms as contained in the

1  disclosure statement, I would have expected to see

2  something that would indicate that.

3          Likely, in the same vein, I would have expected to

4  see some type of a response to the motion for debtor-in-

5  possession financing that Vision was prepared to go forward

6  on the same terms.

7          More than adequate notice was given regarding both

8  those matters.

9          And I think it is only appropriate to look at the

10  totality of the circumstances of this case at this point in

11  rendering a decision on the request for a temporary

12  restraining order.

13          I do not have any concrete proposal for any

14  alternate financing.

15          I understand the exclusivity period has not run.

16    But I have not received a request to limit exclusivity to

17  be able to propose a competing plan.

18          As stated, there was no response to the disclosure

19  statement nor to the request for debtor-in-possession

20  financing.

21          Certainly if there was impropriety regarding those

22  matters, I would have expected to have known about it.

23          Certainly there were reasons for Vision to be

24  suspicious, according to the testimony of its witness,

25  going back to June.  Yet, nothing was placed on the record

1 before me prior to today's hearing.

2        I have no idea of the relationship Mr. Clough has

3 or does not have with Tridex or any other customer, none.

4        I do have Mr. Harrison's declaration, and he is

5 not present to be cross-examined.

6        But TRO's can even be issued without notice.

7        Here, I've had testimony.

8        When one takes a look at the requirements and the

9 sliding scale utilized in the Ninth Circuit and then the

10 separate test that applies in a bankruptcy case, I am

11 persuaded that the debtors have satisfied -- the debtor has

12 satisfied its burden and that there should not be any

13 change in management unless and until that matter is

14 properly brought before the Court.

15        That the attempt to convert preferred shares to

16 common shares should be enjoined and, even it weren't, it

17 does not appear to me based upon representations made today

18 in open court by counsel for Vision that Vision would have

19 sufficient votes to remove the existing board in any event.

20 So I don't see any harm.

21        And I think that it would interfere with the

22 reorganization effort.

23        The reorganization effort does not necessarily

24 preclude participation by Vision.

25        There was enough information developed today that

1  would cause me to be concerned about compliance with all of

2  the requirements of 1129(a).

3          So I think maintaining the status quo through at

4  least the time of the hearing on the disclosure statement,

5  unless otherwise ordered prior to that time, preserves the

6  ability to reorganize while not causing any harm to Vision.

7          That there's no evidence that there would be any

8  harm to Vision but could be considerable irreparable

9  injury, and it would be likely to result in irreparable

10  injury, to the debtor.

11          So what I am doing is granting the temporary

12  restraining order through November 30th, the date of the

13  hearing on the plan.  At which time I'll conduct a status

14  conference regarding the injunctive relief.

15          I am not making any finding whatsoever regarding

16  any violation of the automatic stay.  That's actually

17  asking for declaratory relief, and I'm not going to do

18  that.

19          And I am also going to grant the temporary

20  restraining order through November 30th regarding enjoining

21  the attempt to convert preferred shares by Vision and do

22  common shares of the debtor.

23          So that I've made my findings and conclusions on

24  the record pursuant to Federal Rule of Bankruptcy Procedure

25  7052 that incorporates by reference Federal Rule of Civil

1  Procedure 52.

2         I'm instructing counsel for the debtor to prepare

3  findings and conclusions consistent with the oral findings

4  and conclusions that I've placed on the record, even the

5  earlier findings that I indicated prior to the taking of

6  the testimony.

7         And prepare a separate restraining order

8  consistent with Federal Rule of Bankruptcy Procedure 9019.

9         I'm granting it on both the basis of Federal Rule

10 of Civil -- Federal Rule of Bankruptcy Procedure 7065 as

11 well as Section 105 of the Code;

12        And pursuant to Federal Rule of Bankruptcy

13 Procedure 7065, I'm not requiring compliance with Rule

14 65(c) and there won't be the requirement of a posting of a

15 bond.

16        Now I'm also at this point now conducting a status

17 conference pursuant to 105(b) of the Code.

18        The debtor should engage in discussions with

19 Vision.

20        Reasonable requests for information should be

21 provided.

22        The people at Vision should be aware that just

23 because they have an equity interest does not mean that

24 they likewise are entitled to any type of extraordinary

25 relief.

1        That both parties -- actually all three, because

2    apparently conversations don't include the debtor because

3    the debtor is bereft of funds.

4        I think then if the discussions are at the

5    Fame/Vision level that those should take place and take

6    place soon.

7        Because it seems to me that the one over-arcing

8    matter of clarity is that the business relationships with

9    Asia Pacific's clients need to be preserved and protected.

10       There are ways, as we've indicated, of changing

11   ownership even within the plan process.  But what's the

12   point of having management of a holding company that holds

13   stock in a subsidiary that doesn't have an established

14   client base?

15       Neither Fame nor Vision wants that to occur.

16       And I would believe, and I am persuaded, that

17   Tridex and other customers and counterparties to contracts

18   might well be nervous about the pending bankruptcy and

19   concerned about how the bankruptcy may affect their

20   existing relationships.  Especially if there is

21   considerable sniping and dispute regarding corporate

22   issues.  That simply doesn't make a lot of sense to me.

23       But if there is not a consensual resolution, then

24   we will proceed in accord with the Bankruptcy Code, Federal

25   Rules of Bankruptcy Procedure.

1      (Pause in proceedings.

2              THE COURT:  I think I'm done.

3              Are there any questions?  Mr. Brill?

4              MS. THOMAS:  No, your Honor.

5              THE COURT:  Ms. Thomas?

6              MR. BRILL:  No, your Honor.

7              THE COURT:  Thank you.

8              Mr. Murtha?

9              MR. MURTHA:  Yes, your Honor.

10             THE COURT:  I need to ask you a question.

11             I've looked at the August 28, 2009 transaction as

12  much as I can based upon the documents that I have.

13             MR. MURTHA:  Yes.

14             THE COURT:  And I understand that there were

15  preferred shares in the subsidiary.

16             I am not sure that those shares are property of

17  the estate.  Under 541 I believe that the estate -- the

18  estate's interest is in the equity of Asia Pacific.

19             But obviously that equity is influenced by these

20  types of financial transactions.  I think that needs to be

21  looked at.

22             MR. MURTHA:  Understood, your Honor.

23             THE COURT:  That's part of what I'm saying.

24             MR. MURTHA:  Got the message.

25             THE COURT:  Thank you.

1         Thank you all very much.

2         MR. BRILL:  Thank you, your Honor.

3         THE COURT:  And we'll see you folks back here on

4    the 30th of November.

5         I need orders on all of those things, Mr. Brill.

6         MR. BRILL:  Yes, your Honor.

7         THE COURT:  As indicated.

8         COURTROOM DEPUTY:  All rise.

9     (Proceedings concluded at 11:51:50 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21                    <u>CERTIFICATE</u>

22

23         I certify that the foregoing is a correct

24    transcript from the digital sound recording of the

25    proceedings in the above-entitled matter.

```
 1
 2   /s/ Marjorie G. Davall                October 20, 2009
 3                         I N D E X
 4   WITNESSES:              Direct  Cross  Redirect  Recross
 5      Antti Uusiheimala      53     68      73
 6      Anthony J.A.B Bryan    77
 7         By Mr. Brill                88
 8         By Ms. Thomas               94
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

112

1

2

3